UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE ENGELMAYER

**XL SPECIALTY INSURANCE COMPANY,**

*Plaintiff,*

Civil Action No.

v.

12 CV 1598

**LEVEL GLOBAL INVESTORS, L.P.,
ANTHONY CHIASSON, GREGORY F.
BRENNER, DAVID GANEK, JOSEPH L.
CHIASSON and MICHAEL W. ALESSI**

COMPLAINT

*Defendants.*

RECEIVED
MAR 05 2012
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff XL Specialty Insurance Company ("XL"), for its Complaint against defendant

Level Global Investors, L.P. ("Level Global"), Anthony Chiasson ("A. Chiasson"), Gregory F.

Brenner ("Brenner"), David Ganek ("Ganek"), Joseph L. Chiasson ("J. Chiasson") and Michael

W. Alessi ("Alessi"), alleges as follows:

## NATURE OF THE ACTION

1.     XL brings this action for a declaratory judgment pursuant to 28 U.S.C. §§ 2201

and 2202 determining the parties' respective rights, duties and obligations under Financial

Services Liability Policy No. ELU 116664-10 issued by XL to Level Global for the policy period

April 21, 2010 to April 21, 2011 (the "Policy").  A true and correct copy of the Policy, including

the Application thereto (which, pursuant to both the Application's and the Policy's terms,

constitutes a part of the Policy), is attached as Exhibit A.

2.     XL seeks a declaratory judgment determining that the Policy provides no

coverage for any loss, including defense expenses, that have been incurred or may be incurred by

the defendants in connection with (i) parallel criminal and civil regulatory investigations of Level Global initiated by, respectively, the United States Attorney for the Southern District of New York (the "U.S. Attorney") and the Securities and Exchange Commission (the "SEC") (together, the "Investigations") and (ii) the two actions that have been filed to date in connection with those Investigations (the "Actions").

3.      Because XL has no obligation to provide coverage for any loss incurred by the defendants in connection with the Investigations and/or the Actions, XL further seeks recoupment of the amount of defense expenses paid to date, which were paid under a full reservation of rights, on behalf of the defendants in connection with the Investigations, *i.e.*, $7,451,816.74, plus interest on that amount.

## JURISDICTION AND VENUE

4.      The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1332, 2201 and 2202.  There is complete diversity between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.  The Court has personal jurisdiction over the defendants in this action.

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391.  Level Global maintains its principal place of business in this District, and a substantial part of the events or omissions giving rise to the claims at issue here occurred in this District.

## PARTIES

6.      Plaintiff XL is a Delaware corporation with its principal place of business in Stamford, Connecticut.

7.      On information and belief, defendant Level Global is an unregistered investment advisor with its principal place of business in New York, New York.

8.      On information and belief, defendant A. Chiasson is a co-founder of Level Global and resides in New York, New York.

9.      On information and belief, defendant Brenner is a former employee of Level Global and resides in Great Neck, New York.

10.     On information and belief, defendant Ganek is a co-founder of Level Global and resides in New York, New York.

11.     On information and belief, defendant J. Chiasson is a former employee of Level Global and resides in Andover, Massachusetts.

12.     On information and belief, defendant Alessi is a former employee of Level Global and resides in Plainview, New York.

## FACTS COMMON TO ALL COUNTS

### The Policy

13.     Subject to all of its terms, conditions and exclusions, the Policy provides a $10 million aggregate limit of liability under each of four Coverage Parts: The Investment Advisors Management Liability Coverage Part (the "IAML Coverage Part"), the Investment Advisors Professional Liability Coverage Part (the "IAPL Coverage Part"), the Investment Fund Management and Professional Liability Coverage Part (the "IFMPL Coverage Part") and the Employment Practices Liability Coverage Part (the "EPL Coverage Part"). Each Coverage Part is subject to a $1 million per-Claim retention and, as noted above, a $10 million limit of liability, and the Policy is further subject to a $10 million maximum aggregate limit of liability for all Claims under the Policy under any Coverage Part. Each Coverage Part provides certain coverage for Loss, including Defense Expenses, resulting from Claims first made against the Insureds during the Policy Period for Wrongful Acts.

14.     The Policy specifically incorporates and includes the Financial Services Liability

Policy Application (the "Application"), which was executed by Jeremy Bohrer of Level Global

on behalf of all Insureds on April 16, 2010, and submitted to XL on or about the same date. The

Application states: "THE INFORMATION CONTAINED AND SUBMITTED WITH THIS

APPLICATION IS ON FILE WITH THE INSURER AND, ALONG WITH THIS

APPLICATION, IS CONSIDERED TO BE PHYSICALLY ATTACHED TO THE POLICY

AND WILL BECOME PART OF THE POLICY IF ISSUED." Before issuing the Policy, XL

carefully reviewed the Application and attached materials, and in issuing the Policy it relied

upon the accuracy and integrity of all statements, representations and information included

therein.

15.     Question 8.b of the Application asks:

Is any person(s) or entity(ies) proposed for this insurance aware of any fact,
circumstance or situation which might afford valid grounds for any claim such as
would fall within the scope of the proposed insurance? (If "Yes," please explain
by attachment to this Application.)

This question was answered "no" on the Application.

16.     The Application further states, directly below Question 8.b and in bold print:

Without prejudice to any other rights and remedies of the insurer, any Claim
arising from any claims, facts, circumstances or situations required to be disclosed
in response to 8.a) or 8.b) above is excluded from the proposed insurance
(hereafter, the "Prior Knowledge Provision").

17.     As shown below, based on previously sealed information that recently has been

unsealed, XL has determined that Level Global's answer to Question 8.b of the Application was

false when made.

**The Investigations**

18.     By letter dated November 30, 2010, Aon Risk Insurance Services Central, Inc., on

behalf of Level Global, provided notice to XL that on November 22, 2010 the FBI had executed

a search warrant on Level Global's New York headquarters and that, on the same day, the U.S.
Attorney had issued a subpoena to Level Global in connection with the U.S. Attorney's
investigation of a number of hedge funds and/or mutual funds, including Level Global, regarding
certain funds' allegedly illegal use of material nonpublic information in executing securities
transactions in violation of the securities laws (the "U.S. Attorney Investigation").  Shortly
thereafter, Level Global advised XL that it had received a subpoena from the SEC in connection
with the SEC's parallel investigation of the same allegedly wrongful conduct (the "SEC
Investigation" and, together with the U.S. Attorney Investigation, as noted above, the
"Investigations").

19.     Level Global has sought coverage under the Policy for, among other things, the
attorneys' fees and costs that have been incurred or that would be incurred by Level Global, A.
Chiasson, Brenner, Ganek, J. Chiasson and Alessi and others in connection with the defense of
the Investigations.  XL acknowledged receipt of the Insureds' claim for coverage and, by letter
dated January 19, 2011, issued a complete reservation of rights with respect thereto.  In
particular, subject to its complete reservation of all rights under the Policy and at law, including
without limitation the right to deny coverage pursuant to the Policy's Prior Knowledge
Provision, XL agreed to reimburse and/or advance the Insureds' reasonable Defense Expenses in
excess of the applicable $1 million retention.  To date, XL has paid Defense Expenses on behalf
of the defendants in the aggregate amount of $7,451,816.74.

### The Adondakis Criminal Proceeding

20.     On or about April 25, 2011, the U.S. Attorney filed a sealed Information against
Spyridon Adondakis ("Adondakis") in the United States District Court for the Southern District

of New York (the "Adondakis Information"). The Adondakis Information was unsealed by order

dated January 18, 2012, and is attached hereto as Exhibit B.

21.    According to the Adondakis Information, Adondakis was a research analyst for "a

hedge fund based in New York, New York ('Hedge Fund A')" – *i.e.*, Level Global – during the

period 2006 through May 2010. The Adondakis Information charges him with one count of

Conspiracy to Commit Securities Fraud and one count of Securities Fraud.

22.    The Adondakis Information alleges that from at least in or about 2007 through in

or about 2010, Adondakis conspired to engage in insider trading; that in furtherance of the

conspiracy Adondakis and "one or more coconspirators at [Level Global]" obtained material,

non-public information ("Inside Information") from other coconspirators, including one or more

coconspirators at other hedge funds and investment firms (the "Hedge Fund/Investment Firm

Coconspirators"), for the purpose of executing profitable securities transactions on the basis of

Inside Information for the benefit of Level Global; that Adondakis and other coconspirators

utilized expert networking firms, including a firm whose main office was located in Mountain

View, California (the "Firm") to gain and/or facilitate access to employees at public companies

("Firm Consultants"); that the Firm's clients, including Level Global and other Hedge

Fund/Investment Fund Coconspirators, paid money to the Firm to gain access to the Firm

Consultants; that Adondakis and the Hedge Fund/Investment Fund Coconspirators obtained

Inside Information from public company employees, including the Firm Consultants, relating to

various technology companies whose shares are traded on public exchanges (the "Technology

Companies"); that Adondakis and the Hedge Fund/Investment Fund Coconspirators shared such

Inside Information by emails, and that Adondakis then forwarded by email and/or telephone that

Inside Information to one or more coconspirators at Level Global; and that, on the basis of that

Inside Information, the Level Global coconspirators executed transactions and caused others to execute transactions in the securities of the Technology Companies, earning substantial sums in unlawful profits.

23.     The Adondakis Information specifically alleges, by way of example, that:

- In advance of Dell, Inc.'s ("Dell") March 29, 2008 quarterly earnings announcement, Adondakis received Inside Information indicating that Dell's revenue and margin numbers would be higher than the prevailing expectations, and he provided that Inside Information to one or more of the Level Global coconspirators.

- Based at least in part on that Inside Information, one or more of the Level Global coconspirators purchased or caused to be purchased approximately 1.7 million shares of Dell stock and certain option contracts in Dell, which shares and contracts were subsequently sold by Level Global at a profit of over $4 million.

- In advance of Dell's August 28, 2008 quarterly announcement, Adondakis received Inside Information indicating that Dell's gross margins would be materially lower than the prevailing market expectations, and he provided that Inside Information to one or more of the Level Global coconspirators.

- Based at least in part on that Inside Information, one or more of the Level Global coconspirators sold short approximately nine million shares of Dell stock and purchased certain option contracts in Dell, which shares and contracts were subsequently sold by Level Global at a profit of over $50 million.

**The Adondakis Plea Agreement**

24.     On April 25, 2011, Adondakis pled guilty to both counts set forth in the Adondakis Information – *i.e.*, Conspiracy to Commit Securities Fraud and Securities Fraud. The Adondakis guilty plea was presented to the Court in a closed proceeding and, like the Adondakis Information, the transcript of that proceeding (the "Transcript") and the plea agreement itself (the "Adondakis Plea Agreement") were ordered sealed. Both the Plea Agreement and the Transcript were unsealed by order dated January 18, 2012, and they are attached hereto, respectively, as Exhibits C and D.

25.     Prior to pleading guilty to both charges in the Adondakis Information, Adondakis – who holds a Master's degree from the Wharton School of Business of the University of Pennsylvania – received a copy of the Information from his defense counsel and, as evidenced in the Transcript, testified that he fully understood the charges against him. He further testified that he was pleading guilty of his own free will and that he was doing so because he was in fact guilty of both charges. In particular, he testified as follows with respect to his illegal activity:

> THE COURT:  All right, fine.  So tell me what you did wrong in connection with the conspiracy Count One.
>
> THE DEFENDANT:  From 2007 to 2010, in Manhattan, I agreed with others to commit securities fraud.  Namely, I agreed to obtain, directly and indirectly, material non-public information from employees of public companies.  I knew that the inside information I received was disclosed by the company employees in violation of duties of trust and confidence.  I agreed to share that information with the other individuals at other companies as well as with others at the hedge fund where I worked.  When I gave the inside information to others at the hedge fund where I worked, I knew the information would be used to execute trades. Moreover, I did in fact obtain such information and provide it to others.  For example, on August 27, 2008, I spoke with others at the hedge fund where I worked and discussed with them inside information that I obtained directly from an employee at del [sic].
>
> THE COURT:  That's Count One.  What did you do wrong concerning Count Two?

THE DEFENDANT: From 2007 to 2010, in Manhattan, I committed securities fraud in that I obtained, directly and indirectly, material non-public information from employees of public companies in violation of those employees' duties of trust and confidence. I then provided such information to others at other companies as well as to others at the hedge fund where I worked, and that information was used to execute trades.

THE COURT: And you knew that this conduct was against the law, is that correct?

THE DEFENDANT: Yes.

### The Recently Filed Actions

26.     On January 18, 2012, the same day that the Adondakis Information and the Adondakis Plea Agreement were unsealed, the SEC filed a Complaint in the action captioned *Securities and Exchange Commission v. Spyridon Adondakis, et al.*, No. 12 CIV 0409 (S.D.N.Y.) (the "SEC Action"). The Complaint in the SEC Action asserts claims arising from what the SEC describes as "insider trading by members of a network of closely associated hedge fund traders who illegally obtained nonpublic information concerning public companies Dell, Inc. ("Dell") and/or Nvidia Corporation ("Nvidia"), exchanged that information with others, and reaped massive profits from trading on that information." The named defendants are Adondakis, A. Chiasson, Level Global, Diamondback Capital Management, LLC, Sandeep Goyal ("Goyal"), Jon Horvath ("Horvath"), Danny Kuo ("Kuo"), Todd Newman ("Newman") and Jesse Tortora ("Tortora").

27.     The SEC's Complaint alleges, among other things, that during 2008 a Dell insider passed material nonpublic information regarding Dell to defendant Goyal; that Goyal then passed that information to defendant Tortora; that Tortora in turn passed that information to defendant Adondakis; and that Adondakis then provided that information to defendant A. Chiasson. The Complaint sets forth in detail the dates on which Adondakis allegedly provided the Dell inside information to A. Chiasson (including but not limited to the August 27, 2008 communication that

Adondakis specifically admitted and pled guilty to in his plea allocution), the manner in which

that information was provided, and the allegedly illegal transactions in Dell securities and/or

option contracts that were subsequently executed by Level Global. The Complaint also alleges

that Adondakis advised A. Chiasson that "the Dell information had originated from a source

inside Dell," and that A. Chiasson caused Level Global to trade Dell securities based on the

inside information he had received from Adondakis (including but not limited to the inside

information that Adondakis admitted he communicated to a Level Global coconspirator on

August 27, 2008), thereby causing the Company's hedge funds to reap profits totaling

approximately $57 million. The Complaint similarly alleges that Adondakis provided A.

Chiasson with material nonpublic information regarding Nvidia, thereby enabling Level Global

to execute trades in Nvidia securities that allowed it to illegally reap profits and avoid losses of at

least $15.6 million.

     28.     On January 17, 2012, a sealed Complaint was filed in the United States District

Court for the Southern District of New York in the proceeding captioned *United States of*

*America v. Todd Newman, et al.* (the "Criminal Action" and, together with the SEC Action, as

noted above, the "Actions"). The Complaint in the Criminal Action, which was unsealed on

January 18, 2012, names A. Chiasson as a defendant, as well as Newman, Horvath and Kuo.

     29.     The Complaint in the Criminal Action is based, in significant part, on the sworn

statement of FBI Special Agent David Makol and on information provided to him by Adondakis,

as well as information provided to him by Tortora and Goyal. Among other things, the

Complaint alleges that Adondakis provided A. Chiasson with the material nonpublic information

regarding Dell that is identified in the Adondakis Information and in the Complaint in the SEC

Action (including but not limited to the Dell inside information that Adondakis admitted he

communicated to a Level Global coconspirator on August 27, 2008), and that "[A.] Chiasson, along with others at [Level Global], caused [Level Global] to execute securities transactions based in whole or in part on the Dell Inside Information in advance of Dell's first and second quarter 2008 earnings announcements, resulting in approximately $57 million in illegal profits."

## FIRST CAUSE OF ACTION
## FOR DECLARATORY JUDGMENT

30.     XL repeats and realleges each and every allegation set forth in paragraphs 1 through 29, inclusive, as though fully set forth herein.

31.     Question 8.b of the Application asks:

Is any person(s) or entity(ies) proposed for this insurance aware of any fact, circumstance or situation which might afford valid grounds for any claim such as would fall within the scope of the proposed insurance? (If "Yes," please explain by attachment to this Application.)

This question was answered "no" on the Application.

32.     The Application further states:

Without prejudice to any other rights and remedies of the insurer, any Claim arising from any claims, facts, circumstances or situations required to be disclosed in response to 8.a) or 8.b) above is excluded from the proposed insurance (as noted above, the "Prior Knowledge Provision").

33.     Adondakis is an Insured within the meaning of the Policy.

34.     As evidenced in the Adondakis Information, the Adondakis Plea Agreement and the Transcript of the April 25, 2011 hearing on Adondakis' guilty plea, as of April 16, 2010 – the date on which the Application for the Policy was executed – Adondakis was aware that, in violation of the securities laws, he had obtained on multiple occasions material nonpublic information and that on multiple occasions (including but not limited to the August 27, 2008 communication to a Level Global coconspirator that Adondakis admitted in his plea allocution) he had provided material nonpublic information to one or more Level Global coconspirators,

thereby enabling Level Global to execute unlawful trades and to gain illegal profits of, at a minimum, well over $50 million.

35.    Adondakis was necessarily aware, as of April 16, 2010, of fact(s), circumstance(s) and/or situation(s) which might afford valid grounds for a claim against him, Level Global and/or the Level Global coconspirator(s) to whom he disclosed material nonpublic information in violation of the securities laws.

36.    Such fact(s), circumstance(s) and situation(s) were required to be disclosed in response to Question 8.b of the Application.

37.    The Investigations and the Actions arise from the fact(s), circumstance(s) and situation(s) of which Adondakis was aware, and which were required to be disclosed in response to Question 8.b of the Application.

38.    Pursuant to the Prior Knowledge Provision, the Policy provides no coverage for any loss incurred by any Insureds in connection with the Investigations and/or the Actions.

39.    By virtue of the foregoing, XL is entitled to a judgment declaring that the Policy does not provide coverage for any loss, including any Defense Expenses, incurred by any Insureds in connection with the Investigations or the Actions.

## SECOND CAUSE OF ACTION
## FOR RESTITUTION

40.    XL repeats and realleges each and every allegation set forth in paragraphs 1 through 39, inclusive, as though fully set forth herein.

41.    Because XL is not obligated under the Policy to pay any of the Insureds' Defense Expenses in connection with the Investigations, XL is entitled to a money judgment against each of Level Global, A. Chiasson, Brenner, Ganek, J. Chiasson and Alessi for restitution of all

Defense Expenses paid to date, respectively, on behalf of each defendant, plus pre- and post-judgment interest.

## PRAYER FOR RELIEF

**WHEREFORE**, XL prays for judgment against the defendants as follows:

## ON THE FIRST AND SECOND CAUSES OF ACTION:

1.    That the Court enter judgment declaring that the Policy does not provide coverage for any loss incurred by the defendants in connection with the Investigations and/or the Actions;

2.    That the Court award XL the full amount of all Defense Expenses it has paid to date on behalf of each Insured in connection with the Investigations, plus pre- and post-judgment interest;

3.    That the Court award XL all of its costs and expenses incurred in this matter, including reasonable attorneys' fees; and

4.    Such other and further relief as the Court deems just, necessary and proper.

DATED:  March 5, 2012          Respectfully submitted,
          New York, NY

By _____
          TROUTMAN SANDERS LLP
          Lee W. Stremba, Esq.
          Brett D. Goodman, Esq.
          The Chrysler Building
          405 Lexington Avenue
          New York, NY   10174-0700
          (212) 704-6000

          TROUTMAN SANDERS LLP
          John W. Duchelle, Esq. (*pro hac vice* application pending)
          Whitney Lindahl, Esq. (*pro hac vice* application pending)
          401 Ninth Street, N.W., Suite 1000
          Washington, DC   20004
          (202) 274-2950



**FINANCIAL SERVICES LIABILITY POLICY DECLARATIONS**

**Policy Number:**     **ELU116664-10**

**Renewal of Number**

**XL Specialty Insurance Company**

Members of the XL America Companies

> **FINANCIAL SERVICES LIABILITY**
> **POLICY DECLARATIONS**

Executive Offices
70 Seaview Avenue
Stamford, CT 06902-6040
Telephone 877-953-2636

**THIS IS A CLAIMS MADE POLICY. EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS POLICY ONLY APPLIES TO CLAIMS FIRST MADE DURING THE POLICY PERIOD OR, IF APPLICABLE, THE OPTIONAL EXTENTION PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY THE PAYMENT OF DEFENSE EXPENSES. THIS POLICY DOES NOT PROVIDE FOR ANY DUTY BY THE INSURER TO DEFEND ANY INSURED. PLEASE READ AND REVIEW THE POLICY CAREFULLY.**

| | |
|---|---|
| **Item 1.** | **Name and Mailing Address of Named Insured:** |

Level Global Investors L.P.
888 7th Avenue
27th Floor
New York, NY  10019

| | | | | | |
|---|---|---|---|---|---|
| **Item 2.** | **Policy Period:** | **From:** | April 21, 2010 | **To:** | April 21, 2011 |

At 12:01 A.M. Standard Time at your Mailing Address Shown Above

**Item 3.**     **Limits of Liability:**

| | | |
|---|---|---|
| (a) | $10,000,000 | Maximum Aggregate Limit of Liability each **Policy Period** (including **Defense Expenses**) for all **Claims** under the Investment Advisers Management Liability Coverage Part |
| (b) | $10,000,000 | Maximum Aggregate Limit of Liability each **Policy Period** (including **Defense Expenses**) for all **Claims** under the Investment Advisers Professional Liability Coverage Part |
| (c) | $10,000,000 | Maximum Aggregate Limit of Liability each **Policy Period** (including **Defense Expenses**) for all **Claims** under the Investment Fund Management and Professional Liability Coverage Part |
| (d) | $10,000,000 | Maximum Aggregate Limit of Liability each **Policy Period** (including **Defense Expenses**) for all **Claims** under the Employment Practices Liability Coverage Part |
| (e) | $10,000,000 | Maximum Aggregate Limit of Liability each **Policy Period** (including **Defense Expenses**) for all **Claims** under the Policy |

**Item 4.**     **Retentions:**

| | | |
|---|---|---|
| (a) | $0 | each **Insured Person** under any Coverage Part, but only for **Loss** as to which indemnification by the **Adviser, Investment Fund,** or **Company** is not legally permissible or is not made solely by reason of financial insolvency |
| (b) | $1,000,000 | each **Claim** under the Investment Advisers Management Liability Coverage Part |
| (c) | $1,000,000 | each **Claim** under the Investment Advisers Professional Liability Coverage Part |

## FINANCIAL SERVICES LIABILITY POLICY DECLARATIONS

(d)     $1,000,000   each **Claim** under the Investment Fund Management and Professional Liability Coverage Part

(e)     $1,000,000   each **Claim** under the Employment Practices Liability Coverage Part

---

**Item 5.**   **Optional Extension Period:**

Premium for One Year Optional Extension Period:          $500,000.00

---

**Item 6.**   **Pending and Prior Proceeding Date(s):**

(a)     April 21, 2010     for the Investment Advisers Management Liability Coverage Part
(b)     April 21, 2010     for the Investment Advisers Professional Liability Coverage Part
(c)     April 21, 2010     for the Investment Fund Management and Professional Liability Coverage Part
(d)     April 21, 2010     for the Employment Practices Liability Coverage Part

---

**Item 7.**   **Notices required to be given to the Insurer must be addressed to:**

XL Professional Insurance
100 Constitution Plaza, 17th Floor
Hartford, CT  06103
Toll Free Telephone: 877-953-2636

---

**Item 8.**   **Premium:**

Taxes, Surcharges or Fees:            $0.00
Total Policy Premium:            $250,000.00

---

**Item 9.**   **Policy Forms and Endorsements Attached at Issuance:**

| Manuscript 10927 07 10 | Manuscript 10923 07 10 | Manuscript 10924 07 10 |
| Manuscript 10925 07 10 | Manuscript 10926 07 10 | XL 80 24 03 03 |
| FD 72 08 11 06 | FD 72 07 11 06 | FD 72 10 11 06 |
| FD 72 09 11 06 | FD 72 06 11 06 | FD 80 06 09 00 |

---

THESE **DECLARATIONS** AND THE POLICY, WITH THE ENDORSEMENTS, ATTACHMENTS, AND THE **APPLICATION** SHALL CONSTITUTE THE ENTIRE AGREEMENT BETWEEN THE INSURER AND THE **INSURED** RELATING TO THIS INSURANCE.

---

**XL Specialty Insurance Company**

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

# GENERAL TERMS AND CONDITIONS

**THIS IS A CLAIMS MADE POLICY WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY. PLEASE READ AND REVIEW THE POLICY CAREFULLY. THESE GENERAL TERMS AND CONDITIONS APPLY TO ALL APPLICABLE COVERAGE PARTS. IF THERE IS A CONFLICT BETWEEN THESE GENERAL TERMS AND CONDITIONS AND THE TERMS AND CONDITIONS OF ANY APPLICABLE COVERAGE PART, THE TERMS AND CONDITIONS OF THE APPLICABLE COVERAGE PART SHALL APPLY. THE PROVISIONS OF EACH COVERAGE PART SHALL APPLY ONLY TO THAT PARTICULAR COVERAGE PART AND SHALL IN NO WAY BE CONSTRUED TO APPLY TO ANY OTHER COVERAGE PART OF THIS POLICY.**

**In consideration of the payment of the premium, and in reliance on all statements made and information furnished to the Company identified in the Declarations (hereinafter the Insurer), including the Application, and subject to all of the terms, conditions and limitations of all of the provisions of this Policy, the Insurer and the Insureds agree as follows:**

**I.      GENERAL DEFINITIONS**

(A)     **"Application"** means:

      (1)      the **Application** attached to and forming part of this Policy; and

      (2)      any materials submitted therewith, which shall be retained on file by the Insurer and shall be deemed to be physically attached to this Policy.

(B)     **"Claim"** means:

      (1)      any written notice or demand for monetary or non-monetary relief (including but not limited to a request to toll or waive any statute of limitations) commenced by the receipt of such notice, demand, or request;

      (2)      any civil, administrative or regulatory proceeding commenced by the filing of a notice of charges, service of complaint or similar document or any arbitration proceeding;

      (3)      any criminal proceeding which is commenced by the return of an indictment or the filing of an information or similar document;

      (4)      any arbitration proceeding, mediation or other alternative dispute resolution proceeding;

      (5)      any civil, criminal, administrative or regulatory investigation by a federal, state, local or foreign government authority, agency (including without limitation an investigation by the Equal Opportunity Commission, Securities and Exchange Commission, Commodity Futures Trading Commission, Federal Reserve, Department of Justice, Monetary Authority of Singapore, Financial Services Authority, Department of Labor, Pension Benefit Guaranty Corporation or Grand Jury, and any successor organizations), or self regulatory organization (including, without limitation, any stock or commodities exchange, the National Association of Securities Dealers Inc., and any successor organizations) after service of a subpoena, Wells Notice, notice of investigation, civil investigative demand, "target letter" (within the meaning of Title 9, §11.151 of the United States Attorney's Manual) or other similar document or notification;

      (6)      any written request or other written statement seeking extradition or rendition of an Insured commenced by the receipt of such written request or statement; or

Manuscript 10927 07 10

(7)      any foreign document equivalent of any of the foregoing.

(C)      **"Defense Expenses"** means reasonable legal fees and expenses incurred in the defense of any **Claim** including the premium for an appeal bond, attachment bond or similar bond but will not include applying for or furnishing such bond.  **Defense Expenses** will not include any **Insured's** overhead expenses or any salaries, wages, fees, or benefits of its directors, officers, trustees or employees.

(D)      **"Insured"** shall have the meaning given to that term in each Coverage Part attached hereto.

(E)      **"Insured Person"** shall have the meaning given to that term in each Coverage Part attached hereto.

(F)      **"Interrelated Wrongful Acts"** means **Wrongful Acts** which are based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any of the same or related or series of related facts, circumstances, situations, transactions or events.

(G)      **"Loss"** means damages, judgments (including pre-/post judgment interest), settlements or other amounts (including punitive or exemplary damages where insurable by law) in excess of the Retention that the **Insured** is obligated to pay, and **Defense Expenses**, whether incurred by the Insurer or the **Insured**, in excess of the Retention.  **Loss** (other than Defense Expenses) will not include:

(1)      matters which are uninsurable under the law pursuant to which this Policy is construed; and

(2)      fines, penalties or taxes imposed by law,

NOTE 1:  fines and penalties pursuant to Section 2(g)(2)(B) of the Foreign Corrupt Practices Act, 15 U.S.C. §78-2(g)(2)(B) or Section 30A of the Securities Act of 1934, as amended, shall be include Loss where insurable by law.

**NOTE 2:** With respect to judgments in which punitive or exemplary damages are awarded, the coverage provided by this Policy shall apply to the broadest extent permitted by law.  If, based on the written opinion of counsel for the **Insured**, punitive damages are insurable under applicable law the Insurer will not dispute the written opinion of counsel for the **Insured.**

The Insurer shall not assert that the portion of any settlement of any Claim relating to alleged violations of Sections 11, 12 or 15 of the Securities Act of 1933, as amended, would constitute uninsurable loss."

(H)      **"Named Insured"** means the entity named in ITEM 1 of the Declarations.

(I)      **"Policy Period"** means the period from the Inception Date to the Expiration Date set forth in ITEM 2 of the Declarations or to any earlier cancellation date.

(J)      **"Subsidiary"** means any entity during any time in which the **Named Insured** owns, directly or through one or more **Subsidiary(ies)**, more than fifty percent (50%) of the outstanding securities representing the present right to vote for the election of such entity's directors.

(K)      **"Wrongful Act"** shall have the meaning given to that term in each Coverage Part attached hereto.

**II.      GENERAL CONDITIONS**

**(A)      LIMIT OF LIABILITY, RETENTIONS AND INDEMNIFICATION**

(1)  The amounts set forth in ITEM 3(a) – 3(d) of the Declarations as the Maximum Aggregate Limit of Liability for each Coverage Part shall be the Maximum Aggregate Limit of Liability of the Insurer under such Coverage Part for all **Loss**, including **Defense Expenses**, from all **Claims** made or deemed made under such Coverage Part during the **Policy Period**. Each such amount shall be part of, and not in addition to, the amount set forth in ITEM 3(e) of the Declarations as the Maximum Aggregate Limit of Liability under the Policy for all **Loss** from all **Claims** for which this Policy provides coverage.

(2)  **Defense Expenses** incurred by the Insurer or by the **Insured** in defense of a **Claim** will be part of and not in addition to the Insurer's Limits of Liability, and payment of **Defense Expenses** by the Insurer will reduce and may exhaust the Limits of Liability.

(3)  If coverage is available for a **Claim** under more than one Coverage Part, the maximum applicable Limit of Liability for such **Claim** shall be the largest applicable remaining Limit of Liability under only one of the applicable Coverage Parts.

(4)  With respect to a **Claim** under any Coverage Part attached hereto, the Insurer shall only pay **Loss** which is in excess of the amount set forth in ITEM 4 of the Declarations as the Retention applicable to each **Claim** under the applicable Coverage Part.  If different Retentions are applicable to different parts of any **Loss** under this Policy, the applicable Retention will be applied separately to each part of such **Loss**, and the sum of such Retentions will not exceed the largest applicable Retention set forth in ITEM 4 of the Declarations.

(5)  For purposes of determining whether any **Insured Person** is indemnified, within the meaning of any Insuring Agreement of this Policy, any **Insured Person** will be deemed to be indemnified to the fullest extent permitted by the terms of the applicable partnership agreement, corporate governance or other organizational documents in effect as of the inception date of this Policy of the **Adviser** or **Insured Entity** that is responsible for indemnifying such **Insured Person**, unless and during such time that any such **Adviser** or **Insured Entity** experiences **Financial Insolvency**, in which case no Retention shall apply.

If any of the aforementioned organizational documents are amended subsequent to the inception date noted in ITEM 2 of the Declarations, coverage under this policy related to such updated organizational document(s) shall be subject to the Insurer's review and approval of such amendments. Absent Insurer approval of any such amendments, coverage under this General Conditions (A)(5) shall revert back to organizational document(s) in effect as of the policy's inception date noted in ITEM 2 of the Declarations.

(B)  **DEFENSE, SETTLEMENT AND ALLOCATION OF LOSS**

(1)  It shall be the duty of the **Insureds** to defend any **Claim** under this Policy.

(2)  No **Insured** may incur any **Defense Expenses** or admit any liability for, make any settlement offer with respect to, or settle any **Claim** without the Insurer's consent, such consent not to be unreasonably withheld.  The Insurer will have the right to make investigations and conduct negotiations and, with the consent of the **Insured**, enter into such settlement of any **Claim** as the Insurer deems appropriate.

(3)  The Insurer shall advance covered **Defense Expenses** on a current basis.  The Insurer shall advance such covered **Defense Expenses** no later than 90 days (in the case of an **Insured Person**, 60 days) after receipt of written notice of such costs by the Insurer.

(4)  Notwithstanding GENERAL CONDITIONS (B)(2) above, the **Insured** may settle any **Claim** without the Insurer's prior written consent if the total **Loss**, including **Defense Expenses**, resulting from such **Claim** does not exceed fifty percent (50%) of the amount of the applicable Retention set forth in ITEM 4 of the Declarations; provided, however, the **Insured** must promptly advise the Insurer of any such

settlement and provide any information in connection therewith that the Insurer may request.  If the **Insured** reasonably expects that the total **Loss**, including **Defense Expenses**, resulting from any **Claim** will exceed fifty percent (50%) of the applicable retention, the Insurer shall have the right to participate in any settlement negotiations, and the **Insured** agrees to obtain the consent of the Insurer prior to making any settlement offer or responding to any settlement demand.

(5)     If both **Loss** covered by this Policy and loss not covered by this Policy are incurred, either because a **Claim** made against the **Insured** contains both covered and uncovered matters, or because a **Claim** is made against both the **Insured** and others not insured under this Policy, the **Insured** and the Insurer will use their best efforts to determine a fair and appropriate allocation of **Loss** between that portion of **Loss** that is covered under this Policy and that portion of loss that is not covered under this Policy.  Additionally, the **Insured** and the Insurer agree that in determining a fair and appropriate allocation of **Loss**, the parties will take into account the relative legal and financial exposures of, and relative benefits obtained in connection with the defense and/or settlement of the **Claim** by, the **Insured** and others.

(6)     In the event that an agreement cannot be reached between the Insurer and the **Insured** as to an allocation of **Loss**, as described in GENERAL CONDITIONS (B)(4), the Insurer shall advance that portion of **Loss** which the **Insured** and the Insurer agree is not in dispute until a final amount is agreed upon or determined pursuant to the provisions of this Policy and applicable law.

(C)     **NOTICE**

(1)     As a condition precedent to any right to payment under this Policy, the **Insured** shall give written notice to the Insurer of any **Claim** as soon as practicable after it is first made, but in no event later than thirty (30) days after the expiration of the Policy Period.

(2)     If, during the **Policy Period**, the **Insured** first becomes aware of a specific **Wrongful Act**, and if, during the **Policy Period**, the **Insured**:

(a)     provides the Insurer with written notice of the specific **Wrongful Act**, the consequences which have resulted or may result therefrom (including but not limited to actual or potential damages), the identities of the potential claimants, and the circumstances by which the **Insured** first became aware of such **Wrongful Act**; and

(b)     requests coverage under this Policy for any subsequently resulting **Claim** for such **Wrongful Act**;

then any **Claim** subsequently made arising out of such **Wrongful Act** will be treated as if it had been first made during the **Policy Period**.

(3)     All notices under GENERAL CONDITIONS (C)(1) and (2) must be sent by certified mail or the equivalent to the address set forth in ITEM 7 of the Declarations; Attention: Claim Department.

(D)     **INTERRELATED CLAIMS**

All **Claims** arising from **Interrelated Wrongful Acts** shall be deemed to constitute a single **Claim** and shall be deemed to have been made at the earliest time at which the earliest such **Claim** is made or deemed to have been made pursuant to GENERAL CONDITIONS (C)(1) or, if applicable, GENERAL CONDITIONS (C)(2).

(E)     **OTHER INSURANCE**

All **Loss** payable under this Policy will be specifically excess of, and will not contribute with, any other insurance, including but not limited to any insurance under which there is a duty to defend, unless such other insurance is specifically excess of this Policy.  This Policy will not be subject to the terms of any other insurance policy.

(F)   **CANCELLATION AND RENEWAL OF COVERAGE**

(1)   Except for the nonpayment of premium, as set forth in (F)(2) below, the **Named Insured** has the exclusive right to cancel this Policy.  Cancellation may be effected by mailing to the Insurer written notice when such cancellation shall be effective, provided the date of cancellation is not later than the Policy Expiration Date set forth in ITEM 2 of the Declarations.  In such event, the Insurer shall retain the customary short rate portion of the earned premium.  Return or tender of the unearned premium is not a condition of cancellation.

(2)   The Insurer may only cancel this Policy for nonpayment of premium.  The Insurer will provide not less than ten (10) days written notice stating when the Policy will be cancelled.  Notice of cancellation will be sent to the **Named Insured** and the agent of record for the **Insured**, if applicable.

(3)   The Insurer is under no obligation to renew this Policy upon its expiration.  Once the Insurer chooses to non-renew this Policy, the Insurer will deliver or mail to the **Named Insured** written notice stating such at least sixty (60) days before the Policy Expiration Date set forth in ITEM 2 of the Declarations.

(G)   **OPTIONAL EXTENSION PERIOD**

(1)   If either the **Named Insured** or the Insurer does not renew this Policy, the **Named Insured** shall have the right, upon payment of an additional premium set forth in ITEM 5 of the Declarations, to a one or two year extension of the coverage provided by this Policy with respect only to any **Claim** first made during the one or two year period of time after the Policy Expiration Date, but only with respect to **Wrongful Acts** occurring prior to the Policy Expiration Date.

(2)   As a condition precedent to the right to purchase the Optional Extension Period the total premium for this Policy must have been paid in full.  The right of the **Named Insured** to purchase the Optional Extension Period will be immediately terminated if the Insurer does not receive written notice by the **Named Insured** advising it wishes to purchase the Optional Extension Period together with full payment of the premium for the Optional Extension Period within thirty (30) days after the Policy Expiration Date.

(3)   If the **Named Insured** elects to purchase the Optional Extension Period as set forth in (G)(1) and (2) above, the entire premium for the Optional Extension Period will be deemed to be fully earned at the Inception Date of the Optional Extension Period.

(4)   The purchase of the Optional Extension Period will not in any way increase the Limits of Liability set forth in ITEM 3 of the Declarations, and the Limits of Liability with respect to **Claims** made during the Optional Extension Period shall be part of and not in addition to all applicable Limits of Liability for **Claims** made during the **Policy Period**.

(H)   **SPOUSES, ESTATES AND LEGAL REPRESENTATIVES OF INSURED PERSONS**

The coverage afforded under this Policy shall, subject to all of its terms, conditions and exclusions, extend to:

(1)   the lawful spouse of any **Insured Person**; provided however, that this GENERAL CONDITION (H)(1) will apply only:

(a)   to the extent that the spouse is a party to any **Claim** solely in his or her capacity as a spouse of such **Insured Person**; and

(b)   for the purposes of any **Claim** seeking damages recoverable from marital community property, property jointly held by such **Insured Person** and spouse, or property transferred from such **Insured Person** to the spouse.

    (2)      the estate, heirs, legal representatives or assigns of any **Insured Person** or assigns of any **Insured Person** who is deceased, or against the legal representatives or assigns of any **Insured Person** who is incompetent, insolvent or bankrupt.

(I)      **ASSISTANCE, COOPERATION AND SUBROGATION**

    (1)      The **Insured** agrees to provide the Insurer with all information, assistance and cooperation that the Insurer may reasonably request, and further agrees that it will do nothing which in any way increases the Insurer's exposure under this Policy or in any way prejudices the Insurer's potential or actual rights of recovery.

    (2)      In the event of any payment under this Policy, the Insurer shall be subrogated to all of the potential or actual rights of recovery of the **Insured**. The **Insured** shall execute all papers required and will do everything necessary to secure such rights including but not limited to the execution of such documents as are necessary to enable the Insurer to effectively bring suit in their name, and will provide all other assistance and cooperation which the Insurer may reasonably require; provided however, that under no circumstances will the Insurer exercise or pursue, directly or indirectly, any right(s) of recovery, right(s) of subrogation or other rights under this GENERAL CONDITION (I)(2) against any **Insured** unless and until a final adjudication adverse to such **Insured** in the underlying action or a separate action or proceeding establishes that such **Insured** has committed a criminal or a deliberate fraudulent act, or has obtained any profit or pecuniary advantage to which such **Insured** was not legally entitled, it being expressly understood that except as specifically set forth in this GENERAL CONDITION (I)(2), the Insurer is not waiving or diluting any right(s) of recovery or right(s) of subrogation that the Insurer may have against any person or entity not considered an **Insured** under this Policy.

(J)      **EXHAUSTION**

If the Insurer's Limit of Liability for the Policy, as set forth in ITEM 3(e) of the Declarations, is exhausted by the payment of **Loss**, the premium as set forth in ITEM 8 of the Declarations will be fully earned, all obligations of the Insurer under this Policy will be completely fulfilled and exhausted, and the Insurer will have no further obligations of any kind whatsoever under this Policy. If the Insurer's Limit of Liability for any Coverage Part, as set forth in ITEM 3(a) − (e) of the Declarations, is exhausted by the payment of **Loss**, all obligations of the Insurer under that Coverage Part will be completely fulfilled and exhausted, and the Insurer will have no further obligations of any kind whatsoever under that Coverage Part.

(K)      **WARRANTY**

The **Insured** represents that the statements and particulars contained in the **Application** are true, accurate and complete, and agrees that this Policy is issued in reliance on the truth of that representation, and that such particulars and statements, which are deemed to be incorporated into and constitute a part of this Policy, are the basis of this Policy. No knowledge or information possessed by any **Insured** will be imputed to any other **Insured**. In the event that any of the particulars or statements in all material respects in the **Application** are untrue, this Policy will be void with respect to any **Insured** who had actual knowledge of the untruth in any material respect knew of such untruth.

(L)      **ACTION AGAINST THE INSURER, ASSIGNMENT, AND CHANGES TO THE POLICY**

    (1)      No action may be taken against the Insurer unless, as a condition precedent thereto:

           (a)      there has been full compliance with all of the terms and conditions of this Policy; and

(b)     the amount of the obligation of the **Insured** has been finally determined either by judgment against the **Insured** after actual trial, or by written agreement of the **Insured**, the claimant and the Insurer.

(2)     Nothing contained herein shall give any person or entity any right to join the Insurer as a party to any **Claim** against the **Insured** to determine its liability, nor may the **Insured** implead the Insurer in any **Claim**.

(3)     Assignment of interest under this **Policy** shall not bind the Insurer unless its consent is endorsed hereon.

(4)     Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the Insurer will not cause a waiver or change in any part of this Policy or prevent the Insurer from asserting any right under the terms, conditions and limitations of this Policy.  The terms, conditions and limitations of this Policy may only be waived or changed by written endorsement signed by the Insurer.

## (M)   AUTHORIZATION AND NOTICES

It is understood and agreed that the **Named Insured** will act on behalf of the **Insureds** with respect to:

(1)     the payment of the premiums,

(2)     the receiving of any return premiums that may become due under this Policy,

(3)     the giving of all notices to the Insurer as provided herein, and

(4)     the receiving of all notices from the Insurer.

## (N)   PRIORITY OF PAYMENTS

(1)     In the event of **Loss** arising from one or more covered **Claims** for which payment is due under the provision of this Policy, then the Insurer shall in all events:

(a)     first, pay Loss, for which coverage is provided, to **Insured Persons** under any Coverage Part attached hereto;

(b)     only after payment of **Loss** has been made pursuant to GENERAL CONDITION (N)(1)(a) above, with respect to whatever remaining amount of the Limit of Liability is available after such payment,  the Insurer shall pay **Loss**, for which coverage is provided, to any other **Insured** under any Coverage Part attached hereto;

(c)     after payments of all **Loss** have been made, first, pursuant to GENERAL CONDITION (N)(1)(a) and, then, made pursuant to GENERAL CONDITION (N)(1)(b), the remaining **Limit of Liability** shall thereupon become available for any covered **Claims** that may arise in the future.

(2)     The **Financial Insolvency** of any **Insured** shall not relieve the Insurer of any of its obligations to prioritize payment of covered **Loss** under this Policy pursuant to this GENERAL CONDITION (N) and the **Company** hereby agrees to be bound by such prioritization of payments.

## (O)   ENTIRE AGREEMENT

The **Insured** agrees that the Declarations, Policy, including the endorsements, attachments and the **Application** shall constitute the entire agreement between the Insurer or any of its agents and the **Insured** relating to this insurance.

# INVESTMENT ADVISERS MANAGEMENT LIABILITY COVERAGE PART

**THIS IS A CLAIMS MADE COVERAGE PART WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY. PLEASE READ AND REVIEW THE POLICY CAREFULLY.**

**In consideration of the payment of the premium, and in reliance on all statements made and information furnished to the Company identified in the Declarations (hereinafter the Insurer), including the Application, and subject to all of the terms, conditions and limitations of all of the provisions of this Policy, the Insurer and the Insureds agree as follows:**

**I.      INSURING AGREEMENTS**

(A)     The Insurer shall pay on behalf of the **Insured Persons Loss** resulting from **Claims** first made against the **Insured Persons** during the **Policy Period** or, if applicable, the Optional Extension Period, for **Wrongful Acts**, except for **Loss** which the **Adviser** is permitted or required to pay on behalf of the **Insured Persons** as indemnification.

(B)     The Insurer shall pay on behalf of the **Adviser Loss** which the **Adviser** is required or is permitted to pay as indemnification to:

   (1)     the **Insured Persons** resulting from **Claims** first made against the **Insured Persons**; or

   (2)     the **Adviser** resulting from **Claims** first made against the **Adviser**;

   during the **Policy Period** for **Wrongful Acts**.

**II.      DEFINITIONS**

(A)     "**Adviser**" means the **Named Insured** and any **Subsidiary** created or acquired on or before the Inception Date set forth in ITEM 2 of the Declarations or, subject to CONDITION (A) of this Coverage Part, during the **Policy Period**.

   "**Adviser**" shall also include any of the foregoing entities in such entity's respective capacity as a debtor-in-possession or functional or foreign equivalent.

(B)     "**Claim**," as defined in GENERAL DEFINITIONS (B), shall be deemed to include, for purposes of this Coverage Part, a formal civil, criminal, administrative, or regulatory investigation of an **Insured** which is commenced by the filing or issuance of notice of charges, formal investigative order or similar document identifying in writing such **Insured** as a person or entity against whom a proceeding as described in GENERAL DEFINITIONS (B)(2) or (3) may be commenced.

(C)     "**Insured**" means the **Insured Persons** and the **Adviser**.

(D)     "**Insured Person**" means:

   (1)     any past, present or future director, officer, or member of the Board of Managers of the **Adviser**;

   (2)     those persons serving in a functionally equivalent role for the **Named Insured** or any **Subsidiary** operating or incorporated outside the United States; and

(3) an individual identified in (D)(1) or (2) above who, at the specific written request of the **Adviser,** is serving as a director, officer, trustee, regent or governor of a **Non-Profit Entity;**

In the event of the death, incapacity or bankruptcy of an individual identified in (D)(1), (2) or (3) above, any **Claim** against the estate, heirs, legal representatives or assigns of such individual for a **Wrongful Act** of such individual will be deemed to be a **Claim** against such individual.

(E) **"Non-Profit Entity"** means a corporation or organization, other than the **Adviser,** which is exempt from taxation under Section 501(c)(3), (4) or (10) of the Internal Revenue Code as amended or any rule or regulation promulgated thereunder.

(F) **"Wrongful Act"** means:

(1) with respect to any **Insured Person** of the **Adviser,** any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty but solely by reason of his or her status as such; and

(2) with respect to the **Adviser,** any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty by the **Adviser.**

## III. EXCLUSIONS

The Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Insured:**

(A) brought about or contributed to in fact by any:

(1) intentionally dishonest, fraudulent or criminal act or omission or any willful violation of any statute, rule or law; or

(2) profit or remuneration gained by any **Insured** to which such **Insured** is not legally entitled;

as determined by a final adjudication in the underlying action or in a separate action or proceeding.

(B) based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or **Wrongful Act** which, before the Inception Date of this Policy, was the subject of any notice given under any other management and/or professional liability policy of insurance;

(C) for any actual or alleged bodily injury, sickness, mental anguish, emotional distress, libel, slander, oral or written publication of defamatory or disparaging material, disease or death of any person, or damage or destruction of any tangible property including loss of use thereof; however, this Exclusion (C) will not apply to any:

(1) **Claim** arising from damage to, destruction of, or loss of use of, client records in an **Insured's** possession; or

(2) direct or derivative **Claim** by a security holder of an Adviser, who, when such **Claim** is made and maintained, is acting independently of, and without the solicitation, active assistance, active participation or active intervention of any **Insured.**

(D) based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual, alleged or threatened discharge, dispersal, release, escape, seepage, transportation, emission, treatment, removal or disposal of pollutants, contaminants, or waste of any kind including but not limited to nuclear material or nuclear waste or any actual or alleged direction, request or voluntary decision to test for,

abate, monitor, clean up, recycle, remove, recondition, reclaim, contain, treat, detoxify or neutralize pollutants, contaminants or waste of any kind including but not limited to nuclear material or nuclear waste; provided, however that this EXCLUSION (D) will not apply to: (i) non-indemnifiable loss under Insuring Agreement A, and/or (ii) Defense Expenses.

(E)     based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or **Wrongful Act** underlying or alleged in any prior and/or pending litigation or administrative or regulatory proceeding which incepted prior to the Pending And Prior Proceeding Date set forth in ITEM 6(a) of the Declarations;

(F)     brought by, or on behalf of, or at the direction of any **Insured**, except and to the extent such **Claim** is brought:

    (1) derivatively by a security holder of the **Adviser** who, when such **Claim** is made and maintained, is acting independently of, and without the solicitation, assistance, participation or intervention of any **Insured**;

    (2) by the Bankruptcy Trustee or Examiner of the Company or any assignee of such Trustee or Examiner, or any Receiver, Conservator, Rehabilitator, or Liquidator or comparable authority of the **Adviser**;

    (3) by an **Insured** with respect to which failure to make such **Claim** would result in liability to the **Insured** for failure to do so;

    (4) by an **Insured Person** of an **Adviser** formed and operating in a jurisdiction outside the United States, Canada or any other common law country, including any territories and possessions thereof (hereinafter the Non-Common Law Jurisdiction), provided that such **Claim** is made and continuously maintained in a Non-Common Law Jurisdiction;

    (5) by an **Insured Person** while engaging or who has engaged in any protected activity specified in 18 U.S.C. 1514A(a) ("whistleblower" protection pursuant to the Sarbanes-Oxley Act of 2002) or any protected activity specified in any other "whistleblower" protection pursuant to any federal, state, local or foreign law;

    (6) by any past **Insured Person** who has not served for at least three years prior to such **Claim** being first made by such **Insured Person** against any Insured;

    (7) in the form of a crossclaim, third party claim or other claim for contribution or indemnity by an **Insured Person** which is part of or results directly from a **Claim** which is not otherwise excluded by the terms of this Policy; or

    (8) is brought for the actual or alleged wrongful termination of an **Insured Person**.

(G)     for any actual or alleged liability of the **Adviser** under any express contract or agreement; however, this EXCLUSION (G) will apply only to the coverage available to the **Adviser** under INSURING AGREEMENT (B)(2). Further, this EXCLUSION (G) will not apply to liability which would attach to an **Insured** even in the absence of a contract or agreement

With respect to this EXCLUSION (G), an "express contract or agreement" is defined as an actual agreement of the parties, the terms of which are openly set forth or declared at the time of making in clear or distinct language;

(H)     based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving an **Insured Person** acting in his or her capacity as a director, officer, partner, principal, member, trustee or employee of any entity other than the **Adviser**;

(I)     for any actual or alleged violation of the Securities Act of 1933, the Securities Exchange Act of 1934 or any rule or regulation promulgated thereunder in connection with the offering, sale or purchase of securities of the **Adviser**; however, this EXCLUSION (I) shall not apply to any **Claim** arising out of the offering, sale or

purchase of securities, whether debt or equity, in a transaction that is exempt from registration under the Securities Act of 1933;

(J)     based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged violation of the Employee Retirement Income Security Act of 1974 (ERISA), as amended, or any regulation promulgated thereunder or any similar, federal, state or local law or regulation; however, this EXCLUSION (J) will only apply to any pension, employee benefit or welfare plan sponsored by an Adviser; or

(K)     by, on behalf of, at the direction of or in the name or right of any **Non-Profit Entity** against an **Insured Person** for a **Wrongful Act** while acting in his or her capacity as a director, officer, trustee, regent or governor of such **Non-Profit Entity**.

No conduct of any **Insured Person** will be imputed to any other **Insured Person** to determine the application of any of the above EXCLUSIONS.

## IV.     CONDITIONS

(A)     MERGERS AND ACQUISITIONS (CHANGES IN EXPOSURE OR CONTROL):

(1)     If, during the **Policy Period**, the **Adviser** acquires any assets, acquires a **Subsidiary**, or acquires any entity by merger (each an "Acquired Entity") such that the **Adviser** is the surviving entity (a "Transaction"):

(a)     there will be coverage available under this Coverage Part for any **Claim** made against the Acquired Entity and its directors, officers, or members of the Board of Managers for any **Wrongful Act** committed or allegedly committed after the effective date of the Transaction for a period of ninety (90) days after the effective date of the Transaction (not to exceed the Policy Expiration Date);

(b)     there will be no coverage available under this Coverage Part for any **Claim** made against the Acquired Entity or any of its directors, officers, or members of the Board of Managers for any **Wrongful Act** committed or allegedly committed after the effective date of the Transaction beyond the ninety (90) day period, unless:

(i)     any of the gross annual fees, assets under management or assets of the Acquired Entity are less than thirty-five percent (35%) of the gross annual fees, assets under management or assets, respectively, of the **Adviser** at the time immediately preceding the Transaction; and

(ii)     the **Named Insured** gives the Insurer written notice, with full details, of the Transaction within the ninety (90) day period;

(c)     there will be no coverage available under this Coverage Part for any **Claim** made against the Acquired Entity or any of its directors, officers, or members of the Board of Managers for any **Wrongful Acts** committed or allegedly committed before the effective date of the Transaction.

(2)     If, during the **Policy Period**, any of the following events occurs:

(a)     the merger or acquisition of the **Adviser**, or of all or substantially all of its assets by another entity such that that the **Adviser** is not the surviving entity;

(b)     the acquisition by any person, entity or affiliated group of persons or entities of the right to vote for, select or appoint more than fifty percent (50%) of the directors, trustees, or members of the Board of Managers of the **Adviser**; or

(c)    the appointment of a Receiver, Conservator, Liquidator, Trustee, Rehabilitator, or any comparable authority, with respect to the **Adviser;**

coverage under this Coverage Part will continue in full force and effect with respect to **Claims** for **Wrongful Acts** committed before such event, but coverage will cease with respect to any **Claims** for **Wrongful Acts** committed after such event.  Immediately upon the consummation of any such event the entire premium for this Coverage Part will be deemed fully earned.

(3)    If, during the **Policy Period,** any entity ceases to be a **Subsidiary,** the coverage provided under this Coverage Part shall continue to apply to the **Insureds** that were covered under this Coverage Part but only with respect to a **Claim** for a **Wrongful Act** that occurred or allegedly occurred prior to the time such **Subsidiary** ceased to be a **Subsidiary** of the **Named Insured.**

# INVESTMENT ADVISERS PROFESSIONAL LIABILITY COVERAGE PART

**THIS IS A CLAIMS MADE COVERAGE PART WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY. PLEASE READ AND REVIEW THE POLICY CAREFULLY.**

**In consideration of the payment of the premium, and in reliance on all statements made and information furnished to the Company identified in the Declarations (hereinafter the Insurer), including the Application, and subject to all of the terms, conditions and limitations of all of the provisions of this Policy, the Insurer and the Insureds agree as follows:**

**I.     INSURING AGREEMENT**

The Insurer shall pay on behalf of the **Insureds Loss** resulting from **Claims** first made against the **Insureds** during the **Policy Period** or, if applicable, the Optional Extension Period, for **Wrongful Acts**.

**II.     DEFINITIONS:**

(A)     "**Adviser**" means the **Named Insured** and any **Subsidiary** created or acquired on or before the Inception Date set forth in ITEM 2 of the Declarations or, subject to CONDITION (A) of this Coverage Part, during the **Policy Period**.

"**Adviser**" shall also include any of the foregoing entities in such entity's respective capacity as a debtor-in-possession or functional or foreign equivalent.

(B)     "**Insured**" means the **Insured Persons** and the **Adviser**.

(C)     "**Insured Person**" means any past, present or future director, officer, partner, principal, member, trustee or employee of the **Adviser**.

(D)     "**Professional Services**" means:

(1)     financial, economic, administrative, management, valuation or investment advice, services or other activities  (including execution of an Investment Fund's securities or other transactions) performed for others for compensation or other consideration by the **Adviser** or on behalf of the **Adviser** by any person or entity;

(2)     the provision of computer and Internet services, administrative services, and publications prepared or written by any **Insured**, provided such services are performed in connection with the **Adviser's** operations; or

(3)     the selection, oversight and direction by any **Insured** of any person or entity performing **Professional Services** on behalf of the **Adviser**.

(E)     "**Wrongful Act**" means:

(1)     any actual or alleged act, error, omission, misstatement, misleading statement or breach of fiduciary duty or other duty committed by any **Insured** in the performance of, or failure to perform, **Professional Services**; and

(2)     any actual or alleged libel, slander, or oral or written publication of defamatory or disparaging material committed by any **Insured** in the performance of **Professional Services**.

**III.    EXCLUSIONS**

The Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Insured**:

(A)    brought about or contributed to in fact by any:

    (1)    intentionally dishonest, fraudulent or criminal act or omission or any willful violation of any statute, rule or law; or

    (2)    profit or remuneration gained by any **Insured** to which such **Insured** is not legally entitled;

    as determined by a final adjudication in the underlying action or in a separate action or proceeding.

(B)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or **Wrongful Act** which, before the Inception Date of this Policy, was the subject of any notice given under any other management and/or professional liability policy of insurance;

(C)    for any actual or alleged bodily injury, sickness, mental anguish, emotional distress, libel, slander, invasion of privacy, malicious use or abuse of process, malicious prosecution, wrongful entry or eviction, false arrest, false imprisonment, assault, battery, oral or written publication of defamatory or disparaging material, disease or death of any person, or damage or destruction of any tangible property including loss of use thereof; however, this EXCLUSION (C) will not apply to any:

    (1)    alleged mental anguish or emotional distress to the extent that they arise from an **Insured's** performance of **Professional Services**;

    (2)    actual or alleged libel, slander, oral or written publication of defamatory or disparaging material committed by an **Insured** in the performance of **Professional Services**; or

    (3)    **Claim** arising from damage to, destruction of, or loss of use of, client records in an **Insured's** possession.

(D)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual, alleged or threatened discharge, dispersal, release, escape, seepage, transportation, emission, treatment, removal or disposal of pollutants, contaminants, or waste of any kind including but not limited to nuclear material or nuclear waste or any actual or alleged direction, request or voluntary decision to test for, abate, monitor, clean up, recycle, remove, recondition, reclaim, contain, treat, detoxify or neutralize pollutants, contaminants or waste of any kind including but not limited to nuclear material or nuclear waste; provided, however, that this Exclusion (D) will not apply to: (i) any non-indemnifiable loss; and/or (ii) Defense Expenses.

(E)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or **Wrongful Act** underlying or alleged in any prior and/or pending litigation or administrative or regulatory proceeding which incepted prior to the Pending And Prior Proceeding Date set forth in ITEM 6(b) of the Declarations;

(F)    brought by, or on behalf of, or at the direction of any **Insured**, except and to the extent such **Claim** is brought:

    (1)    in the form of a crossclaim, third party claim or other claim for contribution or indemnity by an **Insured Person** which is part of or results directly from a **Claim** which is not otherwise excluded by the terms of this Policy;

    (2)    by an **Insured Person**, solely in his or her capacity as a client or customer of the **Adviser**;

   (3)    by an **Insured** with respect to which failure to make such **Claim** would result in liability to the **Insured** for failure to do so;

   (4)    by or on behalf of the **Adviser** in bankruptcy, insolvency or liquidation, by the examiner, trustee (including but not limited to a litigation trustee), receiver, liquidator, rehabilitator, conservator, creditors' committee, shareholders' committee or any comparable authority (or any assignee thereof) of the **Adviser**;

   (5)    derivatively by a security holder of the **Adviser** who, when such **Claim** is made and maintained, is acting independently of, and without the solicitation, assistance, participation or intervention of any **Insured**;

   (6)    by an **Insured Person** while engaging or who has engaged in any protected activity specified in 18 U.S.C. 1514A(a) ("whistleblower" protection pursuant to the Sarbanes-Oxley Act of 2002) or any protected activity specified in any other "whistleblower" protection pursuant to any federal, state, local or foreign law;

   (7)    by an **Insured Person** of an **Adviser** formed and operating in a jurisdiction outside the United States, Canada or any other common law country, including any territories and possessions thereof (hereinafter the Non-Common Law Jurisdiction), provided that such **Claim** is made and continuously maintained in a Non-Common Law Jurisdiction; or

   (8)    by any past **Insured Person** who has not served for at least three years prior to such **Claim** being first made by such Insured Person against any Insured

(G)    for any actual or alleged liability of the **Adviser** under any express contract or agreement; however, this EXCLUSION (G) will not apply to:

   (1)    any **Claim** against an **Insured** by a client or customer of the **Adviser**, if and to the extent that the **Claim** alleges a breach of contractual obligations in the rendering of or failure to render **Professional Services**; or

   (2)    liability which would attach to an **Insured** even in the absence of a contract or agreement.

With respect to this EXCLUSION (G), an "express contract or agreement" is defined as an actual agreement of the parties, the terms of which are openly set forth or declared at the time of making in clear or distinct language;

(H)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving an **Insured Person** acting in his or her capacity as a director, officer, partner, principal, member, trustee or employee of any entity other than the **Adviser**;

(I)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged violation of the Employee Retirement Income Security Act of 1974 (ERISA), as amended, or any regulation promulgated thereunder or any similar, federal, state or local law or regulation; however, this EXCLUSION (I) will only apply to any **Insured's** pension, employee benefit or welfare plan;

(J)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the **Insured's** rendering of investment banking services, including:

   (1)    the underwriting, syndicating or promoting of any debt or equity securities; or

   (2)    service as a consultant, adviser or specialist relating to or in connection with any actual, attempted or threatened merger, acquisition, securities offering, restructuring, divestiture or other investment banking activity;

however, this EXCLUSION (J) will not apply to any **Claim** arising from the performance of, or failure to perform, **Professional Services**

(K)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the insolvency of any bank, banking firm, broker or dealer in securities, or any other person or entity, or the inability of any such entity or person to make any payment or settle or effect any transaction of any kind; however, this EXCLUSION (K) will not apply to any **Claim** arising from the performance of, or failure to perform, **Professional Services.**

(L)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any **Insured's** activity as a "broker" or "dealer" in securities, as those terms are defined in Section 3(a)(4), 3(a)(5) and 3(a)(6) of the Securities and Exchange Act of 1934, as amended; however, this EXCLUSION (L) will not apply to any **Claim** arising from the performance of, or failure to perform, **Professional Services.**

No conduct of any **Insured Person** will be imputed to any other **Insured Person** to determine the application of any of the above EXCLUSIONS.

## IV.    CONDITIONS

(A)    MERGERS AND ACQUISITIONS (CHANGES IN EXPOSURE OR CONTROL):

(1)    If, during the **Policy Period**, the **Adviser** acquires any assets, acquires a **Subsidiary**, or acquires any entity by merger (each an "Acquired Entity") such that the **Adviser** is the surviving entity (a "Transaction"):

(a)    there will be coverage available under this Coverage Part for any **Claim** made against the Acquired Entity and its directors, officers, partners, principals, members, trustees or employees for any **Wrongful Act** committed or allegedly committed after the effective date of the Transaction for a period of ninety (90) days after the effective date of the Transaction (not to exceed the Policy Expiration Date);

(b)    there will be no coverage available under this Coverage Part for any **Claim** made against the Acquired Entity or any of its directors, officers, partners, principals, members, trustees or employees for any **Wrongful Act** committed or allegedly committed after the effective date of the Transaction beyond the ninety (90) day period, unless:

(i)    any of the gross annual fees, assets under management or assets of the Acquired Entity are less than thirty-five percent (35%) of the gross annual fees, assets under management or assets, respectively, of the **Adviser** at the time immediately preceding the Transaction; and

(ii)    the **Named Insured** gives the Insurer written notice, with full details, of the Transaction within the ninety (90) day period;

(c)    there will be no coverage available under this Coverage Part for any **Claim** made against the Acquired Entity or any of its directors, officers, partners, principals, members, trustees or employees for any **Wrongful Acts** committed or allegedly committed before the effective date of the Transaction.

(2)    If, during the Policy Period, any of the following events occurs:

(a)    the merger or acquisition of the **Adviser**, or of all or substantially all of its assets by another entity such that that the **Adviser** is not the surviving entity;

(b)   the acquisition by any person, entity or affiliated group of persons or entities of the right to vote for, select or appoint more than fifty percent (50%) of the directors, trustees, or members of the Board of Managers of the **Adviser**; or

(c)   the appointment of a Receiver, Conservator, Liquidator, Trustee, Rehabilitator, or any comparable authority, with respect to the **Adviser**;

coverage under this Coverage Part will continue in full force and effect with respect to **Claims** for **Wrongful Acts** committed before such event, but coverage will cease with respect to any **Claims** for **Wrongful Acts** committed after such event.  Immediately upon the consummation of any such event the entire premium for this Coverage Part will be deemed fully earned.

(3)   If, during the **Policy Period,** any entity ceases to be a **Subsidiary,** the coverage provided under this Coverage Part shall continue to apply to the **Insureds** that were covered under this Coverage Part but only with respect to a **Claim** for a **Wrongful Act** that occurred or allegedly occurred prior to the time such **Subsidiary** ceased to be a **Subsidiary** of the **Named Insured.**

# INVESTMENT FUND MANAGEMENT AND PROFESSIONAL LIABILITY COVERAGE PART

**THIS IS A CLAIMS MADE COVERAGE PART WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY. PLEASE READ AND REVIEW THE POLICY CAREFULLY.**

**In consideration of the payment of the premium, and in reliance on all statements made and information furnished to the Company identified in the Declarations (hereinafter the Insurer), including the Application, and subject to all of the terms, conditions and limitations of all of the provisions of this Policy, the Insurer and the Insureds agree as follows:**

**I.      INSURING AGREEMENT**

The Insurer shall pay on behalf of the **Insureds Loss** resulting from **Claims** first made against the **Insureds** during the **Policy Period** or, if applicable, the Optional Extension Period, for **Wrongful Acts.**

**II.     DEFINITIONS:**

(A)     "**Insured**" means:

    (1)     the **Named Insured;**

    (2)     the **Insured Persons;**

    (3)     each **Investment Fund;**

    (4)     the general partner or managing general partner of each **Investment Fund** that is organized as a limited partnership; and

    (5)     the managing member of each **Investment Fund** that is organized as a limited liability company;

An **Outside Entity** is not an **Insured.**

(B)     "**Insured Entity**" means any **Insured** that is organized as a corporation, limited liability company or limited partnership.

(C)     "**Insured Person**" means any past, present or future director, officer, partner, principal, member, trustee or employee of:

    (1)     an **Investment Fund;**

    (2)     the general partner or managing general partner of each **Investment Fund** that is organized as a limited partnership; and

    (3)     the managing member of any **Investment Fund** organized as a limited liability company.

    (4)     any individual serving on an advisory board or advisory committee of an **Investment Fund**, which advisory board or advisory committee was created pursuant to a limited partnership agreement or equivalent documents of such **Investment Fund.**

(D)   "**Investment Fund**" means:

   (1)   any fund which is listed in the Schedule of **Investment Funds** attached to and forming part of this Coverage Part; and

   (2)   subject to CONDITION (A) of this Coverage Part, any pooled investment vehicle formed by the **Named Insured** during the **Policy Period**.

(E)   "**Non-Profit Entity**" means a corporation or organization, other than an **Insured**, which is exempt from taxation under Section 501(c)(3), (4) and (10) of the Internal Revenue Code as amended or any rule or regulation promulgated thereunder.

(F)   "**Outside Capacity**" means service by an **Insured Person** as a director, officer, trustee, regent, governor or member of the Board of Managers of an **Outside Entity**, but only during the time that such service is at the specific request of an **Insured Entity**.

(G)   "**Outside Entity**" means any **Non-Profit Entity** and any **Portfolio Company**.

(H)   "**Portfolio Company**" means any entity during any time in which an **Insured**, through an **Investment Fund**, owns or controls outstanding securities representing the right to vote for the election of such entity's directors or members of the Board of Managers.

(I)   "**Professional Services**" means:

   (1)   advisory or other services performed by an **Investment Fund** or on behalf of an **Investment Fund** by any person or entity, provided such services are performed in connection with the management or operation of such **Investment Fund**;

   (2)   the actual or alleged organization, capitalization, formation, calling of committed capital to, or the dissolution or winding up of an **Investment Fund**;

   (3)   the actual or alleged purchase or sale of, or solicitation or offer to purchase or sell, or other disposition of any direct or indirect interest(s) in or asset(s) of an **Investment Fund**;

   (4)   the provision of computer and Internet services, administrative services, and publications prepared or written by any **Insured**, provided such services are performed in connection with the management or operation of an **Investment Fund**; and

   (5)   the selection, oversight and direction by any **Insured** of any person or entity performing **Professional Services** on behalf of an **Investment Fund**.

(J)   "**Wrongful Act**" means:

   (1)   any actual or alleged act, error, omission, misstatement, misleading statement or breach of fiduciary duty or other duty committed by an **Insured** in the performance of, or failure to perform, **Professional Services**;

   (2)   any actual or alleged libel, slander, or oral or written publication of defamatory or disparaging material committed by an **Insured** in the performance of **Professional Services**;

   (3)   any actual or alleged act, error, omission, misstatement, misleading statement or breach of fiduciary duty or other duty committed by an **Insured Person** in his or her capacity as a director, officer, member of the Board of Managers, general partner, or managing general partner of an **Investment Fund**;

    (4)      any matter asserted against an **Insured Person** solely by reason of his or her status as a director, officer, member of the Board of Managers, general partner, or managing general partner of an **Investment Fund**; and

    (5)      any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty by an **Insured Person** in his or her **Outside Capacity**.

## III.    EXCLUSIONS:

The Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Insured**:

(A)      brought about or contributed to in fact by any:

    (1)      intentionally dishonest, fraudulent or criminal act or omission or any willful violation of any statute, rule or law; or

    (2)      profit or remuneration gained by any **Insured** to which such **Insured** is not legally entitled;

    as determined by a final adjudication in the underlying action or in a separate action or proceeding.

(B)      based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or **Wrongful Act** which, before the Inception Date of this Policy, was the subject of any notice given under any other management and/or professional liability policy of insurance;

(C)      for any actual or alleged bodily injury, sickness, mental anguish, emotional distress, libel, slander, invasion of privacy, malicious use or abuse of process, malicious prosecution, wrongful entry or eviction, false arrest, false imprisonment, assault, battery, oral or written publication of defamatory or disparaging material, disease or death of any person, or damage or destruction of any tangible property including loss of use thereof; however, this EXCLUSION (C) will not apply to any:

    (1)      alleged mental anguish or emotional distress to the extent that they arise from an **Insured's** performance of **Professional Services**;

    (2)      direct or derivative **Claim** by a security holder of an **Insured Entity**, who, when such **Claim** is made and maintained, is acting independently of, and without the solicitation, active assistance, active participation or active intervention of any **Insured**;

    (3)      actual or alleged libel, slander, oral or written publication of defamatory or disparaging material committed by an **Insured** in the performance of **Professional Services**; or

    (4)      **Claim** arising from damage to, destruction of, or loss of use of, client records in an **Insured's** possession.

(D)      based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual, alleged or threatened discharge, dispersal, release, escape, seepage, transportation, emission, treatment, removal or disposal of pollutants, contaminants, or waste of any kind including but not limited to nuclear material or nuclear waste or any actual or alleged direction, request or voluntary decision to test for, abate, monitor, clean up, recycle, remove, recondition, reclaim, contain, treat, detoxify or neutralize pollutants, contaminants or waste of any kind including but not limited to nuclear material or nuclear waste, provided however, that this EXCLUSION (D) will not apply to: (i) any non-indemnifiable loss; and/or (ii) Defense Expenses.

(E)     based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or **Wrongful Act** underlying or alleged in any prior and/or pending litigation or administrative or regulatory proceeding which incepted prior to the Pending And Prior Proceeding Date set forth in ITEM 6(c) of the Declarations;

(F)     brought by, or on behalf of, or at the direction of any **Insured**, except and to the extent such **Claim** is brought:

    (1)     in the form of a crossclaim, third party claim or other claim for contribution or indemnity by an **Insured Person** which is part of or results directly from a **Claim** which is not otherwise excluded by the terms of this Policy;

    (2)     by any past **Insured Person** who has not served for at least three years prior to such **Claim** being first made by such **Insured Person** against any Insured;

    (3)     directly or derivatively by any past or present member of an advisory board or advisory committee and who serves in such role on the behalf of limited partners, members or shareholders of an **Investment Fund**, in his or her capacity as a security holder of, member of, or investor in an **Insured Entity**, so long as when such **Claim** is made and maintained, is acting independently of, and without the solicitation, active assistance, active participation or active intervention of the **Company** or any **Insured Entity**;

    (4)     by or on behalf of the **Company** or an **Insured Entity** in bankruptcy, insolvency or liquidation, by the examiner, trustee (including but not limited to a litigation trustee), receiver, liquidator, rehabilitator, conservator, creditors' committee, shareholders' committee or any comparable authority (or any assignee thereof) of the **Company** or an **Insured Entity**;

    (5)     by an **Insured Person** while engaging or who has engaged in any protected activity specified in 18 U.S.C. 1514A(a) ("whistleblower" protection pursuant to the Sarbanes-Oxley Act of 2002) or any protected activity specified in any other "whistleblower" protection pursuant to any federal, state, local or foreign law;

    (6)     by an **Insured Person** of the **Company** or an **Insured Entity** formed and operating in a jurisdiction outside the United States, Canada or any other common law country, including any territories and possessions thereof (hereinafter the Non-Common Law Jurisdiction), provided that such **Claim** is made and continuously maintained in a Non-Common Law Jurisdiction;

    (7)     by an **Insured** with respect to which failure to make such **Claim** would result in liability to the **Insured** for failure to do so; or

    (8)     derivatively by a security holder of an **Investment Fund** who, when such **Claim** is made and maintained, is acting independently of, and without the solicitation, assistance, participation or intervention of any **Insured**.

(G)     for any actual or alleged liability of an **Insured** under any express contract or agreement; provided however, that this EXCLUSION (G) will not apply to:

        (1) any **Claim** based upon, arising out of or related to the performance of or failure to perform Professional Services; or

        (2) liability which would attach to an **Insured** even in the absence of a contract or agreement;

With respect to this EXCLUSION (G), an "express contract or agreement" is defined as an actual agreement of the parties, the terms of which are openly set forth or declared at the time of making in clear or distinct language.

(H)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving an **Insured Person** acting in his or her capacity as a director, officer, partner, principal, member, trustee or employee of any entity other than an **Insured** or **Outside Entity**;

(I)    brought by or on behalf of, or in the name or right of, any **Outside Entity** against an **Insured Person** for a **Wrongful Act** committed in his or her **Outside Capacity** with respect to such **Outside Entity**; however, this EXCLUSION (I) will not apply to any derivative action by a security holder of an **Outside Entity** on behalf of, or in the name or right of, an **Outside Entity**, if such action is brought and maintained independently of, and without the solicitation, assistance, participation or intervention of, any **Outside Entity or Insured**.

(J)    for any actual or alleged violation of the Employee Retirement Income Security Act of 1974 (ERISA), as amended, or any regulation promulgated thereunder or any similar, federal, state or local law or regulation; however, this EXCLUSION (J) will only apply to any **Insured's** pension, employee benefit or welfare plan;

(K)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any **Insured's** activity as a "broker" or "dealer" in securities, as those terms are defined in Section 3(a)(4), 3(a)(5) and 3(a)(6) of the Securities and Exchange Act of 1934, as amended; however, this EXCLUSION (K) will not apply to any **Claim** arising from the rendering or failing to render **Professional Services**;

No conduct of any **Insured Person** will be imputed to any other **Insured Person** to determine the application of any of the above EXCLUSIONS.

## IV.    CONDITIONS

(A)    NEWLY CREATED INVESTMENT FUNDS:

If, during the Policy Period, an **Insured Entity** creates an **Investment Fund**:

(1)    there will be coverage available under this Coverage Part for any **Claim** made against the newly created **Investment Fund** or its general partner(s), managing general partner(s), managing member(s), directors, officers, partners, principals, trustees or employees for a period of ninety (90) days after the creation of such **Investment Fund**; and

(2)    there will be no coverage available under this Coverage Part for any **Claim** made against the newly created **Investment Fund** or its general partner(s), managing general partner(s), managing member(s), directors, officers, partners, principals, trustees or employees after the creation of such **Investment Fund** beyond the ninety (90) day period unless:

(a)    the offering amount of the newly created **Investment Fund** is less than 175% of the offering amount of the most recently created **Investment Fund** which is listed in the Schedule of **Investment Funds** attached to and forming part of this Coverage Part; and

(b)    the **Named Insured** gives the Insurer written notice, with full details, of the creation of such **Investment Fund** within the ninety (90) day period.

(B)    MERGERS AND ACQUISITIONS (CHANGES IN EXPOSURE OR CONTROL):

(1)    If, during the **Policy Period**, an **Insured Entity** acquires a **Subsidiary**, or acquires any entity by merger (each an "Acquired Entity") such that the **Insured Entity** is the surviving entity (a "Transaction"):

(a)    there will be coverage available under this Coverage Part for any **Claim** made against the Acquired Entity and its directors, officers, partners, principals, members or trustees for any **Wrongful Act** committed or allegedly committed after the effective date of the Transaction for

a period of ninety (90) days after the effective date of the Transaction (not to exceed the Policy Expiration Date);

    (b)    there will be no coverage available under this Coverage Part for any **Claim** made against the Acquired Entity or any of its directors, officers, partners, principals, members or trustees for any **Wrongful Act** committed or allegedly committed after the effective date of the Transaction beyond the ninety (90) day period, unless:

        (i)    any of the gross annual fees, assets under management or assets of the Acquired Entity are less than thirty-five percent (35%) of the gross annual fees, assets under management or assets, respectively, of the **Insured Entity** at the time immediately preceding the Transaction; and

        (ii)    the **Named Insured** gives the Insurer written notice, with full details, of the Transaction within the ninety (90) day period;

    (c)    there will be no coverage available under this Coverage Part for any **Claim** made against the Acquired Entity or any of its directors, officers, partners, principals, members, trustees or employees for any **Wrongful Acts** committed or allegedly committed before the effective date of the Transaction.

    (2)    If, during the **Policy Period**, any of the following events occurs:

        (a)    the merger or acquisition of an **Insured Entity**, or of all or substantially all of its assets by another entity such that that the **Insured Entity** is not the surviving entity;

        (b)    the acquisition by any person, entity or affiliated group of persons or entities of the right to vote for, select or appoint more than fifty percent (50%) of the directors, trustees, members or board of management of an **Insured Entity**;

        (c)    the appointment of a Receiver, Conservator, Liquidator, Trustee, Rehabilitator, or any comparable authority, with respect to an **Insured Entity**; or

        (d)    the sale, spin-off or termination of an **Insured Entity**;

coverage under this Coverage Part will continue in full force and effect for such **Insured Entity** with respect to **Claims** for **Wrongful Acts** committed before such event, but coverage will cease with respect to any **Claims** for **Wrongful Acts** committed after such event. Immediately upon the consummation of any such event the entire premium for this Coverage Part will be deemed fully earned.

    (3)    If, during the **Policy Period**, any entity ceases to be a **Subsidiary**, the coverage provided under this Coverage Part shall continue to apply to the **Insureds** that were covered under this Coverage Part but only with respect to a **Claim** for a **Wrongful Act** that occurred or allegedly occurred prior to the time such **Subsidiary** ceased to be a **Subsidiary** of the **Named Insured**.

(C)    SERVICE IN CONNECTION WITH OUTSIDE ENTITIES

    (1)    All coverage under this Coverage Part for **Loss** from **Claims** made against **Insured Persons** while acting in their **Outside Capacities** will be specifically excess of, and will not contribute with,:

        (a)    any other insurance available to such **Insured Persons** by reason of their service in **Outside Capacities**; and

(b)   any indemnification by any person or entity other than an **Insured Entity**, including any **Outside Entity**, available to such **Insured Persons** by reason of their service in **Outside Capacities**.

(2)   The certificate of incorporation, charter, articles of association or other organizational documents of each **Outside Entity**, including bylaws and resolutions, will be deemed to provide indemnification to the **Insured Persons** to the fullest extent permitted by law.

(3)   If, during the **Policy Period**, an **Insured Person** discontinues his or her service in an **Outside Capacity**, coverage under this Coverage Part will continue in full force and effect for the **Insured Person** in such **Outside Capacity**, but only with respect to **Claims** for **Wrongful Acts** committed before the time the **Insured Person** discontinued serving in such capacity.

# EMPLOYMENT PRACTICES LIABILITY COVERAGE PART

**THIS IS A CLAIMS MADE COVERAGE PART WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY. PLEASE READ AND REVIEW THE POLICY CAREFULLY.**

**In consideration of the payment of the premium, and in reliance on all statements made and information furnished to the Company identified in the Declarations (hereinafter the Insurer) including the Application, and subject to all of the terms, conditions and limitations of all of the provisions of this Policy, the Insurer and the Insureds agree as follows:**

## I.      INSURING AGREEMENT

The Insurer shall pay on behalf of the **Insureds Loss** resulting from **Claims** first made against the **Insureds** during the **Policy Period** or, if applicable, the Optional Extension Period, for **Wrongful Acts**.

## II.     DEFINITIONS

(A)     **"Claim,"** as defined in GENERAL DEFINITIONS (B), shall be deemed to include, for purposes of this Coverage Part, an administrative or regulatory investigation when conducted by the Equal Employment Opportunity Commission ("EEOC") or similar, state, local or foreign agency, which is commenced by the filing of a notice of charges, service of a complaint or similar document of which notice has been given to the **Insured**. A **Claim** will not include any labor or grievance arbitration or other proceeding which is subject to a collective bargaining agreement.

(B)     **"Company"** means the **Named Insured** and any **Subsidiary** created or acquired on or before the Inception Date set forth in ITEM 2 of the Declarations or, subject to CONDITION (A) of this Coverage Part, during the **Policy Period**.

(C)     **"Insured"** means the **Insured Persons** and the **Company**.

(D)     **"Insured Person"** means:

      (1)     any past, present or future director, officer, partner, principal, member, trustee or employee of the **Company**, including any part-time, seasonal, or temporary employee; and

      (2)     any leased employee or independent contractor so long as he or she is working solely for the **Company** and only for conduct within his or her duties as such, but only if the **Company** provides indemnification to such individual in the same manner as is provided to the **Company's** employees; and

(E)     **"Loss,"** as defined in GENERAL DEFINITIONS (G), shall be deemed to include, for purposes of this Coverage Part, damages (including back pay and front pay) and judgments (including pre-judgment and post judgment interest). **Loss** will not include any costs associated with the modification of any building or property in order to provide any reasonable accommodations required by, made as a result of, or to conform with the requirements of, the Americans With Disabilities Act and any amendments thereto or any similar federal, state or local statute, regulation, or common law.

(F)     **"Wrongful Act"** means any actual or alleged:

      (1)     wrongful termination of employment whether actual or constructive;

(2)     employment discrimination of any kind including violation of any federal, state or local law involving employment or discrimination in employment which would deprive or potentially deprive any person of employment opportunities or otherwise adversely affect his or her status as an employee, because of such person's race, color, religion, age, gender, national origin, disability, sexual preference, pregnancy, or other protected status;

(3)     unwelcome sexual advances, requests for sexual favors, or other verbal, visual or physical conduct of a sexual nature or other harassment in the workplace;

(4)     wrongful deprivation of career opportunity, failure to grant tenure, employment related misrepresentations, retaliatory treatment against an employee of the **Company**, failure to promote, demotion, wrongful discipline or evaluation, or refusal to hire; and

(5)     employment related libel, slander, humiliation, defamation, or invasion of privacy;

by the **Company** or by any **Insured Person** in his or her capacity as such.

## III.    EXCLUSIONS

The Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Insured**:

(A)     brought about or contributed to in fact by:

(1)     any intentionally dishonest, fraudulent or criminal act or omission; or

(2)     profit or remuneration gained by any **Insured** to which such is not legally entitled;

as determined by a final adjudication in the underlying action or in a separate action or proceeding. Each **Insured** agrees that, if the Insurer has no liability to an **Insured** for **Loss** as a result of a **Claim** by reason of this EXCLUSION (A), such **Insured** will repay the Insurer upon demand all **Loss** paid on behalf of such **Insured** in connection with such **Claim**;

(B)     based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or **Wrongful Act** which, before the Inception Date of this Policy, was the subject of any notice given under any other policy of insurance;

(C)     for any actual or alleged bodily injury, sickness, disease or death of any person, or damage or destruction of any tangible property including loss of use thereof; however, this EXCLUSION (C) will not apply to any allegations of emotional distress, loss of reputation, mental anguish, or humiliation;

(D)     based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or **Wrongful Act** underlying or alleged in any prior and/or pending litigation or administrative or regulatory proceeding which incepted prior to the Pending And Prior Proceeding Date set forth in ITEM 6(d) of the Declarations;

(E)     arising out of any actual or alleged liability of the **Company** under any express contract or agreement; however, this EXCLUSION (E) will not apply to the extent that an **Insured** would have been liable in the absence of such express contract or agreement. With respect to this EXCLUSION (E), an "express contract or agreement" is defined as an actual agreement of the parties, the terms of which are openly set forth or declared at the time of making in clear or distinct language;

(F)     based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged violation of the Employee Retirement Income Security Act of 1974 (ERISA) as amended or any regulation promulgated thereunder or any similar, federal, state or local law or regulation;

(G)     for actual or alleged violation of the Occupational Safety and Health Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, the National Labor Relations Act or other similar provisions of any federal, state or local statutory or common law or any rules or regulations promulgated under any of the foregoing;

provided that EXCLUSIONS (F) and (G) above will not apply to actual or alleged retaliation against an **Insured Person** for exercising his or her rights under any such law(s);

(H)     seeking only injunctive or non-monetary relief, regardless of whether a prevailing claimant may be entitled to recover attorney's fees and costs; however, this EXCLUSION (H) shall not apply to **Defense Expenses** incurred in the defense of any such **Claim;**

(I)     for any liability arising out of a lockout, strike, picket line, hiring of replacement workers, or other similar actions in connection with labor disputes or labor negotiations.

No conduct of any **Insured Person** will be imputed to any other **Insured Person** to determine the application of any of the above EXCLUSIONS.

## IV.     CONDITIONS

(A)     MERGERS AND ACQUISITIONS (CHANGES IN EXPOSURE OR CONTROL):

(1)     If, during the **Policy Period**, the **Company** acquires any assets, acquires a **Subsidiary**, or acquires any entity by merger (each an "Acquired Entity") such that the **Company** is the surviving entity (a "Transaction"):

(a)     there will be coverage available under this Coverage Part for any **Claim** made against the Acquired Entity and its directors, officers, partners, principals, members, trustees or employees for any **Wrongful Act** committed or allegedly committed after the effective date of the Transaction for a period of ninety (90) days after the effective date of the Transaction (not to exceed the Policy Expiration Date);

(b)     there will be no coverage available under this Coverage Part for any **Claim** made against the Acquired Entity or any of its directors, officers, partners, principals, members, trustees or employees for any **Wrongful Act** committed or allegedly committed after the effective date of the Transaction beyond the ninety (90) day period, unless:

(i)     any of the gross annual fees, assets under management or assets of the Acquired Entity are less than thirty-five percent (35%) of the gross annual fees, assets under management or assets, respectively, of the **Company** at the time immediately preceding the Transaction; and

(ii)     the **Named Insured** gives the Insurer written notice, with full details, of the Transaction within the ninety (90) day period;

(c)     there will be no coverage available under this Coverage Part for any **Claim** made against the Acquired Entity or any of its directors, officers, partners, principals, members, trustees or employees for any **Wrongful Acts** committed or allegedly committed before the effective date of the Transaction.

(2)     If, during the **Policy Period**, any of the following events occurs:

(a)     the merger or acquisition of an **Company**, or of all or substantially all of its assets by another entity such that that the **Company** is not the surviving entity;

(b)     the acquisition by any person, entity or affiliated group of persons or entities of the right to vote for, select or appoint more than fifty percent (50%) of the directors, trustees, or members of the Board of Managers of the **Company**; or

(c)     the appointment of a Receiver, Conservator, Liquidator, Trustee, Rehabilitator, or any comparable authority, with respect to the **Company**;

coverage under this Coverage Part will continue in full force and effect with respect to **Claims** for **Wrongful Acts** committed before such event, but coverage will cease with respect to any **Claims** for **Wrongful Acts** committed after such event.  Immediately upon the consummation of any such event the entire premium for this Coverage Part will be deemed fully earned.

(3)     If, during the **Policy Period**, any entity ceases to be a **Subsidiary**, the coverage provided under this Coverage Part shall continue to apply to the **Insureds** that were covered under this Policy but only with respect to a **Claim** for a **Wrongful Act** that occurred or allegedly occurred prior to the time such **Subsidiary** ceased to be a **Subsidiary** of the **Named Insured**.

Manuscript 10925 07 10

# POLICYHOLDER DISCLOSURE
## NOTICE OF TERRORISM
## INSURANCE COVERAGE

**Coverage for acts of terrorism is already included in your current policy. You are hereby notified that under the Terrorism Risk Insurance Program Reauthorization Extension Act of 2007, the definition of "act of terrorism" has changed. As defined in Section 102(1) of the Act: The term "act of terrorism" means any act that is certified by the Secretary of the Treasury in concurrence with the Secretary of the State, and the Attorney General of the United States—to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. Under your existing coverage, any losses caused by certified acts of terrorism may be partially reimbursed by the United States under a formula established by federal law. Under this formula, the United States generally reimburses 85% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. However, your policy may contain other exclusions that may affect your coverage. The Terrorism Risk Insurance Program Reauthorization Extension Act contains a $100 billion cap that limits U.S. Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses exceeds $100 billion in any one calendar year. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.**

**The portion of your annual premium that is attributable to coverage for acts of terrorism is: $ waived. Any premium waiver is only valid for the current Policy Period.**

I ACKNOWLEDGE THAT I HAVE BEEN NOTIFIED THAT UNDER THE TERRORISM RISK INSURANCE PROGRAM REAUTHORIZATION EXTENSION ACT OF 2007, ANY LOSSES CAUSED BY CERTIFIED ACTS OF TERRORISM UNDER MY POLICY COVERAGE WILL BE PARTIALLY REIMBURSED BY THE UNITED STATES AND I HAVE BEEN NOTIFIED OF THE AMOUNT OF MY PREMIUM ATTRIBUTABLE TO SUCH COVERAGE.

Name of Insurer: **XL Specialty Insurance Company**

Policy Number: **ELU116664-10**

_____
Signature of Insured

_____
Print Name and Title

_____
Date

## NOTICE TO POLICYHOLDERS

## U.S TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC")

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy.  You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Policyholder Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC.  **Please read this Policyholder Notice carefully.**

OFAC administers and enforces sanctions policy, based on Presidential declarations of "national emergency".  OFAC has identified and listed numerous

- Foreign agents
- Front organizations
- Terrorists
- Terrorist organizations
- Narcotics traffickers

as "Specially Designated Nationals and Blocked Persons".  This list can be found on the United States Treasury's web site - http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance will be immediately subject to OFAC.  When an insurance policy is considered to be such a blocked or frozen contract, neither payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

# PRIVACY POLICY

The XL America, Inc. insurance group ("We" or "Our Group"), respects the privacy of all personal information. Thus, the information We collect from our customers, or potential customers, is treated with the highest degree of privacy.

We have developed a Privacy Policy for Our Group that:
1)    ensures the security of your information; and
2)    complies with state and federal privacy laws.

The term "personal information" includes all information we obtain about a customer and maintain in our files. All persons with access to personal information are required to follow this policy.

## Our Privacy Promise

Your privacy rights are important to us. Analysis of your private information allows us to provide to you excellent service and products. Your trust in us depends upon the security and integrity of our records. Thus, We promise to:

1)    Follow strict security standards. This will protect any information you share with us, or that we receive about you.
2)    Verify and exchange data regarding your credit and financial status only for the purposes of: underwriting; policy administration; or risk management. We will obtain only reputable references and services.
3)    Collect and use the least amount of information necessary to:
    a.    advise you and deliver excellent service and products; and
    b.    conduct our business.
4)    Train our employees to securely handle private information. We will only permit authorized employees to have access to such information.
5)    Not disclose data about you or your business to any organization outside Our Group or to third party providers unless:
    a.    we disclose to you our intent to do so; or
    b.    we are required to do so by law.
6)    Not disclose medical information unless:
    a.    you give us written consent to do so; or
    b.    We disclose for any exception provided in the law.
7)    attempt to keep our records complete and exact.
8)    advise you how and where to access your account (unless prohibited by law).
9)    advise you how to correct errors or make changes to your account.
10)    inspect our procedures to ensure your privacy.

## Collection and Sources of Information

We collect only the personal information needed to:
1)    determine suitability for a product or service;
2)    manage the product or service; and
3)    advise customers about our products and services.

The information we collect come from the following sources:

- **Submission** – In the application, you provide: your name; address; phone number; e-mail address; and other types of private information.
- **Quotes** – We collect information to determine:

1)      your eligibility for an insurance product; and
2)      your coverage cost.
The data we collect will vary with the type of insurance you seek.

- **Transactions** – We maintain records of all transactions with Our Group and our third party providers. Our records include:
  1)      your coverage choices;
  2)      premiums; billing; and payment records,
  3)      claims history; and
  4)      other data related to your account.

- **Claims** –We maintain records on any claims that are made under your policies.  The investigation of a claim involves collection of a broad range of information.  It also involves many issues, some of which do not directly involve you.  We will share with you facts that we collect about your claim; unless prohibited by law.  The process of claim investigation also involves advice; opinions; and comments from many people.  These may include attorneys and experts.  This will help us determine how best to handle your claim.  To protect the legal and privileged aspects of opinions and advice, we will not disclose this information to you.

- **Credit and Financial Reports** – We may receive your credit history.  This is to support information you provided during the submission and quote processes.  This history will help to underwrite your coverage.

### Retention and Correction of Personal Information

We retain personal information only as long as required by law; or as required by our business methods. If we become aware that any information may be incorrect, we will make reasonable effort to correct it.

### Storage of Personal Information

Safeguards are in place to protect data and paper files containing personal information.

### Sharing/Disclosing of Personal Information

We do not share personal information with a third party outside of Our Group for marketing purposes. This is true unless such sharing is permitted by law.  Information may be shared with a third party for necessary servicing of the product.  It may also be disclosed for other business reasons as permitted by law.

We do not share personal data outside of Our Group for servicing or joint marketing reasons.  We will only disclose such data when a contract containing non-disclosure language has been signed by us and the third party.

Unless a consumer consents, we do not disclose "consumer credit report" type information outside of Our Group.  "Consumer credit report type information" means such things as: net worth; credit worthiness; hobbies (piloting, boating, etc.); solvency; etc.

We also do not disclose outside of Our Group personal information for use in marketing.  We may share information within Our Group regarding our experience and dealings with the customer.

We may disclose private information about a customer as allowed or otherwise required by law.  The law allows us to share a customer's financial data within Our Group for marketing purposes.  The law does not allow customers to limit or prevent such disclosures.

We may also disclose personal information about you or your business to:
- your independent agent or broker;
- an independent claim adjuster; investigator; attorney; or expert;
- persons or groups that conduct scientific studies.  This includes actuaries and accountants;

- a medical care facility or professional to verify coverage for a covered person;
- an insurance support group;
- another insurer if to prevent fraud;
- another insurer to properly underwrite a risk;
- insurance regulators;
- governmental authorities pursuant to law;
- an authority in response to a valid administrative or judicial order.  This includes a warrant or subpoena;
- a party for the following purposes regarding a book of business: sale; transfer; merger; or consolidation.  This applies whether the transaction is proposed or complete;
- a professional peer review group.  This includes reviewing the service or conduct of medical care facilities or personnel;
- a covered person for providing the status of a transaction; or
- any of the following: a lienholder; mortgagee; assignee; lessor; or other person of record having a legal interest in the policy.

<u>**Policy for Personal Information Relating to Nonpublic Personal Health Information**</u>

We do not disclose nonpublic personal health information about a customer; unless consent is obtained from that customer.   However, such consent shall not be prohibited, limited or sought for certain insurance functions.  This includes, but is not limited to:

     a.     claims administration;

     b.     fraud prevention;

     c.     underwriting; policy placement or issuance; loss control or auditing.

<u>**Access to Your Information**</u>

The following persons will have access to personal information we collect:
employees of Our Group and third party service providers.  Information will only be collected as is needed in transactions with you.

<u>**Violation of the Privacy Policy**</u>

Any person violating this Policy will be subject to discipline. This may include termination.


For questions regarding this privacy statement, please contact your brok


XLA-CA-Privacy Notice (4/03)            Page 3

# NOTICE TO POLICYHOLDERS

## FRAUD NOTICE

| | |
|---|---|
| **Arkansas** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **Colorado** | It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claiming with regard to a settlement or award payable for insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies. |
| **District of Columbia** | **WARNING:** It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant. |
| **Florida** | Any person who knowingly and with intent to injure, defraud, or deceive any insurance company files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree. |
| **Hawaii** | For your protection, Hawaii law requires you to be informed that presenting a fraudulent claim for payment of a loss or benefit is a crime punishable by fines or imprisonment, or both. |
| **Kentucky** | Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime. |
| **Louisiana** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **Maine** | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines, or denial of insurance benefits. |
| **Maryland** | Any person who knowingly and willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly and willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |

Page 1
© 2009 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

# NOTICE TO POLICYHOLDERS

| | |
|---|---|
| **New Jersey** | Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties. |
| **New Mexico** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to civil fines and criminal penalties. |
| **New York** | **All Commercial Insurance Forms, Except As Provided for Automobile Insurance:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

**Automobile Insurance Forms:** Any person who knowingly makes or knowingly assists, abets, solicits or conspires with another to make a false report of the theft, destruction, damage or conversion of any motor vehicle to a law enforcement agency, the department of motor vehicles or an insurance company, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the value of the subject motor vehicle or stated claim for each violation.

**Fire Insurance:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime. The proposed insured affirms that the foregoing information is true and agrees that these applications shall constitute a part of any policy issued whether attached or not and that any willful concealment or misrepresentation of a material fact or circumstances shall be grounds to rescind the insurance policy. |
| **Ohio** | Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud. |
| **Oklahoma** | **WARNING:** Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony. |
| **Pennsylvania** | Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

**Automobile Insurance Forms:** Any person who knowingly and with intent to injure or defraud any insurer files an application or claim containing any false, incomplete or misleading information shall, upon conviction, be subject to imprisonment for up to seven years and the payment of a fine of up to $15,000. |

PN CW 01 0210

© 2009 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

# NOTICE TO POLICYHOLDERS

| | |
|---|---|
| **Puerto Rico** | Any person who knowingly and with the intention to defraud includes false information in an application for insurance or file, assist or abet in the filing of a fraudulent claim to obtain payment of a loss or other benefit, or files more than one claim for the same loss or damage, commits a felony and if found guilty shall be punished for each violation with a fine of no less than five thousands dollars ($5,000), not to exceed ten thousands dollars ($10,000); or imprisoned for a fixed term of three (3) years, or both.  If aggravating circumstances exist, the fixed jail term may be increased to a maximum of five (5) years; and if mitigating circumstances are present, the jail term may be reduced to a minimum of two (2) years. |
| **Rhode Island** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **Tennessee** | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.<br><br>**Workers Compensation:**  It is a crime to knowingly provide false, incomplete or misleading information to any party to a workers compensation transaction for the purpose of committing fraud. Penalties include imprisonment, fines and denial of insurance benefits. |
| **Utah** | **Workers Compensation:**  Any person who knowingly presents false or fraudulent underwriting information, files or causes to be filed a false or fraudulent claim for disability compensation or medical benefits, or submits a false or fraudulent report or billing for health care fees or other professional services is guilty of a crime and may be subject to fines and confinement in state prison. |
| **Virginia** | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits. |
| **Washington** | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits. |
| **West Virginia** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **All Other States** | Any person who knowingly and willfully presents false information in an application for insurance may be guilty of insurance fraud and subject to fines and confinement in prison. |

© 2009 X.L. America, Inc.  All Rights Reserved.<br>May not be copied without permission.

# IN WITNESS

## XL SPECIALTY INSURANCE COMPANY

REGULATORY OFFICE
505 EAGLEVIEW BOULEVARD, SUITE 100
DEPARTMENT: REGULATORY
EXTON, PA 19341-0636
PHONE: 800-688-1840

It is hereby agreed and understood that the following In Witness Clause supercedes any and all other In Witness clauses in this policy.

All other provisions remain unchanged.

IN WITNESS WHEREOF, the Insurer has caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by a duly authorized representative of the Insurer.

_____
Bernard R. Horovitz
President

_____
Toni Ann Perkins
Secretary

LAD 400 XLS 0710

© 2010 X.L. America, Inc.  All Rights Reserved.  May not be copied without permission.

**Endorsement No.: 1**
**Named Insured: Level Global Investors, L.P.**
**Policy No.: ELU116664-10**

XL 80 24 03 03

**Effective: April 21, 2010**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# TERRORISM PREMIUM ENDORSEMENT

Please note: The portion of your annual premium set forth in Item 8. of the Declarations that is attributable to coverage for acts of terrorism is: $ waived.

All other terms, conditions and limitations of this Policy shall remain unchanged.

FD 72 08 11 06

Endorsement No.: 2
Named Insured: Level Global Investors, L.P.
Policy No.: ELU116664-10

Effective: April 21, 2010
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

# NEW YORK DEFENSE EXPENSES DISCLOSURE

This endorsement modifies insurance provided under the following:

FINANCIAL SERVICES LIABILITY INSURANCE COVERAGE FORM

**Defense Expenses** reduce and may completely exhaust the applicable Limit of Liability.  To the extent the applicable Limit of Liability is exceeded, the Insurer shall not be liable for **Defense Expenses** or for the amount of any judgment or settlement. **Defense Expenses** are also applied to the applicable retention.

This form shall be attached to and made part of the Policy.

The below Officer of the **Named Insured**, on behalf of the **Insureds**, acknowledges that he/she read this form and understands the above provisions.

All other terms, conditions and limitations of this Policy shall remain unchanged.

FD 72 07 11 06

Endorsement No.: 3
Named Insured: Level Global Investors, L.P.
Policy No.: ELU116664-10

Effective: April 21, 2010
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

# NEW YORK DISCLOSURE STATEMENT

This endorsement modifies insurance provided under the following:

FINANCIAL SERVICES LIABILITY INSURANCE COVERAGE FORM

This Policy is a claims-made policy.

Coverage under this Policy or any subsequent renewal of this Policy, subject to the terms of the applicable policy, applies only to any "**Claim**" (as defined herein) made against the **Insureds**, for a specific **Wrongful Act** reported during the **Policy Period** of this Policy or the applicable renewal policy.  All coverage under this Policy ceases upon **Termination of Coverage**, except for the Automatic Extension Period unless the Optional Extension Period is purchased.

The below officer of the **Named Insured**, on behalf of the **Insureds**, acknowledges that he/she has received information from the Insurer or its agent explaining the limitations and potential gaps in coverage of a claims-made policy and that he/she understands these limitations and potential gaps in coverage.

This Policy includes a 60-day automatic extended reporting period, referred to as the Automatic Extension Period.

This Policy provides the **Insured** with the option to purchase for an additional premium at least a one-year Optional Extension Period from the termination of this Policy.  The premium for the Optional Extension Period is indicated in ITEM 5 of the Policy's Declarations.

During the first several years of a claims-made relationship between the **Insureds** and the Insurer, claims-made rates are relatively lower than occurrence rates, and the **Insured** can expect substantial annual premium increases independent of overall rate level increases, until the claims-made relationships reaches maturity.

All other terms, conditions and limitations of this Policy shall remain unchanged.

FD 72 07 11 06

Page 1 of 1

**FD 72 10 11 06**

Endorsement No.: 4
Named Insured: Level Global Investors, L.P.
Policy No.: ELU116664-10

Effective: April 21, 2010
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

# NEW YORK COINSURANCE ENDORSEMENT – INVESTMENT ADVISERS MANAGEMENT LIABILITY COVERAGE PART

This endorsement modifies insurance provided under the following:

FINANCIAL SERVICES LIABILITY INSURANCE COVERAGE FORM

Solely for the purpose of the coverage provided under Section I. Insuring Agreements (A) of the Investment Advisers Management Liability Coverage Part, in accordance with New York State Laws BCL section 726(a)(3):

1.  the **Insured Persons** are liable to coinsure 0.5% of **Loss** in excess of the retention for the first $1,000,000 of coverage; and

2.  the retention shall be $5,000 each **Insured Person**, not to exceed $50,000 in the aggregate.

The **Insured Persons** shall not be liable to coinsure any **Loss** in excess of the first $1,000,000 of **Loss** in excess of the retention under Section I. Insuring Agreements (A).

All other terms, conditions and limitations of this Policy remain unchanged.

FD 72 09 11 06

Endorsement No.: 5                 Effective: April 21, 2010
Named Insured: Level Global Investors, L.P.    12:01 A.M. Standard Time
Policy No.: ELU116664-10         Insurer: XL Specialty Insurance Company

# NEW YORK AMENDATORY ENDORSEMENT – GENERAL TERMS AND CONDITIONS

This endorsement modifies insurance provided under the following:

FINANCIAL SERVICES LIABILITY INSURANCE COVERAGE FORM

1.    Section I. GENERAL DEFINITIONS of the General Terms and Conditions of the Policy is amended to include the following:

    (L)    "**Termination of Coverage**" means (1) the Expiration Date set forth in ITEM 2 of the Declarations, or its earlier cancellation date, or (2) a decrease in limits, a reduction in coverage, increased deductible or self-insured retention, new exclusion, or any other change in coverage less favorable to the **Insured.**

2.    Notwithstanding anything to the contrary in the Declarations and Section II. GENERAL CONDITIONS (C) NOTICE (3) of the General Terms and Conditions of the Policy, notice of any **Claim** may also be provided to any authorized agent of the Insurer located within the state of New York.

3.    Section II. GENERAL CONDITIONS (F) CANCELLATION AND RENEWAL OF COVERAGE (2) of the General Terms and Conditions of the Policy is amended to include the following:

    The notice shall state the reason for cancellation.

4.    Section II. GENERAL CONDITIONS (F) CANCELLATION AND RENEWAL OF COVERAGE (3) of the General Terms and Conditions of the Policy is deleted and amended to read as follows:

    (3)    The Insurer is under no obligation to renew this Policy upon its expiration.  Once the Insurer chooses to non-renew this Policy or conditions its renewal upon a change in the Limit of Liability, change in type of coverage, reduction of coverage, increased retention, the addition of any exclusion or an increase in premium in excess of 10%, then the Insurer shall mail or deliver written notice of the refusal to renew or the conditional renewal to the **Named Insured** at the mailing address shown on the Policy and to the **Insureds'** authorized agent at least sixty (60) days but not more than one hundred and twenty (120) days in advance of the Policy Expiration Date.  Such notice shall contain the specific reasons for the refusal to renew or the conditional renewal and shall set forth the amount or a reasonable estimate of any premium increase and describe any additional proposed changes.

        If the Insurer does not provide notice of non-renewal or conditional renewal as provided in Section II.(F)(3), coverage will remain in effect at the same terms and conditions of this Policy at the lower of the current rates or the prior period's rates until 60 days after such notice is mailed or delivered, unless the **Named Insured**, during this 60-day period, has replaced the coverage or elects to cancel.

        If the Insurer provides notice of non-renewal or conditional renewal on or after the Policy Expiration Date, coverage will remain in effect at the same terms and conditions of this Policy for another policy period, at the lower of the current rates or the prior period's rates, unless the **Named Insured**, during the additional policy period, has replaced the coverage or elects to cancel.

The Insurer will not send the **Insureds** notice of non-renewal or conditional renewal if the **Insureds**, their authorized agent or another insurer of the **Insureds** mail or deliver notice that the Policy has been replaced or is no longer desired.

If the **Insureds** elect to accept the terms, conditions and rates of the conditional renewal notice pursuant to Section II.(F)(3), a new maximum aggregate Limit of Liability shall become effective as of the inception date of renewal, subject to regulations promulgated by the Superintendent of Insurance.

8.    Section II. GENERAL CONDITIONS (G) OPTIONAL EXTENSION PERIOD of the General Terms and Conditions of the Policy is deleted and amended to read as follows:

(1)    If either the **Named Insured** or the Insurer cancels or does not renew this Policy, or if the **Named Insured** or Insurer offers to renew this Policy on terms which involve a decrease in the Limit of Liability, a reduction in coverage, an increase in Retention, an addition of an exclusion, an increase in premium in excess of 10% over the current Policy's premium, or any change in coverage less favorable to the **Insured**, then, without any additional premium being required, there shall be an automatic extension of the coverage granted by this Policy with respect to any **Claim** first made during a period of sixty (60) days immediately following the **Termination of Coverage**, but only with respect to a **Wrongful Act** committed before the **Termination of Coverage**, provided such **Wrongful Act** is otherwise covered by this Policy. This 60-day period shall be referred to as the "Automatic Extension Period". The granting of such Automatic Extension Period shall not serve to increase the Limits of Liability set forth in ITEM 3 of the Declarations applicable to the Policy Period and Automatic Optional Extension Period.

(2)    If either the **Named Insured** or the Insurer cancels or does not renew this Policy, or if the **Named Insured** or Insurer offers to renew this Policy on terms which involve a decrease in the Limit of Liability, a reduction in coverage, an increase in Retention, an addition of an exclusion, an increase in premium in excess of 10% over the current Policy's premium, or any change in coverage less favorable to the Insured, then the **Named Insured** shall have the right, upon payment of an additional premium set forth in ITEM 5 of the Declarations, to a one or two year extension of the coverage provided by this Policy with respect only to any **Claim** first made during the one or two year period of time after the date upon which the Automatic Extension Period ends. However, the extension of coverage applies only to a **Wrongful Act** committed before the **Termination of Coverage** provided such **Wrongful Act** is otherwise covered by this Policy. This additional period of coverage shall be referred to as the "Optional Extension Period". Except in the Declarations to the Policy and this Section II., the Automatic Extension Period may also be referred to as the Optional Extension Period.

(3)    The Limits of Liability applicable to the Optional Extension Period, if any, shall be at least equal to the amount of coverage remaining in the Policy's applicable Limits of Liability set forth in ITEM 3 of the Declarations.

(4)    The Insurer shall provide written notice to the Named Insured of the Automatic Optional Extension Period and the availability of, the premium for, and the importance of purchasing, the Optional Extension Period within thirty (30) days after the **Termination of Coverage.**

(5)    The right to purchase the Optional Extension Period shall terminate unless written notice is given to the Insurer within sixty (60) days from the **Termination of Coverage**, or within thirty (30) days after the mailing or delivery of the notice provided by the Insurer under Section II.(G)(4), above, whichever is greater, together with full payment of the premium for the Optional Extension Period. If such notice and premium payment are not so given to the Insurer, the **Named Insured** will not be able to exercise the right to purchase the Optional Extension Period.

(6)    If the Optional Extension Period is purchased, the entire premium shall be deemed earned at its commencement and if the **Named Insured** terminates the Optional Extension Period before its term, the Insurer shall not be liable to return any portion of the premium paid for the Optional Extension

Period. The premium charged for the Optional Extension Period shall be based upon the rates in effect on the date this Policy was last issued or renewed.

(7)  In the event the **Named Insured** is in liquidation or bankruptcy, or permanently ceases operation, and if the **Named Insured** or its designated trustee, although entitled to, does not purchase the Optional Extension Period, any **Insured Person** who requests the Optional Extension Period within 120 days of the **Termination of Coverage** may purchase the Optional Extension Period, as provided in Section II.(G)(2), above.

(8)  After an **Insured Person** has ceased to be affiliated with the **Named Insured** or any **Subsidiary** as an **Insured Person**, that **Insured Person** shall continue to be covered under this Policy and any Optional Extension Period for his or her covered **Wrongful Acts** during his or her affiliation with the **Named Insured** or any **Subsidiary** as an **Insured Person**.

(9)  Upon **Termination of Coverage**, any return premium due the **Named Insured** shall be applied to the premium for the Optional Extension Period if the **Named Insured** elects to purchase such coverage. Where the premium is due to the Insurer, any payment received by the Insurer from the **Insured** as payment for the Optional Extension Period shall be first applied to any premium due for the Policy.

(10) In the event similar insurance to that provided by this Policy is in force during the Optional Extension Period, the coverage afforded during the Optional Extension Period shall be excess over any such valid and collectible insurance.

9.  Section II. GENERAL CONDITIONS (L) ACTION AGAINST THE INSURER, ASSIGNMENT, AND CHANGES TO THE POLICY (1) of the Policy is amended to include the following:

If the Insurer does not pay any judgment covered by the terms of this Policy within thirty (30) days from the service of notice of the judgment upon the **Insured** or its attorney and the Insurer, then an action may be brought against the Insurer under the terms of the Policy for the amount of judgment not exceeding the amount of the applicable Limit of Liability under the Policy, except during a stay or limited stay of execution against the Insured on such judgment.

10. Section II. GENERAL CONDITIONS of the Policy is amended to include the following:

The insolvency or bankruptcy of the **Insureds**, or the insolvency of their estates, shall not release the Insurer from the payment of **Loss** not otherwise excluded under this Policy.

All other terms, conditions and limitations of this Policy shall remain unchanged.

FD 72 06 11 06

**Endorsement No.: 6**
**Named Insured: Level Global Investors, L.P.**
**Policy No.: ELU116664-10**

**Effective: April 21, 2010**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# NEW YORK AMENDATORY ENDORSEMENT – EMPLOYMENT PRACTICES LIABILITY COVERAGE PART

This endorsement modifies insurance provided under the following:

FINANCIAL SERVICES LIABILITY INSURANCE COVERAGE FORM

Section II. DEFINITIONS (F)(2) and (3) of the Employment Practices Liability Coverage Part are deleted and amended to read as follows:

(2)     vicarious liability for employment discrimination of any kind including violation of any federal, state or local law involving employment or discrimination in employment which would deprive or potentially deprive any person of employment opportunities or otherwise adversely affect his or her status as an employee because of such person's race, color, religion, age, sex, national origin, disability, sexual preference, pregnancy, or other protected status; or disparate impact discrimination in employment.

(3)     vicarious liability for unwelcome sexual advances, requests for sexual favors, or other verbal, visual or physical contact of a sexual nature or other harassment in the workplace;

All other terms, conditions and limitations of this Policy shall remain unchanged.

FD 80 06 09 00

**Endorsement No.: 7**
**Named Insured: Level Global Investors, L.P.**
**Policy No.:  ELU116664-10**
**Coverage Part: Investment Fund Management and Professional Liability**

**Effective: April 21, 2010**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# SCHEDULE OF INVESTMENT FUND(S)

In consideration of the premium charged, the term "Investment Fund" shall be deemed to include the following Investment Fund(s):

INVESTMENT FUND(S)

Level Global, LP
Level Global Investors, LP
Level Global Overseas Master Fund, Ltd
Level Radar, LP
Level Radar Fund, Ltd
Level Radar Master Fund, Ltd

All other terms, conditions and limitations of this Policy shall remain unchanged.

FD 80 06 09 00

Page 1 of 1

04/16/2010 13:22 IFAX                                    → Brian Murray        ☒001/005


**XL INSURANCE**

## FINANCIAL SERVICES LIABILITY POLICY APPLICATION

## INVESTMENT FUND MANAGEMENT AND PROFESSIONAL LIABILITY COVERAGE (D&O/GPL/E&O)

**(Complete only if coverage is desired under the Investment Fund Management and Professional Liability Coverage Part of the Financial Services Liability Policy)**

**NOTICE: THE POLICY FOR WHICH THIS APPLICATION IS MADE APPLIES, SUBJECT TO ITS TERMS, ONLY TO "CLAIMS" FIRST MADE DURING THE POLICY PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED BY "DEFENSE EXPENSES," AND "DEFENSE EXPENSES" WILL BE APPLIED AGAINST THE RETENTION. THE ENTIRE APPLICATION SHOULD BE CAREFULLY READ BEFORE IT IS EXECUTED.**

1.  Name of Applicant: _Level Global Investors, L P_
    (Whenever used in this Application, the term "**Applicant**" shall mean the Named Insured.)

2.  Principal Address: _888  Seventh  Avenue  -  27th Floor_

    City: _New York_            State: _NY_   Zip Code: _10019_

3.  Please complete the following schedule of Funds:

@ 3-31-10

| Name of Investment Fund | Date Established | Total Committed Capital Amount | Current Asset Amount (Cost) | Current Asset Amount (Value) |
|---|---|---|---|---|
| Level Global, L.P | March 2005 | $ | $ | $ 879,309,427 |
| Level Global Overseas, Ltd | March 2005 | $ | $ | $ 2,568,482,482 |
| Level Global Overseas Master Fund Ltd | March 2003 | $ | $ | $ 3,569,557,998 |
|  |  | $ | $ | $ |
|  |  | $ | $ | $ |
|  |  | $ | $ | $ |
| Level Radar, L.P. | Aug 2006 | $ | $ | $ 34,813,913 |
| Level Radar Fund, Ltd | Aug 2006 | $ | $ | $ 323,281,753 |
| Level Radar Master Fund, Ltd | Aug 2006 | $ | $ | $ 371,543,447 |
|  |  | $ | $ | $ |
|  |  | $ | $ | $ |
|  |  | $ | $ | $ |
|  |  | $ | $ | $ |

**Note:**  If there are additional Funds to be added to this schedule, please do so by attachment to this Application.

4.  a)  Is there an affiliated investment manager of the Funds scheduled above?   ☐ Yes  ☒ No

    If "Yes," please provide name and address: _____

    b)  Is there an affiliated distributor/underwriter of the Funds scheduled above?   ☐ Yes  ☒ No

    If "Yes," please provide name and address: _____

5.  a)  Have there been any changes or modifications in the investment restrictions or limitations of any Fund during the past two (2) years?   ☐ Yes  ☒ No
        If "Yes," please explain by attachment to this Application.

    b)  Have there been any material changes in the administrative operations or investment policies of any Fund during the past two (2) years?   ☐ Yes  ☒ No
        If "Yes," please explain by attachment to this Application.

# **XL**INSURANCE

6.   Has any representative of the **Applicant** ever served on the board of directors or served as an officer of any Portfolio Company?                                                                        ☐ Yes   ☒ No
     If "Yes," please complete the schedule of Portfolio Companies below:

| Name of Portfolio Company | Applicant's Representative Board Member / Officer | Dates of Service | Public or Private |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

7.   Has any person(s) or entity(ies) proposed for this insurance been a party to any civil, criminal, disciplinary action or administrative proceeding alleging or investigating a violation of any federal or state security law or regulation?                                                                        ☐ Yes   ☒ No
     If "Yes," please explain by attachment to this Application.

8.   a)   Have any claims such as would fall within the scope of the proposed insurance been made against any person(s) or entity(ies) proposed for this insurance?  (If "Yes," please explain by attachment to this Application.)                                                                   ☐ Yes   ☒ No

     b)   Is any person(s) or entity(ies) proposed for this insurance aware of any fact, circumstance or situation which might afford valid grounds for any claim such as would fall within the scope of the proposed insurance?  (If "Yes," please explain by attachment to this Application.)               ☐ Yes   ☒ No

     **Without prejudice to any other rights and remedies of the Insurer, any Claim arising from any claims, facts, circumstances or situations required to be disclosed in response to 8.a) or 8.b) above is excluded from the proposed insurance.**

9.   As part of this Application, please submit the following documents with respect to the **Applicant**:

     a)   Most recent private placement memorandum for each Fund.
     b)   Most recent annual and quarterly report for each Fund.
     c)   Latest version of the partnership agreement for each Fund.
     d)   Summary and status of any litigation filed within the last twelve (12) months against any person(s) or entity(ies) proposed for this insurance (including any litigation that has been resolved).

04/16/2010 13:23 IFAX                                      → Brian Murray          Ø003/005



FOR THE PURPOSE OF THIS APPLICATION, THE UNDERSIGNED AUTHORIZED AGENT OF THE PERSON(S) AND ENTITY(IES) PROPOSED FOR THIS INSURANCE DECLARES THAT TO THE BEST OF THEIR KNOWLEDGE AND BELIEF, AFTER REASONABLE INQUIRY, THE STATEMENTS HEREIN ARE TRUE AND COMPLETE. THE INSURER IS AUTHORIZED TO MAKE ANY INQUIRY IN CONNECTION WITH THIS APPLICATION. SIGNING THIS APPLICATION DOES NOT BIND THE INSURER TO COMPLETE THE INSURANCE.

THE UNDERSIGNED DECLARES THAT THE PERSON(S) AND ENTITY(IES) PROPOSED FOR THIS INSURANCE UNDERSTAND:

(A)     THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED, AND MAY BE COMPLETELY EXHAUSTED BY THE PAYMENT OF "DEFENSE EXPENSES," AND IN SUCH EVENT, THE INSURER WILL NOT BE RESPONSIBLE FOR ANY ONGOING DEFENSE EXPENSES OR FOR THE AMOUNT OF ANY JUDGEMENT OR SETTLEMENT TO THE EXTENT THAT ANY OF THE FOREGOING EXCEED ANY APPLICABLE LIMIT OF LIABILITY;

(B)     "DEFENSE EXPENSES" WILL BE APPLIED AGAINST THE RETENTION;

(C)     THIS POLICY APPLIES ONLY TO "CLAIMS" FIRST MADE OR DEEMED MADE DURING THE "POLICY PERIOD," OR, IF PURCHASED, ANY EXTENDED REPORTING PERIOD;

IF THE INFORMATION IN THIS APPLICATION MATERIALLY CHANGES BETWEEN THE DATE OF THIS APPLICATION AND THE POLICY EFFECTIVE DATE, THE APPLICANT WILL NOTIFY THE INSURER WHO MAY MODIFY OR WITHDRAW ANY QUOTATION.

THE INFORMATION CONTAINED AND SUBMITTED WITH THIS APPLICATION IS ON FILE WITH THE INSURER AND, ALONG WITH THIS APPLICATION, IS CONSIDERED TO BE PHYSICALLY ATTACHED TO THE POLICY AND WILL BECOME PART OF THE POLICY IF ISSUED.

**Notice to Arizona Applicants:**  For your protection, Arizona law requires the following statement to appear on this form. Any person who knowingly presents a false or fraudulent claim for payment of a loss is subject to criminal and civil penalties.

**Notice to Arkansas Applicants:**  Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**Notice to Colorado Applicants:**  It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company.  Penalties may include imprisonment, fines, denial of insurance and civil damages.  Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policy holder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.

**Notice to District of Columbia Applicants:** WARNING: It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant.

**Notice to Florida Applicants:**  Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony in the third degree.

**Notice to Hawaii Applicants:** For your protection, Hawaii law requires you to be informed that presenting a fraudulent claim for payment of a loss or benefit is a crime punishable by fines or imprisonment, or both.

**Notice to Kentucky Applicants:**  Any person who knowingly and with intent to defraud any insurance company or other person files a statement of claim containing materially false information concerning any fact material thereto commits a fraudulent insurance act, which is a crime.



**Notice to Louisiana Applicants:**   Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**Notice to Maine Applicants:**  It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company.  Penalties may include imprisonment, fines or a denial of insurance benefits.

**Notice to New Jersey Applicants:**  Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties.

**Notice to New Mexico Applicants:**  Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to civil fines and criminal penalties.

**Notice to New York Applicants:**  Any person who, knowingly and with intent to defraud any insurance company or other person, files an application for insurance or statement of claim containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime and is subject to a civil penalty not to exceed $5,000.00 and the stated value of the claim for each such violation.

**Notice to Ohio Applicants:**  Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

**Notice to Oklahoma Applicants:  WARNING:**  Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

**Notice to Pennsylvania Applicants:**  Any person who, knowingly and with intent to defraud any insurance company or other person, files an application for insurance or statement of claim containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

**Notice to Puerto Rico Applicants:** Any person who knowingly and with the intention to defraud includes false information in an application for insurance or file, assist or abet in the filing of a fraudulent claim to obtain payment of a loss or other benefit, or files more than one claim for the same loss or damage, commits a felony and if found guilty shall be punished for each violation with a fine of no less than five thousands dollars ($5,000), not to exceed ten thousands dollars ($10,000); or imprisoned for a fixed term of three (3) years, or both.  If aggravating circumstances exist, the fixed jail term may be increased to a maximum of five (5) years; and if mitigating circumstances are present, the jail term may be reduced to a minimum of two (2) years.

**Notice to Tennessee, Virginia, and Washington Applicants:**  It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.

| APPLICANT | | |
|---|---|---|
| *Jeremy Bohrer (signature)* | | |
| BY (President and/or CEO Signature) | TITLE | DATE |
| *Jeremy E. Bohrer* | *Chief Operating Officer* | *4-16-10* |

NOTE:  This Application must be signed by the President and/or CEO of the Applicant acting as the authorized agent of the persons and entity(ies) proposed for this insurance.

04/16/2010 13:24 IFAX                                    → Brian Murray        ☒005/005



| PRODUCER (Insurance Agent or Broker) | INSURANCE AGENCY OR BROKERAGE |
|---|---|
| INSURANCE AGENCY TAXPAYER I.D. OR SOCIAL SECURITY NO. | AGENT OR BROKER LICENSE NO. |
| ADDRESS OF AGENT OR BROKER (Include Street, City and Zip Code) | |
| E-MAIL ADDRESS OF AGENT OR BROKER | |

| SUBMITTED BY (Insurance Agency) | INSURANCE AGENCY TAXPAYER I.D. OR SOCIAL SECURITY NO. |
|---|---|
| ADDRESS OF AGENT OR BROKER (Include Street, City and Zip Code) | |

# B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - x
                                     :
UNITED STATES OF AMERICA             :
                                     :
        -v.-                         :
                                     :
SPYRIDON ADONDAKIS,                  :
     a/k/a "Sam Adondakis,"          :
                                     :
                Defendant.           :
                                     :
- - - - - - - - - - - - - - - - - - x

**◻ORIGINAL**

# 11 CRIM 360

<u>INFORMATION</u>

11 Cr. ____

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4-25-11

## COUNT ONE

(Conspiracy to Commit Securities Fraud)

The United States Attorney charges:

### Relevant Entities and Individuals

1.   From in or about 2006 through in or about May 2010, SPYRIDON ADONDAKIS, a/k/a "Sam Adondakis," the defendant, worked as a research analyst for a hedge fund based in New York, New York ("Hedge Fund A").  At certain times relevant to this Information, Hedge Fund A had approximately $4 billion in assets under management.

### The Insider Trading Scheme

2.   From at least in or about 2007 through in or about 2010, SPYRIDON ADONDAKIS, a/k/a "Sam Adondakis," the defendant, and others known and unknown, conspired to engage in insider trading.  In furtherance of the conspiracy, ADONDAKIS, together with one or more coconspirators at Hedge Fund A (the "Hedge Fund A Coconspirators"), obtained material, nonpublic information ("Inside Information") from certain other coconspirators (and in

certain cases, exchanged Inside Information with such

coconspirators), known and unknown, including one or more

coconspirators at other hedge funds and investment firms (the

"Hedge Fund/Investment Firm Coconspirators"), for the purpose of

executing profitable securities transactions on the basis of the

Inside Information for the benefit of Hedge Fund A.

     3.   In addition, in furtherance of the conspiracy,

SPYRIDON ADONDAKIS, a/k/a "Sam Adondakis," the defendant, certain

of the Hedge Fund/Investment Firm Coconspirators, and others known

and unknown, utilized expert networking firms, including a firm

whose main office was located in Mountain View, California (the

"Firm"), to gain and/or facilitate access to employees at public

companies ("Firm Consultants") who in turn provided Inside

Information.  The Firm paid the Firm Consultants to provide

information to its clients ("Firm Clients").  The Firm Clients

included Hedge Fund A and other hedge funds at which the Hedge

Fund/Investment Firm Coconspirators worked.  The Firm Clients paid

money to the Firm to gain access to the Firm Consultants.

     4.   SPYRIDON ADONDAKIS, a/k/a "Sam Adondakis," the

defendant, the Hedge Fund A Coconspirators, and the Hedge

Fund/Investment Firm Coconspirators obtained Inside Information

directly and indirectly from public company employees, including

the Firm Consultants.  The Inside Information related to various

technology companies whose shares are traded on public exchanges

(the "Technology Companies").   The Inside Information included
information relating to earnings, revenues, gross margins, and
other confidential and material business developments of the
Technology Companies.

5.   The Inside Information provided to SPYRIDON
ADONDAKIS, a/k/a "Sam Adondakis," the defendant, the Hedge Fund A
Coconspirators, the Hedge Fund/Investment Firm Coconspirators, and
others known and unknown, was obtained in violation of: (i)
fiduciary and other duties of trust and confidence owed by the
employees of the Technology Companies to their employers; (ii)
expectations of confidentiality held by the Technology Companies;
and (iii) written policies of the Technology Companies regarding
the use and safekeeping of Inside Information.

6.   As a part of the scheme, SPYRIDON ADONDAKIS, a/k/a
"Sam Adondakis," the defendant, exchanged Inside Information with
the Hedge Fund/Investment Firm Coconspirators by email.   In
addition, ADONDAKIS often forwarded by email the Inside
Information he received from the Hedge Fund/Investment Firm
Coconspirators to the Hedge Fund A Coconspirators.   However, with
respect to certain, particularly sensitive Inside Information,
ADONDAKIS, the Hedge Fund/Investment Firm Coconspirators, and the
Hedge Fund A Coconspirators often used the telephone, and not
emails, as a means to share the Inside Information.

7.   On the basis of the Inside Information that SPYRIDON ADONDAKIS, a/k/a "Sam Adondakis," the defendant, obtained from both the Hedge Fund/Investment Firm Coconspirators and the Firm Consultants, the Hedge Fund A Coconspirators, and others known and unknown, executed transactions and caused others to execute transactions in the securities of the Technology Companies, earning substantial sums in unlawful profits.

8.   For example, in or about 2008, SPYRIDON ADONDAKIS, a/k/a "Sam Adondakis," the defendant, obtained Inside Information pertaining to Dell, Inc. ("Dell"), which traded on the NASDAQ, from certain of the Hedge Fund/Investment Firm Coconspirators. The Inside Information, which included information concerning Dell's revenue and gross margin numbers, was obtained before that information was made public in connection with the company's quarterly earnings announcements.  ADONDAKIS provided the Inside Information to the Hedge Fund A Coconspirators in advance of the quarterly announcements, and one or more of the Hedge Fund A Coconspirators executed or caused to be executed transactions in securities of Dell based on the Inside Information, earning millions of dollars in profits for the benefit of Hedge Fund A.

9.   Specifically, in advance of Dell's May 29, 2008 quarterly earnings announcement, SPYRIDON ADONDAKIS, a/k/a "Sam Adondakis," the defendant, received Inside Information indicating that Dell's revenue and margin numbers would be higher than the

4

prevailing market expectations.  ADONDAKIS provided this Inside

Information to one or more of the Hedge Fund A Coconspirators.

Based in part on that Inside Information, between on or about May

13, 2008 and May 28, 2008, one or more of the Hedge Fund A

Coconspirators purchased or caused to be purchased approximately

1.7 millions shares of Dell stock.  Additionally, on or about May

12, 2008, based in part on the same Inside Information, one or

more of the Hedge Fund A Coconspirators purchased option contracts

in Dell.  Shortly after Dell's May 29, 2008 quarterly earnings

announcement, which caused the price of Dell shares to increase by

more than 5%, one or more of the Hedge Fund A Coconspirators sold

the recently purchased Dell stock and option contracts, realizing

a profit of over $4 million for Hedge Fund A.

      10.  Additionally, in advance of Dell's August 28, 2008

quarterly announcement, SPYRIDON ADONDAKIS, a/k/a "Sam Adondakis,"

the defendant, received Inside Information indicating that Dell's

gross margins would be materially lower than the prevailing market

expectations.  ADONDAKIS provided this Inside Information to one

or more of the Hedge Fund A Coconspirators.  Based in part on that

Inside Information, between on or about July 8, 2008 and August

28, 2008, one or more of the Hedge Fund A Coconspirators sold

short approximately nine million shares of Dell stock.

Additionally, between on or about August 11, 2008 and August 26,

2008, based in part on the same Inside Information, one or more of

the Hedge Fund A Coconspirators purchased option contracts in
Dell.  Shortly after Dell's August 28, 2008 quarterly earnings
announcement, which caused the price of Dell shares to drop by
approximately 13%, one or more of the Hedge Fund A Coconspirators
covered Hedge Fund A's entire short position in Dell and sold all
of the Dell option contracts purchased by Hedge Fund A, realizing
a profit of over $50 million for Hedge Fund A.

### The Conspiracy

11.  From at least in or about 2007 through in or about
2010, in the Southern District of New York and elsewhere, SPYRIDON
ADONDAKIS, a/k/a "Sam Adondakis," the defendant, the Hedge Fund A
Conspirators, the Hedge Fund/Investment Firm Coconspirators, the
Firm Consultants, and others known and unknown, unlawfully,
willfully, and knowingly did combine, conspire, confederate and
agree together and with each other to commit an offense against
the United States, to wit, securities fraud, in violation of Title
15, United States Code, Sections 78j(b) and 78ff, and Title 17,
Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2.

### Object of the Conspiracy

### Securities Fraud

12.  It was a part and an object of the conspiracy that
SPYRIDON ADONDAKIS, a/k/a "Sam Adondakis," the defendant, the
Hedge Fund A Coconspirators, the Hedge Fund/Investment Firm
Coconspirators, the Firm Consultants, and others known and

unknown, unlawfully, willfully, and knowingly, directly and
indirectly, by the use of the means and instrumentalities of
interstate commerce, and of the mails, and of the facilities of
national securities exchanges, would and did use and employ, in
connection with the purchase and sale of securities, manipulative
and deceptive devices and contrivances in violation of Title 17,
Code of Federal Regulations, Section 240.10b-5 by: (a) employing
devices, schemes and artifices to defraud; (b) making untrue
statements of material fact and omitting to state material facts
necessary in order to make the statements made, in the light of
the circumstances under which they were made, not misleading; and
(c) engaging in acts, practices and courses of business which
operated and would operate as a fraud and deceit upon any person,
all in violation of Title 15, United States Code, Sections 78j(b)
and 78ff, and Title 17, Code of Federal Regulations, Sections
240.10b-5 and 240.10b5-2.

### Means and Methods of the Conspiracy

13.   Among the means and methods by which SPYRIDON
ADONDAKIS, a/k/a "Sam Adondakis," the defendant, the Hedge Fund A
Coconspirators, the Hedge Fund/Investment Firm Coconspirators, the
Firm Consultants, and others known and unknown, would and did
carry out the conspiracy were the following:

a.   ADONDAKIS obtained Inside Information directly
and indirectly from employees of public companies, including the

7

Firm Consultants, that had been disclosed by those employees in violation of duties of trust and confidence.

      b.   ADONDAKIS and the Hedge Fund/Investment Firm Coconspirators shared with each other Inside Information that they obtained from public company employees, including the Firm Consultants.

      c.   ADONDAKIS provided the Inside Information that he obtained from the Hedge Fund/Investment Firm Coconspirators, the Firm Consultants, and others known and unknown, to the Hedge Fund A Coconspirators.

      d.   The Hedge Fund A Coconspirators used the Inside Information to execute and to cause others to execute profitable securities transactions at Hedge Fund A in numerous public companies, knowing that the information had been disclosed by public company employees in violation of duties of trust and confidence owed to their employers.

### Overt Acts

      14.  In furtherance of the conspiracy, and to effect the illegal object thereof, SPYRIDON ADONDAKIS, a/k/a "Sam Adondakis," the defendant, the Hedge Fund A Coconspirators, the Hedge Fund/Investment Firm Coconspirators, the Firm Consultants, and others known and unknown committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.   In or about August 2008, ADONDAKIS, while working at Hedge Fund A, located in New York, New York, obtained Inside Information pertaining to Dell from certain of the Hedge Fund/Investment Firm Coconspirators.

b.   On or about August 27, 2008, ADONDAKIS had a telephone call with the Hedge Fund A Coconspirators, one or more of whom were located in New York, New York, during which ADONDAKIS discussed Inside Information pertaining to Dell.

c.   In or about August and September 2008, one or more of the Hedge Fund A Coconspirators caused Hedge Fund A to execute securities transactions in Dell on the basis of the Inside Information provided by ADONDAKIS.

d.   On or about February 10, 2009, ADONDAKIS received an email from one of the Hedge Fund/Investment Firm Coconspirators containing Inside Information concerning another technology company.

(Title 18, United States Code, Section 371.)

## COUNT TWO

(Securities Fraud)

The United States Attorney further charges:

15.   The allegations contained in paragraphs 1 through 10 and 13 through 14 are repeated and realleged as though fully set forth herein.

16.   From at least in or about 2007 through in or about
2010, in the Southern District of New York and elsewhere, SPYRIDON
ADONDAKIS, a/k/a "Sam Adondakis," the defendant, unlawfully,
willfully and knowingly, directly and indirectly, by use of the
means and instrumentalities of interstate commerce, and of the
mails, and of the facilities of national securities exchanges, in
connection with the purchase and sale of securities, did use and
employ manipulative and deceptive devices and contrivances, in
violation of Title 17, Code of Federal Regulations, Section
240.10b-5, by (a) employing devices, schemes and artifices to
defraud; (b) making untrue statements of material facts and
omitting to state material facts necessary in order to make the
statements made, in the light of the circumstances under which
they were made, not misleading; and (c) engaging in acts,
practices and courses of business which operated and would operate
as a fraud and deceit upon persons, to wit, ADONDAKIS received
Inside Information from, among others, the Hedge Fund/Investment
Firm Coconspirators and the Firm Consultants, and relayed such
Inside Information to the Hedge Fund A Coconspirators, who in turn
effected securities transactions based on such Inside Information.

(Title 15, United States Code, Sections 78j(b) & 78ff;
Title 17, Code of Federal Regulations, Sections 240.10b-5 and
240.10b5-2; and Title 18, United States Code, Section 2.)

10

### FORFEITURE ALLEGATION

17.  As a result of committing both of the foregoing securities fraud offenses alleged in Counts One and Two of this Information, SPYRIDON ADONDAKIS, a/k/a "Sam Adondakis," the defendant, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the securities fraud offenses, including but not limited to the following:

#### Money Judgment

a.  At least a sum of money in United States currency which was derived from proceeds traceable to the commission of the securities fraud offenses.

### Substitute Assets Provision

18.  If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

a.  cannot be located upon the exercise of due diligence;

b.  has been transferred or sold to, or deposited with, a third party;

c.  has been placed beyond the jurisdiction of the court;

d.  has been substantially diminished in value; or

11

e.    has been commingled with other property which

cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21,

United States Code, Section 853(p), to seek forfeiture of any

other property of the defendant up to the value of the forfeitable

property described above.

(Title 18, United States Code, Section 981; Title 28, United
States Code, Section 2461; Title 18, United States Code, Sections
371 and 2; Title 15, United States Code, Sections 78j(b) and 78ff;
and Title 17, Code of Federal Regulations, Sections 240.10b-5 and
240.10b5-2).

PREET BHARARA NB
United States Attorney

12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v -

SAM ADONDAKIS,

Defendant.

## INFORMATION

11 Cr. ____ (JFK)

(18 U.S.C. §§ 371, 2
15 U.S.C. §§ 78j(b), and 78ff)

PREET BHARARA
United States Attorney.

4-25-11 (wR): Filed information & waiver of indictment.





**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 5, 2011

Justine Harris, Esq.
Colson & Harris LLP
10 East 40th Street
Suite 3307
New York, N.Y. 10016

     Re:    <u>United States</u> v. <u>Spyridon Adondakis, a/k/a "Sam Adondakis"</u>
            11 Cr. ____

Dear Ms. Harris:

On the understandings specified below, the Office of the United States Attorney for the Southern District of New York ("this Office") will accept a guilty plea from Spyridon Adondakis, also known as "Sam Adondakis" ("Adondakis" or the "defendant") to a two-count criminal Information (the "Information").

Count One of the Information charges the defendant with conspiracy to commit securities fraud, in violation of Title 18, United States Code, Section 371. This charge carries a maximum sentence of five years' imprisonment, a maximum term of three years' supervised release, a maximum fine, pursuant to Title 18, United States Code, Section 3571, of the greatest of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to a person other than the defendant as a result of the offense, and a mandatory $100 special assessment.

Count Two of the Information charges the defendant with securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2, and Title 18, United States Code, Section 2. This charge carries a maximum sentence of 20 years' imprisonment, a maximum term of three years' supervised release, a maximum fine of the greatest of $5 million, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than the defendant resulting from the offense, and a mandatory $100 special assessment.

The total maximum sentence of incarceration on the two counts in the Information is 25 years' imprisonment.

2010.11.18

Justine Harris, Esq.
April 5, 2011
Page 2

It is further understood that Adondakis shall make restitution in an amount to be specified by the Court in accordance with 18 U.S.C. §§ 3663, 3663A, and 3664. This amount shall be paid according to a plan established by the Court.

The defendant furthermore admits the forfeiture allegations with respect to Counts One and Two of the Information and agrees to forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(c) and 28 U.S.C. § 2461, a sum of money equal to the proceeds traceable to the commission of the offenses. It is further understood that any forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon him in addition to forfeiture.

It is understood that Adondakis (a) shall truthfully and completely disclose all information with respect to the activities of himself and others concerning all matters about which this Office inquires of him, which information can be used for any purpose; (b) shall cooperate fully with this Office, the Federal Bureau of Investigation, and any other law enforcement agency designated by this Office; (c) shall attend all meetings at which this Office requests his presence; (d) shall provide to this Office, upon request, any document, record, or other tangible evidence relating to matters about which this Office or any designated law enforcement agency inquires of him; (e) shall truthfully testify before the grand jury and at any trial and other court proceeding with respect to any matters about which this Office may request his testimony; (f) shall bring to this Office's attention all crimes which he has committed, and all administrative, civil, or criminal proceedings, investigations, or prosecutions in which he has been or is a subject, target, party, or witness; and (g) shall commit no further crimes whatsoever. Moreover, any assistance Adondakis may provide to federal criminal investigators shall be pursuant to the specific instructions and control of this Office and designated investigators.

It is understood that this Office cannot, and does not, agree not to prosecute Adondakis for criminal tax violations. However, if Adondakis fully complies with the understandings specified in this Agreement, no testimony or other information given by him (or any other information directly or indirectly derived therefrom) will be used against him in any criminal tax prosecution. Moreover, if Adondakis fully complies with the understandings specified in this Agreement, he will not be further prosecuted criminally by this Office for any crimes, except for criminal tax violations, related to his participation in insider trading, and in a conspiracy to commit the same, from in or about 2007 to in or about 2010, as charged in Counts One and Two of the Information. This Agreement does not provide any protection against prosecution for any crimes except as set forth above.

It is understood that this Agreement does not bind any federal, state, or local prosecuting authority other than this Office. This Office will, however, bring the cooperation of Adondakis to the attention of other prosecuting offices, if requested by him.

2010.11.18

Justine Harris, Esq.
April 5, 2011
Page 3

It is understood that the sentence to be imposed upon Adondakis is within the sole discretion of the Court. This Office cannot, and does not, make any promise or representation as to what sentence Adondakis will receive, and will not recommend any specific sentence to the Court. However, this Office will inform the Probation Department and the Court of (a) this Agreement; (b) the nature and extent of Adondakis's activities with respect to this case and all other activities of Adondakis which this Office deems relevant to sentencing; and (c) the nature and extent of Adondakis's cooperation with this Office. In so doing, this Office may use any information it deems relevant, including information provided by Adondakis both prior to and subsequent to the signing of this Agreement. In addition, if this Office determines that Adondakis has provided substantial assistance in an investigation or prosecution, and if he has fully complied with the understandings specified in this Agreement, this Office will file a motion, pursuant to Section 5K1.1 of the Sentencing Guidelines, requesting the Court to sentence Adondakis in light of the factors set forth in Section 5K1.1(a)(1)-(5). It is understood that, even if such a motion is filed, the sentence to be imposed on Adondakis remains within the sole discretion of the Court. Moreover, nothing in this Agreement limits this Office's right to present any facts and make any arguments relevant to sentencing to the Probation Department and the Court, or to take any position on post-sentencing motions. Adondakis hereby consents to such adjournments of his sentence as may be requested by this Office.

It is understood that, should this Office determine either that Adondakis has not provided substantial assistance in an investigation or prosecution, or that Adondakis has violated any provision of this Agreement, such a determination will release this Office from any obligation to file a motion pursuant to Section 5K1.1 of the Sentencing Guidelines, but will not entitle Adondakis to withdraw his guilty plea once it has been entered.

It is understood that, should this Office determine, subsequent to the filing of a motion pursuant to Section 5K1.1 of the Sentencing Guidelines and/or 18 U.S.C. §3553(e), that Adondakis has violated any provision of this Agreement, this Office shall have the right to withdraw such motion.

It is understood that, should Adondakis commit any further crimes or should it be determined that he has given false, incomplete, or misleading testimony or information, or should he otherwise violate any provision of this Agreement, Adondakis shall thereafter be subject to prosecution for any federal criminal violation of which this Office has knowledge, including perjury and obstruction of justice. Any such prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against Adondakis, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecution. It is the intent of this Agreement to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date that this Agreement is signed.

2010.11.18