UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X
                                                          :
XL SPECIALTY INSURANCE CO.,                               :
                                                          :
                                      Plaintiff,          :          12 Civ. 1598 (PAE)
                                                          :
                    -v-                                   :          OPINION & ORDER
                                                          :
LEVEL GLOBAL INVESTORS, L.P. et al.,                      :
                                                          :
                                      Defendants.         :
                                                          :
-----------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

        Defendants Level Global Investors, L.P. ("Level Global"), Michael Alessi, Gregory

Brenner, Anthony Chiasson, Joseph Chiasson, and David Ganek (collectively, with Level

Global, the "Insureds") move for a preliminary injunction requiring plaintiff XL Specialty

Insurance Company ("XL") to resume advancing, pursuant to a professional-liability insurance

policy, their costs of defending themselves against, *inter alia,* a federal criminal investigation.

For the following reasons, defendants' motion is granted.

I.      **Background**[1]

        A.      **November 2010 through March 2012: XL Advances Funds to Cover the
                Insureds' Defense Costs**

---

[1]     The following account of the facts is drawn from the Complaint ("Compl.") (Dkt. 1) and
the exhibits thereto; the parties' briefs on the instant motion (Dkt. 5, 19, 23); the Declaration of
Shawn Naunton in Support of Defendants' Motion for a Preliminary Injunction ("Naunton
Decl.") and the exhibits thereto (Dkt. 6); the Declaration of Brett Goodman in Opposition to
Defendants' Motion for a Preliminary Injunction ("Goodman Decl.") and the exhibits thereto
(Dkt. 20); the Complaint in *SEC v. Spyridon Adondakis et al.*, No. 12-cv-409 (S.D.N.Y. 2012)
("SEC Compl."); the Indictment in *United States v. Todd Newman et al.,* No. 12-cr-121
(S.D.N.Y. Feb. 7, 2012) ("Ind't"); the Information filed by the United States Attorney's Office
against Adondakis ("Adondakis Inf'n"); and counsel's factual representations at the May 10,
2012 hearing in this case ("Hg. Tr") .

Level Global is an investment advisor which manages hedge funds.  As of 2010, it had approximately $4 billion in assets under management.  SEC Compl. ¶ 25.  Both Chiassons, Alessi, Brenner, and Ganek were or are Level Global directors, officers, or employees.

On November 22, 2010, the Federal Bureau of Investigation executed a search warrant on Level Global's New York offices.  Compl. ¶ 18.  The same day, the United States Attorney's Office for the Southern District of New York (the "USAO") issued a grand jury subpoena duces tecum to Level Global.  *Id.*

As publicly reported, these steps were part of a broad criminal investigation—which drew nationwide publicity—into alleged insider trading within the securities industry.  As described in news reports, the government was investigating allegations that hedge funds, mutual funds, and other financial firms had obtained material non-public information regarding public issuers, including from so-called "expert networks" or third-party consultants, and traded on this information, in violation of the federal securities laws.[2]

Soon thereafter, the Securities and Exchange Commission ("SEC") subpoenaed Level Global for records in connection with a parallel investigation.  Compl. ¶ 18.

Level Global promptly notified XL of these claims.  It sought coverage from XL under an Investment Fund Management and Professional Liability Coverage Policy (the "Policy") which

---

[2] *See, e.g.*, Peter Lattman and Azam Ahmed, *Insider Inquiry Pivots Its Focus To Hedge Funds*, N.Y. TIMES, Feb. 9, 2011, at A1 ("Government investigators have been increasingly examining hedge fund traders' use of so-called expert network firms.  These research firms are essentially matchmakers, connecting hedge funds with employees at public companies and other specialists who are paid to provide the funds with insight into their businesses and industries"); David S. Hilzenrath and Jia Lynn Yang, *The Federal Dragnet on Wall Street's Inside Game*, WASHINGTON POST, Feb. 13, 2011, at G1 ("The current wave of investigations has focused largely on hedge funds—investment vehicles for wealthy individuals and institutional investors that often deliver outsize returns.  It also has cast a spotlight on employees of public companies who allegedly feed information to investment firms for a price—sometimes through 'expert network firms' that specialize in matching insiders with traders.").

[2]

Level Global had entered into with XL in April 2010, covering claims made between April 21, 2010 and April 21, 2011. Level Global sought coverage for the fees and costs incurred by the Insureds in defending against the USAO and SEC investigations.

XL acknowledged receipt of Level Global's notice. It began advancing the Insureds' defense costs in connection with the two investigations. *Id.* ¶¶ 18–19.

On January 17, 2012, Anthony Chiasson, Level Global's co-founder, was indicted (along with others not party to this litigation) in this District (the "Criminal Action"). The Indictment charges Chiasson with four counts of securities fraud and one count of conspiracy to commit securities fraud. Ind't ¶¶ 11, 31–32. It alleges that Chiasson received material non-public information regarding technology companies, including from a co-worker at Level Global regarding Dell, Inc. *Id.* ¶¶ 8, 11, 19. It alleges that Chiasson learned of Dell's quarterly earnings before they were publicly announced on May 29, 2008, and traded on that information, resulting in a $4 million trading gain. *Id.* ¶ 19. The Indictment alleges that Chiasson again received material non-public information in advance of Dell's August 28, 2008 earnings announcement, based on which Level Global shorted 700,000 shares of Dell stock, resulting in an approximately $53 million trading gain. *Id.* ¶ 22.

The following day, January 18, 2012, the SEC sued Anthony Chiasson and Level Global for securities fraud (the "SEC Action"). Compl. ¶ 26. The allegations in the SEC Action are similar to those in the Criminal Action.

The Court henceforth uses the term the "Government Actions" to refer, collectively, to (1) the Criminal Action, as against Anthony Chiasson, (2) the SEC Action, as against Anthony Chiasson and Level Global, and (3) the continuing criminal and SEC investigations of all the Insureds.

**B.      March 5, 2012: XL Ceases Advancing the Insureds' Defense Costs**

On January 18, 2012, the USAO unsealed an Information against a former Level Global mid-level research analyst, Spyridon Adondakis.  *Id.* ¶ 26.  Adondakis had worked at Level Global between 2006 and May 2010.  Unbeknownst to XL or the Insureds, the Information had been filed, and Adondakis had pled guilty to it, in a sealed proceeding, nine months earlier, on April 25, 2011.  *Id.* ¶¶ 20, 24 & Ex. B.  The Information charged Adondakis with securities fraud and conspiracy to commit securities fraud.  Inf'n ¶¶ 2, 16.

In his guilty plea colloquy, also unsealed on January 18, 2012, Adondakis allocuted to these charges as follows:

> From 2007 to 2010 I agreed, with others, to commit securities fraud.  Namely, I agreed to obtain, directly and indirectly, material non-public information from employees of public companies.  I knew that the inside information I received was disclosed by the company employees in violation of duties of trust and confidence.  I agreed to share that information with the other individuals at other companies as well as with others at the hedge fund where I worked.  When I gave the inside information to the others at the hedge fund where I worked, I knew the information would be used to execute trades.  Moreover, I did in fact obtain such information and provide it to others.  For example, on August 27, 2008, I spoke with others at the hedge fund where I worked and discussed with them inside information that I obtained indirectly from an employee at [Dell].

Compl. Ex. D at pp. 17–18.[3]

By letter sent on March 5, 2012, XL notified the Insureds that—based on Adondakis's guilty plea allocution—it would no longer advance defense costs relating to the Government Actions.  Naunton Decl. Ex. B.  Up to that point, XL had advanced nearly three-quarters of the Policy's $10 million aggregate coverage limit.  This included $4,721,677.68 advanced to Level Global, $1,800,408.54 to Ganek, $573,672.26 to Anthony Chiasson, $286,812.72 to Brenner, $48,223.05 to Joseph Chiasson, and $21,022.50 to Alessi.  *Id.* at p. 7.  Since March 5, 2012, XL

---

[3] The SEC charged Adondakis, alongside Level Global and Anthony Chiasson, in the lawsuit it filed that same day.

has not reimbursed any such defense costs.  These include fees and costs the Insureds had

incurred before January 18, 2012, and between January 18, 2012 and March 5, 2012.

XL's basis for denying a duty to cover the Insureds—as explained in its letter—is a

provision in the application that Level Global had submitted to XL in seeking the Policy (the

"Application").  The Application was completed and signed by Jeremy Bohrer, Level Global's

General Counsel and Chief Operating Officer, on April 16, 2010.  Naunton Decl. Ex. C at p. 4.

Question 8.b on the Application asks:

> Is any person(s) or entity(ies) proposed for this insurance aware of any fact,
> circumstance or situation which might afford valid grounds for any claim such as
> would fall within the scope of the proposed insurance?  (If "Yes," please explain
> by attachment to this Application.)

*Id.* at p. 2.  Bohrer checked the box corresponding to "No."  *Id.*  Immediately following this

question is the following statement:

> **Without prejudice to any other rights and remedies of the Insurer, any
> Claim arising from any claims, facts, circumstances or situations required to
> be disclosed in response to 8.a) or 8.b) above is excluded from the proposed
> insurance.**

*Id.*  (the "Prior Knowledge Exclusion" or "Exclusion") (boldface in original).

In its letter to the Insureds, XL took the position that the Exclusion applies to the

Government Actions.  It explained that, based on his plea allocution, Adondakis—a person

"proposed for this insurance"—necessarily knew, as of the April 2010 date of the Application, of

facts which could give rise to a claim, *i.e.*, an investigation, prosecution, or lawsuit, based on his

insider trading scheme while at Level Global.  Naunton Decl. Ex. B at p. 6.  XL demanded that

the Insureds repay the funds it had previously advanced.  *Id.* at p. 7.

**C.**     **XL Files This Lawsuit**

[5]

On March 5, 2012, the same day it terminated coverage, XL commenced this lawsuit. XL seeks (1) a declaration that, under the Prior Knowledge Exclusion, XL has no duty to cover any Insured in connection with the Government Actions, as a result of Adondakis's admitted crimes while at Level Global between 2007 and 2010; and (2) restitution of all defense costs (more than $7.3 million) that it has advanced to the Insureds.

### D.    The Insureds' Motion for a Preliminary Injunction

On March 28, 2012, the Insureds moved for a preliminary injunction.  Dkt. 4.  They argue that, in the absence of an injunction compelling XL to resume advances for defense expenses, their ability to defend against the Government Actions will otherwise be irreparably harmed.  Insureds' Br. 13–15.  The Insureds argue that they are likely to succeed in demonstrating an entitlement to coverage under the Policy, because, when the Prior Knowledge Exclusion is read in tandem with other provisions in the Application, it is at best ambiguous whether it permits XL to terminate coverage for all Insureds, and, under New York law, ambiguities in an insurance contract are construed to favor the insured.  Insureds' Br. 16–17.

The Insureds point, first, to a provision at the end of the Application.  It appears immediately before Bohrer's signature.  It states:

> **FOR THE PURPOSE OF THIS APPLICATION, THE UNDERSIGNED AUTHORIZED AGENT OF THE PERSON(S) AND ENTITY(IES) PROPOSED FOR THIS INSURANCE DECLARES THAT TO THE BEST OF THEIR KNOWLEDGE AND BELIEF AFTER REASONABLE INQUIRY, THE STATEMENTS HEREIN ARE TRUE AND COMPLETE. THE INSURER IS AUTHORIZED TO MAKE ANY INQUIRY IN CONNECTION WITH THIS APPLICATION.   SIGNING THIS APPLICATION DOES NOT BIND THE INSURER TO COMPLETE THE INSURANCE.**

Naunton Decl. Ex. C at p. 3 (the "Reasonable Inquiry Provision" or "Provision") (boldface and capitals in original).  The Insureds argue that the Provision qualifies the Prior Knowledge

[6]

Exclusion, such that when Bohrer answered "no" to Question 8.b, did not—and was not required to—attest omnisciently that no proposed Insured was aware of a basis for a claim.  Rather, he was attesting—and was required to attest—only that he, on behalf of Level Global, was unaware, after a reasonable inquiry, that any proposed insured was aware of a basis for a claim. Accordingly, the Insureds argue, Adondakis' crimes—concealed from Bohrer—did not trigger the Exclusion.  Insureds' Br. 18.

The Insureds also point to Condition K (a "Warranty" clause) in the Application, which provides:

> No knowledge or information possessed by any Insured will be imputed to any other Insured.  In the event that any of the particulars or statements in all material respects in the Application are untrue, this Policy will be void with respect to any Insured who had actual knowledge of the untruth in any material respect [*sic*] knew of such untruth.

Naunton Decl. Ex. A at p. 26; Insureds' Br. 19–20.  The Insureds argue that, in excluding them from coverage, XL is, effectively, imputing Adondakis's criminal knowledge to the Insureds in violation of Condition K.

The Insureds separately argue that, regardless of whether they ultimately prevail on the underlying issue of whether the Prior Knowledge Exclusion bars coverage, they are entitled to advancement of defense costs until a court resolves that issue.  Insureds' Br. 20–24; *see also id.* at 23 ("insurers are required to make contemporaneous interim advances of defense expenses where coverage is disputed, subject to recoupment in the event it is ultimately determined no coverage is afforded.") (internal quotation marks and citations omitted).  They argue that XL does not have the unilateral right to cease advancement in midstream.  *Id.*

On April 16, 2012, XL filed its opposition.  Dkt. 19.  XL argues that neither the Reasonable Inquiry Provision nor Condition K modifies the Prior Knowledge Exclusion, and that

the Insureds thus fail to establish a likelihood of success on the merits.  XL's Br. 9–11.  XL also

denies that it must await a judicial determination that the Exclusion applies before terminating

coverage.  It distinguishes the cases on which the Insureds rely as arising in the different context

of insurer attempts to rescind a policy altogether.  *Id.* at 19–22.  XL also asks that, if an

injunction is granted, the Insureds be required to post a bond.  *Id.* at 22–24.

On April 26, 2012, the Insureds filed a reply brief.  Dkt. 23.

On May 10, 2012, the Court held a nearly three-hour hearing on the motion.  At the end

of that hearing, the Court informed the parties that it intended to grant the Insureds' motion for a

preliminary injunction, and that an appropriate opinion and order would follow.

## II.   Discussion

### A.      Applicable Legal Standards

A preliminary injunction

is an extraordinary remedy never awarded as of right.  In each case, courts must
balance the competing claims of injury and must consider the effect on each party
of the granting or withholding of the requested relief.  In exercising their sound
discretion, courts of equity should pay particular regard for the public
consequences in employing the extraordinary remedy of injunction.

*Salinger v. Colting*, 607 F.3d 68, 79 (2d Cir. 2010) (quoting *Winter v. Natural Res. Def. Council*,

555 U.S. 7, 24 (2008)).  Thus, a plaintiff seeking a preliminary injunction must normally

"establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in

the absence of preliminary relief, that the balance of equities tips in his favor, and that an

injunction is in the public interest."  *Litwin v. OceanFreight, Inc.*, No. 11-cv-7218, 2011 U.S.

Dist. LEXIS 127362, at *13–14 (S.D.N.Y. Nov. 2, 2011) (quoting *Psihoyos v. John Wiley &

Sons, Inc.*, No. 11-cv-1416, 2011 U.S. Dist LEXIS 115835, at *3 (S.D.N.Y. Oct. 4, 2011) (citing

*Winter*, 555 U.S. at 20 (2008))); *see also Reckitt Benckiser Inc. v. Motomco Ltd.*, 760 F. Supp. 2d

446, 451–52 (S.D.N.Y. 2011).

[8]

The Second Circuit has repeatedly emphasized that "[a] showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)); *see also Singas Famous Pizza Brands Corp. v. New York Adver. LLC*, No. 11-1038, 2012 U.S. App. LEXIS 6753, at *3 (2d Cir. Mar. 19, 2012) (slip op.) (summ. order); *Bisnews AFE (Thail.) Ltd. v. Aspen Research Group Ltd.*, 437 F. App'x 57, 58 (2d Cir. 2011) (summ. order); *Borey v. Nat'l Union Fire Insur. Co.*, 934 F.2d 30, 34 (2d Cir. 1991). "'To satisfy the irreparable harm requirement, [movants] must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm.'" *Faiveley Transp.*, 559 F.3d at 118 (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)). Thus, "'[w]here there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances.'" *Faiveley Transp.*, 559 F.3d at 118 (quoting *Moore v. Consol. Edison Co. of N.Y.*, 409 F.3d 506, 510 (2d Cir. 2005)).

 "The decision to grant or to deny a preliminary injunction depends in part on a flexible interplay" between the likelihood of success and irreparable harm. *Packard Instrument Co. v. ANS, Inc.*, 416 F.2d 943, 945 (2d Cir. 1969) (citing *Unicon Mgmt. Corp. v. Koppers Mgmt. Co.*, 366 F.2d 199 (2d Cir. 1966)). Thus, those two factors should not be considered in isolation. *See Dopp v. Franklin Nat'l Bank*, 461 F.2d 873, 886 (2d Cir. 1972) ("The likelihood of success on the merits that a movant for injunctive relief must demonstrate varies with the quality and quantum of harm that it will suffer from the denial of an injunction."); *IBM Corp. v. Johnson*,

[9]

629 F. Supp. 2d 321, 329 (S.D.N.Y. 2009); *Suthers v. Amgen Inc.*, 372 F. Supp. 2d 416, 429 (S.D.N.Y. 2005).

The Second Circuit has, further, differentiated between injunctions that propose to alter the status quo (mandatory injunctions) and those that merely seek to maintain it (prohibitory injunctions).  A mandatory injunction may "issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2011) (citing *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 n.4 (2d Cir. 2010)); *see also LSSi Data Corp. v. Time Warner Cable, Inc.*, No. 11-cv-7780, 2012 U.S. Dist. LEXIS 72122, at *27 (S.D.N.Y. May 23, 2012).  By contrast, a prohibitory injunction may be granted on a showing of "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup Global Mkts., Inc.*, 598 F.3d at 35 (citing *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979)) (additional citations omitted).  Under the prohibitory injunction standard, the overall burden on a movant to show "sufficiently serious questions going to the merits" and that "the balance of hardships tips 'decidedly in its favor'" is "no lighter than the one it bears under the 'likelihood of success' standard." *Citigroup Global Mkts., Inc.*, 598 F.3d at 35 (internal citation omitted).

The parties differ as to whether the injunction sought here is mandatory or prohibitory. XL argues that, because it ceased to advance defense costs on March 5, 2012, and the Insureds did not move for resumption of advancement until 23 days later, the injunction would alter the status quo and thus is mandatory.  *See* XL's Br. 4–5 (citing *Brewer v. W. Irondequoit Cent. Sch.*

[10]

*Dist.*, 212 F.3d 738, 744 (2d Cir. 2000)).  The Insureds counter that XL should not be allowed to effectively heighten the Insureds' burden on this motion, by unilaterally ceasing advancement without warning.[4]  They argue that the relevant date for classifying the requested injunction is March 5, 2012, the date XL terminated advancement and filed this lawsuit.  Thus, the Insureds argue, they seek a prohibitory injunction.  Insureds' Reply 2–3 & n.1.

To be sure, "'the distinction between mandatory and prohibitory injunctions is not without ambiguities or critics'" and often leads to "'distinctions that are more semantic[] than substantive.'"  *Mastrovincenzo v. City of New York*, 435 F.3d 78, 90 (2d Cir. 2006) (quoting *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995)) (alteration in original).  However, on the facts at hand, the Insureds have far the better of this argument.  But for XL's unilateral decision to terminate advancement and file suit, it would have been XL, not the Insureds, that would have been seeking an injunction (and to alter the status quo).  And it is long settled that the "'[s]tatus quo' to be preserved by a preliminary injunction is the last actual, peaceable uncontested status which preceded the pending controversy."  *LaRouche v. Kezer*, 20 F.3d 68, 74 n.7 (2d Cir. 1994) (quoting Black's Law Dictionary 1410 (6th ed. 1990)); *see also O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1013 (10th Cir. 2004) ("'Status quo' does not mean the situation existing at the moment the law suit is filed, but the last peaceable uncontested status existing between the parties before the dispute developed.  Thus, courts of equity have long issued preliminary injunctions requiring parties to restore the status quo ante") (McConnell, J., concurring) (internal quotation omitted), *aff'd and remanded*, 546 U.S. 418  (2006); *United Steelworkers of Am., AFL-CIO v. Textron, Inc.*, 836 F.2d 6, 10 (1st Cir. 1987) (construing an injunction requiring payment of insurance premiums "not as mandatory,

---

[4]  XL has acknowledged that, at the time it terminated advancement, it knew that the Insureds would respond by moving for injunctive relief.  Hg. Tr. 65.

but as prohibitory" where, immediately before controversy erupted, premiums were being paid)
(Breyer, J.); *Davis v. Shah*, No. 12-cv-6134, 2012 U.S. Dist. LEXIS 62295, at \*13–15
(W.D.N.Y. May 2, 2012); *Blom ASA v. Pictometry Int'l Corp.*, 757 F. Supp. 2d 238, 243
(W.D.N.Y. 2010); *Stockstill v. Quinnipiac Univ.*, No. 10-cv-265, 2010 U.S. Dist. LEXIS 49481,
at \*21 (D. Conn. May 19, 2010).

Applied here, that principle requires that the status quo be measured as of March 4, 2012,
immediately before XL told the Insureds that it would no longer advance defense costs. The
Court, therefore, holds that the injunction sought is prohibitory, not mandatory.

### B.     Irreparable Harm

The failure to receive defense costs under a professional liability policy at the time they
are incurred "constitutes 'an immediate and direct injury'" sufficient to satisfy the irreparable
harm requirement. *See In re Worldcom, Inc., Sec. Litig.*, 354 F. Supp. 455, 469 (S.D.N.Y. 2005)
(quoting *Wedtech Corp. v. Fed. Ins. Co.*, 740 F. Supp. 214, 221 (S.D.N.Y. 1990)); *see also In re
Adelphia Commc'ns Corp.*, No. 02-41729, 2004 U.S. Dist. LEXIS 19478, at \*21–22 (S.D.N.Y.
Sept. 27, 2004) (upholding, despite asset freeze during bankruptcy proceeding, release of funds
to pay for defense of serious criminal charges, because failure to do so would likely result in
irreparable harm); *In re CyberMedica, Inc.*, 280 B.R. 12, 18–19 (Bankr. Ct. D. Mass. 2002)
(granting relief from automatic stay in bankruptcy because directors and officers would suffer
irreparable harm if prevented from exercising rights to legal defense payments under D&O
policy); *cf. Flood v. ClearOne Commc'ns, Inc.*, No. 08-cv-631, 2009 U.S. Dist. LEXIS 2145, at
\*15–16 (D. Utah Jan. 12, 2009), *injunction vacated on other grounds at* 618 F.3d 1110 (10th Cir.
2010) (finding irreparable harm and granting injunctive relief where insured "face[d] a criminal
trial in less than three weeks" and "[i]n the absence of continued payment of fees and costs by

[12]

ClearOne, Ms. Flood's counsel ha[d] represented to the Court that they cannot continue representation"); *Great Am. Ins. Co. v. Gross*, No. 05-cv-159, 2005 U.S. Dist. LEXIS 8003, at *13–14 (E.D. Va. May 3, 2005) (granting preliminary injunction compelling insurer to resume advancement of defense costs, because insured faced prospect of "massive civil liability due to . . . complex, fact intensive actions" and "[t]he practical effect of Plaintiff's failure to advance costs of defense to Moving Defendants would be to cause [insureds' counsel] to withdraw"); *Emons Indus., Inc. v. Liberty Mutual Ins. Co.*, 749 F. Supp. 1289, 1293 (S.D.N.Y. 1990) (finding irreparable harm where insurer sought to force insured whose policy covered defense costs to replace his attorney of a decade); *Nu-Way Envtl., Inc. v. Planet Ins. Co.*, No. 95-cv-573, 1997 U.S. Dist. LEXIS 11884, at *7 (S.D.N.Y. Aug. 5, 1997).

Presumably as a result of this body of authority, XL concedes that, absent an injunction, the Insureds will suffer irreparable harm.[5]  But this spare concession is quite inadequate to capture the full extent of the harm and risk to these Insureds presented by XL's decision to abruptly stop paying their defense costs.  For three independent reasons, the Court finds that, if XL is not directed to resume paying those costs, the Insureds are likely to suffer "extreme or very serious damage," the highest of the standards the Second Circuit uses to measure irreparable harm.  *Cacchillo*, 638 F.3d at 406.

---

[5] Although XL's opposition brief was silent on the subject, at argument, XL conceded the point:

> **The Court**:  Putting aside the scale of the irreparable harm, I take it you are not disputing that there is irreparable harm to the insureds, here, are you?
> **Mr. Duchelle**:  We are not raising that defense on this motion.
> **The Court**:  And what about the balance of the equities?
> **Mr. Duchelle**:  We are not raising that defense on this motion.

Hg. Tr. 65–66.

[13]

First, in the underlying legal actions, the Insureds are confronted by criminal charges, either actual or threatened, and XL's termination of payment came at a critical juncture for the defense. As of the time that XL ceased paying their legal fees, the Insureds were each either the subject of a broad and ongoing criminal investigation[6] or, in the case of Anthony Chiasson, an indicted defendant awaiting trial. To date, the Department of Justice's investigation into insider trading on Wall Street has resulted in the indictments of nearly 60 people.[7] The Government Actions thus present a real risk to the Insureds not only of monetary liability, but of prosecution and a loss of liberty. The SEC Action and its investigation present the added risk of serious regulatory sanctions, including a potential bar from the securities industry.

XL's termination of payment of defense costs presents an obvious risk that one or more Insureds, as a result of a sudden inability to pay legal fees, would lose his existing counsel in the middle of (and quite possibly at a key moment in) these sensitive matters. The potential injury to a criminal defendant or an investigative subject of losing counsel in midstream cannot be minimized. *Cf. Flood*, 2009 U.S. Dist. LEXIS 2145, at *16. An Insured's new counsel, starting from scratch in a highly complex matter, will not have, and may not be able to quickly acquire, predecessor counsel's familiarity with the evidence, legal principles, strategy, and witnesses. Nor may such counsel be able to quickly replicate prior counsel's working relationships with the

---

[6] The Court uses the term "subject" in the vernacular, not the technical sense used in the United States Attorney's Manual. The record does not disclose whether the government has classified the Insureds under that Manual, or, if so, how (*e.g.*, witnesses, subjects, or targets). Hg. Tr. 16–17.

[7] *See* January 18, 2012 Press Release, *available at* http://www.justice.gov/usao/nys/pressreleases/January12/newmantoddetalcharges.html (last visited May 30, 2012). As described by the government, that inquiry, known as Operation Perfect Hedge, focuses "on a circle of research analysts at different investment firms who obtained Inside Information directly or indirectly from employees who worked at public companies, and then shared it with each other and with the Hedge Fund portfolio managers for whom they worked." *Id.*

prosecutors, counsel for co-defendants or fellow investigative subjects, or with his or her new client.  A defendant without substantial assets to pay for counsel also has no assurance that the new counsel will have the talent and experience of the predecessor, with price now potentially a decisive factor in choosing counsel.  *See United States v. Stein*, 435 F. Supp. 2d 330, 362, 371 (S.D.N.Y. 2006) (finding that if accounting firm were to cease paying legal fees of former partners who were charged in a complex tax fraud prosecution, these defendants would be inhibited in presenting their defense, and relying on appointed or lower-cost counsel to marshal a comparable defense was "unrealistic"); *cf. United States v. Eisenberg*, No. 01-cr-210, 2002 U.S. Dist. LEXIS 5354, at *7–10, 38–39 (S.D.N.Y. Mar. 8, 2002); *United States v. Rosen*, 487 F. Supp. 2d 721, 734–35 (E.D. Va. 2007).

The potential damage from interrupting and destabilizing ongoing defense efforts is multiplied here.  That is because XL's decision extends to all Insureds.  It therefore jeopardizes at once *every* existing representation of persons affiliated with Level Global, and of Level Global itself.[8]  It is well known that, where investigative subjects have a common interest—including having worked in the business unit that is the focus of a criminal or regulatory investigation—the subjects' defense counsel often collaborate and/or pool resources in a "joint defense" or "common interest" group.  The work of coordinated defense groups is well known, *see, e.g.*, *United States v. Weissman*, No. 94-cr-760, 1996 U.S. Dist. LEXIS 19066, at *16–18 (S.D.N.Y. Dec. 26, 1996), and, as practitioners appreciate, can sometimes be vital to the successful defense of a government investigation.  *See also United States v. McPartlin*, 595 F.2d 1321, 1336 (7th

---

[8] Level Global itself is no longer actively managing investor funds or rendering investment advisory services.  It is today essentially "in runoff."  Hg. Tr. 19 (representation by Level Global's counsel); *id.* at 71 (XL's counsel, not disputing this).  It is unclear to what extent Level Global, were it unable to call upon its D&O policies to pay defense costs, would be able to fund the defense of a protracted investigation or prosecution.

Cir. 1979) (communication among co-defendants' counsel "can be necessary to a fair opportunity to defend" in a multi-defendant case); *cf. In re Grand Jury Subpoena Duces Tecum Dated Nov. 16, 1974*, 406 F. Supp. 381, 390 (S.D.N.Y. 1975) (noting defense group collaboration in defending against SEC enforcement action).  This is particularly true where an investigation probes complex areas of alleged corporate misconduct.  As a result of this coordinated work, a criminal defendant or investigative subject may have a real interest in the continuity of fellow subjects' legal representations.  Not surprisingly, collaboration among counsel for the Insureds appears to be underway in this investigation.  *See* Hg. Tr. 18 (statement of counsel for Mr. Brenner).

XL's global termination could, therefore, act as a ten-strike aimed at the entire Level Global defense group.  It would create the risk at this key juncture that multiple defense counsel—or, conceivably, counsel for all Insureds—would step aside, because their fees in this costly matter could no longer realistically be paid.  Were this to happen, the productive collaborative efforts and the existing body of joint-defense intellectual capital could be substantially impaired, to the detriment of all Insureds.  *See United States v. Stepney*, 246 F. Supp. 2d 1069, 1084 (N.D. Cal. 2003) (noting harm to joint defense group presented by one attorney's disqualification).

Second, the government's charges or potential charges in the complex underlying matters are by their nature unusually costly to defend against.  The prosecution of Anthony Chiasson illustrates the point well.  Based on counsel's representations at the hearing, Chiasson's trial is presently scheduled for October 2012, and is projected to last between six to eight weeks.  Hg. Tr. 7.  The prosecution has produced between one and two terabytes of electronic discovery to Chiasson's counsel—equating to between 100 million and 1 billion pages.  *Id.*  In addition,

[16]

although the Indictment charges Chiasson with insider trading in two securities across eight

trading days, the prosecution has stated that it may supersede to add charges relating to up to 33

other securities. *Id.* at 8–9.

       As to any instance of alleged insider trading, a diligent defense counsel can be expected

to investigate numerous potential defenses.  These, presumably, include whether information

about the security was communicated to his client in advance of the particular trade; whether that

information was material; whether it was non-public, as opposed to known or fairly ascertainable

through legitimate means; whether it had been obtained by the expert network or other third-

party intermediaries in breach of a duty; and whether counsel's client knew the answers to those

questions at the time of the trade.  Hg. Tr. 8.  It is likely that defense counsel will wish to retain

expert assistance in connection with these inquiries.  Further, because the government alleges

that material non-public information was furnished to Level Global and Chiasson not directly by

a company insider, but indirectly, including by means of one or more intermediary experts and/or

consultants, counsel can also be expected to vigorously investigate these intermediaries.  *See*

SEC Compl. ¶¶ 2–7 (alleging that information from "Dell Insider" traveled through two

intermediaries before reaching Adondakis).  All this defense work will be costly.  Without

professional liability coverage, these costs are likely beyond the financial reach of some

Insureds, if not all.[9]

---

[9] As the Honorable Lewis A. Kaplan has chronicled, the cost of defending complex cases of white-collar crime in the era of electronic discovery can be astronomical.  The defense of Sanjay Kumar, former CEO of Computer Associates, against securities fraud charges cost nearly $15 million; the defense of Dennis Kozlowski, former CEO of Tyco International, spanning two trials, cost more than $25 million; the defense of John Rigas and his sons, former executives of Adelphia Communications, cost $25 million; the defense of Richard Scrushy of HealthSouth, spanning two trials, against charges, *inter alia*, of bribery and extortion cost $32 million; and the defense of Kenneth Lay and Jeff Skilling, of Enron, cost $25 million and $70 million, respectively.  *See United States v. Stein,* 495 F. Supp. 2d 390, 424 (S.D.N.Y. 2007).

Third, at stake here is not only whether the Insureds can access the $2.7 million left to be paid out on Level Global's $10 million policy with XL. Also in jeopardy is the Insureds' ability to access additional layers of excess insurance to which the Insureds are entitled after the XL policy has been exhausted. At argument, Level Global's counsel explained that it had purchased $15 million in additional layers of excess coverage, atop XL's Policy, from other carriers. But, counsel explained, the carrier responsible for the next layer of coverage has taken the position that its duty to pay is not triggered until XL, the primary insurer, has paid out the full $10 million on its Policy. *See* Hg. Tr. 11–12 (next-layer carrier has rejected Insureds' position that its duty has been triggered by fact that Insureds have incurred more than $10 million in defense costs). Although the duty of the next insurer to advance costs under these circumstances could certainly be litigated if necessary, as a practical matter, XL's decision to cease payment of the Insureds' defense fees is blocking the Insureds from accessing not just the remaining $2.7 million under XL's policy, but an additional $15 million in excess coverage as well.[10]

In *In re Worldcom*, the district court succinctly summarized why the insurer's refusal to advance funds—with civil lawsuits underway and a trial date approaching—confronted the insureds with irreparable harm:

> Every party . . . requires effective representation. It is impossible to predict or quantify the impact on a litigant of a failure to have adequate representation at this critical stage of litigation. The ability to mount a successful defense requires competent and diligent representation. The impact of an adverse judgment will have ramifications beyond the money that will necessarily be involved. There is the damage to reputation, the stress of litigation, and the risk of financial ruin—each of which is an intangible but very real burden.

---

[10] The insurance carriers responsible for the additional layers of coverage have not, to date, asserted that provisions akin to XL's Prior Knowledge Exclusion preclude them from advancing defense costs. *See* Hg. Tr. 12.

[18]

*Worldcom*, 354 F. Supp.2d at 469.  Those considerations apply here, and, for the reasons stated, with special force.  The Court, accordingly, finds that the Insureds' need to access additional legal defense costs from XL under the Policy is immediate and concrete, and that in the absence of the requested injunction, the Insureds would suffer irreparable harm and sustain "extreme or very serious damage."  *Cacchillo*, 638 F.3d at 406 (citing *Citigroup Global Mkts.*, 598 F.3d at 35 n.4).

### C.      The Balance of Hardships

For many of the same reasons, the balance of hardships tips, not only decisively but lopsidedly, in favor of the Insureds.

Absent an injunction, the Insureds would face an increased risk of having to defend against a criminal investigation or prosecution, without their present counsel, and very likely without the funds to mount a fully effective defense against these complex charges.  They also face a parallel SEC investigation that may result in serious civil charges.  Insured Anthony Chiasson would face the pending criminal Indictment against him (to which may be added expanded insider trading charges) with a risk of losing his existing counsel months before trial, and without the funds to pay for the investigation and preparation such charges merit.  All Insureds face the risk that, because of XL's refusal to complete payout under its Policy, they will be inhibited from accesing the additional layers of coverage—totaling $15 million—for which Level Global contracted.  The Insureds thus stand to lose, from a strictly monetary perspective, access to approximately $17.7 million.  From a human perspective, they stand to lose much that is far more consequential, including their liberty.

XL, by contrast, faces at most the loss of an additional $2.7 million, and then only if a court were to determine that it had no duty to advance or pay out those funds, and in such

circumstances, XL could seek to recoup those funds from the Insureds.   At argument, XL's counsel acknowledged that $2.7 million "is not going to tank XL" and that XL "will continue as a viable insurer."  Hg. Tr. 71.  XL has not identified any non-monetary adverse consequences to it from granting the injunction.  The balance of equities thus, decisively, favors the Insureds.

### D.   Likelihood of Success on the Merits

#### 1.   Authorities Relied on by the Parties

As both parties recognize, this is not the first case to address the application of a prior knowledge exclusion or an attempt by an insurer to cease advancement of defense costs based on undisclosed claims or misconduct.

For its part, XL relies on three cases enforcing prior knowledge exclusions, which, it claims, defeat the Insureds' claim of a likelihood of success on the merits.

At issue in *Gluck v. Executive Risk Indemnity, Inc.*, 680 F. Supp. 2d 406 (E.D.N.Y. 2010), was a prior knowledge exclusion worded quite similarly to the one here.  The insured had sought a declaratory judgment of coverage for defense costs; the insurer moved for summary judgment, based on the fact that the insured had not disclosed a dispute and settlement agreement with the Federal government.  *Id.* at 407, 411–12.  The district court held that because the insured entity had been required to disclose the settlement, had not done so, and the claims for which coverage was sought arose from that settlement, the exclusion barred coverage for the underlying claims for all insureds.  *Id.* at 413–14, 424.

In *MDL Capital Management., Inc. v. Federal Insurance Company*, No. 05-cv-1396, 2008 U.S. Dist. LEXIS 57089 (W.D. Pa. 2008), the insurance application asked the corporate applicant: "Does the applicant or any of its partners, directors, officers, employees or trustees have any knowledge of any fact or circumstances which might give rise to a claim under the

[20]

proposed policy?" *Id.* at *18–19.  The application provided:  "It is agreed that if such knowledge exists any claim arising from such fact or circumstances will not be covered by the policy." *Id.* at *36.  One such insured (Lay, the company's CEO) was later found guilty of mail and wire fraud.  The district court held that that conviction "establishes that [he] knew or should have known of the likelihood of a claim related to his fraudulent conduct." *Id.* at *44–45.  The court rejected the other insureds' claim that their "lack of privity" to Lay precluded application of the exclusion to them.  It noted that the application question "inquired about the knowledge of '*any*' director, officer or employee, and the [Exclusion] provide[d] that any such knowledge eliminate[d] coverage for 'any claim arising from such fact or circumstances.'" *Id.* at *46 (emphasis in original).  Thus, Lay's subjective knowledge defeated coverage for all claimants. *Id.* at *47–48.

Finally, in *Shapiro v. American Home Assurance Company*, 584 F. Supp. 1245 (D. Mass. 1984), the application asked the applicant, Giant Stores:  "Does any Director or Officer have knowledge or information of any act, error or omission which might give rise to a claim under the proposed policy?" *Id.* at 1247.  It further provided:  "It is agreed that if such knowledge or information exists any claim or action arising therefrom is excluded from this proposed coverage." *Id.*  Shapiro, Giant's president, completing the application for the company, answered "no"; he was later convicted of securities fraud based on conduct predating the application. *Id.*  On the claim by other officers and directors that they had been unaware of Shapiro's crimes, the district court held, as a matter of contract interpretation, that the insurer, American Home, was entitled to rescind the agreement, and that the "clear language" of the exclusion also justified denying coverage even to innocent corporate officials, based on Shapiro's knowledge at the time of the application of a potential claim. *Id.* at 1252–53.

[21]

The Insureds, for their part, rely principally on three different cases, in which courts have refused to permit insurers to cease advancement of defense costs.

In *In re Worldcom*, a former director sought a preliminary injunction compelling Worldcom's D&O insurer to advance defense costs in connection with litigation related to the company's accounting irregularities.  354 F. Supp. 2d at 462.  The insurer argued that misrepresentations made in Worldcom's insurance policy application had made that policy void *ab initio*; it sought to rescind the policy.  *Id.* at 462–63.  The district court (Cote, J.) held that, on a motion for a preliminary injunction, the insured need establish a likelihood of success only as to the issue of a duty to advance defense costs while the claim of rescission was *sub judice*, not a likelihood of success in defeating the rescission claim.  *Id.* at 466–67.  The court found such a likelihood, and issued an injunction compelling the insurer to advance defense costs until the underlying claims had been adjudicated.  *Id.* at 471.  It explained: "Until the issue of rescission is adjudicated, a contract of insurance remains in effect and the duty to pay defense costs is enforceable."  *Id.* at 465.

In *In re HealthSouth Corporation Insurance Litigation*, 308 F. Supp. 2d 1253 (N.D. Ala. 2004), former directors and officers of HealthSouth sought partial summary judgment against a complaint brought by 10 insurers, seeking, as in *Worldcom*, to void D&O policies *ab initio* as having been procured by materially false financial information.  *Id.* at 1256–57.  The district court granted (in part) the insureds' motions, on the ground that, under the insurance contract, the knowledge of wrong-doers within the company could not be imputed to innocent fellow employees seeking coverage under the policy.  *Id.* at 1283–85.  In so concluding, the court stated, in a passage quoted by the Insureds here:

> If the companies can rescind coverage because of misstatements or misleading
> statements in HealthSouth SEC filings, without showing that the individual

insured knew of the misstatement, then coverage under the D&O policies would be totally illusory.  Under the interpretation urged by the excess carriers, officers and directors who have no specific control over or intimate knowledge about statements contained in SEC filings and other financial reports would not have insurance protection in cases of misstatements by the corporation or other insureds.

*Id.* at 1285; Insureds' Br. 20.

Finally, in *Associated Electric & Gas Incorporated v. Rigas*, 382 F. Supp. 2d 685 (E.D. Pa. 2004), a number of former officers and directors of Adelphia Communications sought summary judgment against the complaint of their D&O insurer, which sought to disclaim coverage for defense costs based on, *inter alia*, both rescission and a prior knowledge exclusion. The insurers claimed that they could unilaterally invoke the exclusion, without any judicial determination that it applied, as a basis to cease advancing legal costs.  *Id.* at 685, 690.  The district court granted the insureds' motion.  *Id.* at 702–03.  It noted that a bankruptcy stay prevented it "from making any determination at [that] time about whether the Prior Knowledge Exclusion applie[d,]" or whether other language in the application (including a warranty clause not dissimilar from Condition K here), made "only the signatory to the policy application or all of the directors and officers subject to the Prior Knowledge Exclusion."  *Id.* at 700.

However, the *Rigas* court held that, pending a judicial determination of the exclusion's applicability, the insurer was required to continue to advance defense costs.  The court noted that the policy's prior knowledge exclusion "does not . . . contain any language to suggest that it operates at the discretion of the insurer," "does not say that the exclusion precludes the payment of defense costs when the insurer believes the insured had prior knowledge, and it does not say that the insurer can itself determine whether such knowledge was likely to give rise to claims."  *Id.* at 699.  The court therefore held that it was ambiguous whether the contract empowered the insurer to unilaterally invoke a policy exclusion, and to cut off the forwarding of defense costs,

without a judicial determination that the exclusion applied. *Id.* at 699–700. Drawing on Pennsylvania law, the *Rigas* court noted that an insurer becomes "legally obligated" to advance defense costs as those costs are incurred by the insureds, at least in the absence of contravening language in the relevant policy. *Id.* at 700. Because the policy was ambiguous whether the insurer had contracted around that background norm, the court construed the ambiguity in favor of the insured, and compelled the insurer to advance defense costs pending a judicial resolution of the exclusion's applicability. *Id.*

In the Court's view, although all of these cases are instructive, none is dispositive here. XL's cases—*Gluck*, *MDL Capital*, and *Shapiro*—all demonstrate that, under an unambiguously drafted insurance contract containing a prior knowledge exclusion, coverage of all insureds can be excluded based on the knowledge of a single insured, as of the application date. The Insureds' counsel conceded this point at argument. Hg. Tr. 43–44. *Gluck* particularly assists XL, because the exclusion there is similar to the one here. *See* XL's Br. 9–11.

However, none of those cases involved the claim here that specific policy language outside the four corners of the prior knowledge exclusion informs its proper construction. That is the Insureds' primary argument. As discussed *supra*, they have made a substantial argument that the Reasonable Inquiry Provision narrows the "claims, facts, circumstances or situations" that are "*required to be disclosed*"—the decisive term in XL's Prior Knowledge Exclusion—so as not to require disclosure of information, like Adondakis's crimes, unknown to signatory Bohrer after his due diligence inquiry. Notably, had such a provision existed, it would not have changed the outcomes in *Gluck*, *MDL Capital*, or *Shapiro*. That is because, in each case, the signatory to the insurance application had personally been aware—based on firsthand involvement—of the undisclosed circumstances giving rise to the claim forming the basis for the

[24]

exclusion.  In *Gluck*, the signatory, CEO Klein, had signed the undisclosed settlement agreement, *see* 680 F. Supp.2d at 411–12, and in *MDL Capital Management* and *Shapiro*, the respective signatories, CEO Lay and President Shapiro, were each later convicted of federal crimes based on their pre-application conduct.  *See* 2008 U.S. Dist. LEXIS 57089, at * 4, 18–19, 26; 584 F. Supp. at 1247.  Thus, in each case, the excluding circumstance would have been "required to be disclosed" because the signatory personally knew it.  At argument, XL's counsel agreed that whether the interplay between  XL's Prior Knowledge Provision and its Reasonable Inquiry Provision gives rise to contractual ambiguity presents a question of first impression.  *See* Hg. Tr. 69.

The Insureds' cases, too, are distinguishable.  *Worldcom* and *HealthSouth* are rescission cases.  In each, the insurers sought a declaration that the insurance contract had been void *ab initio*.  This, however, is an exclusion case.  XL concedes that a binding Policy exists with Level Global; it seeks a declaration that the Government Actions are excluded under the Policy's Prior Knowledge Exclusion.  XL's Br. 17.  The Insureds note that the impact on them of termination of advancement is the same, whether the legal issue is cast as rescission or exclusion; and that, inasmuch as Level Global did not make any other claims for coverage during the policy period, exclusion of the Covered Claims in substance works a rescission of the agreement (save for the non-return of the insured's premium).  *See* Insureds' Br. 22; Hg. Tr. 74.  However, under the case law, the contractual defenses of rescission and exclusion are distinct.  They must be analyzed pursuant to separate principles.  *See, e.g.*, *Gluck*, 680 F. Supp. 2d at 416–17 & n.8; *Home Ins. Co. of Ill. v. Spectrum Info. Techs., Inc.*, 930 F. Supp. 825, 835–41, 848–49 (E.D.N.Y. 1996) (analyzing rescission and exclusion separately); *Barkan v. New York Schools Ins. Reciprocal*, 65 A.D.3d 1061, 1063–64 (2d Dep't 2009) (same).  Of the Insureds' cases, *Rigas* is

[25]

most closely on point, because it involved a prior knowledge exclusion, not a claim for

rescission.  But it, too, is distinguishable, for a variety of reasons, discussed *infra* at 40–41.

      Accordingly, although the Court is guided by the valuable analyses in these cases, to

resolve the pending motion, the Court must independently analyze, under principles of New

York insurance law, the specific Policy provisions at issue here.

### 2.      Principles of New York Law

      Under New York law, "an insurance contract is interpreted to give effect to the intent of

the parties as expressed in the clear language of the contract." *Parks Real Estate Purchasing

Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006); *see also Vill. of Sylvan

Beach v. Travelers Indem. Co.*, 55 F.3d 114, 115 (2d Cir. 1995); *St. Paul Fire & Marine Ins. Co.

v. Novus Int'l, Inc.*, No. 09-cv-1108, 2011 U.S. Dist. LEXIS 150317, at *23 (S.D.N.Y. Dec. 28,

2011).  "When the provisions are unambiguous and understandable, courts are to enforce them as

written." *Parks Real Estate Purchasing Grp.*, 472 F.3d at 42 (citing *Goldberger v. Paul Revere

Life Ins. Co.*, 165 F.3d 180, 182 (2d Cir. 1999)); *see also Essex Ins. Co. v. Laruccia Constr., Inc.*,

71 A.D.3d 818, 819 (2d Dep't 2010) (under New York law, courts must give "unambiguous

provisions of an insurance contract . . . their plain and ordinary meaning").

      "The initial interpretation of a contract 'is a matter of law for the court to decide.'" *10

Ellicott Square Court Corp. v. Mt. Valley Indem. Co.*, 634 F.3d 112, 119 n.8 (2d Cir. 2010)

(quoting *Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000));

*see also White v. Cont'l Cas. Co.*, 9 N.Y.3d 264, 267 (2007).  "Part of this threshold

interpretation is the question of whether the terms of the insurance contract are ambiguous."

*Parks Real Estate Purchasing Grp.*, 472 F.3d at 42 (citing *Alexander & Alexander Servs., Inc. v.

These Certain Underwriters at Lloyd's*, 136 F.3d 82, 86 (2d Cir. 1998)).  In resolving that

question, a court may not view the particular terms at issue in a vacuum.  Rather, it must view

these terms from the perspective of one "who has examined the context of the entire integrated

agreement."  *Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 914 (2d Cir. 2010); *see also*

*Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002).

"It is well settled that [a] contract is unambiguous if the language it uses has a definite

and precise meaning, unattended by danger of misconception in the purport of the [agreement]

itself, and concerning which there is no reasonable basis for a difference of opinion."  *White*, 9

N.Y.3d at 267 (quoting *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569 (2002)) (brackets in

original, additional citation and internal quotation marks omitted).  Conversely, "[a]n ambiguity

exists where the terms of an insurance contract could suggest 'more than one meaning when

viewed objectively by a reasonably intelligent person who has examined the context of the entire

integrated agreement and who is cognizant of the customs, practices, usages and terminology as

generally understood in the particular trade or business.'"  *Parks Real Estate Purchasing Grp.*,

472 F.3d at 42 (quoting *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906 (2d Cir. 1997))

(citation and internal quotation marks omitted); *see also U.S. Licensing Assocs. v. Rob Nelson*

*Co.*, No. 11-cv-4517, 2012 U.S. Dist. LEXIS 58712, at *8 (S.D.N.Y. Apr. 26, 2012).

"If the terms of a policy are ambiguous, however, any ambiguity must be construed in

favor of the insured and against the insurer."  *White*, 9 N.Y.3d at 267 (citing *United States Fid. &*

*Guar. Co. v. Annunziata*, 67 N.Y.2d 229, 232 (1986)); *see also Woodhams v. Allstate Fire &*

*Cas. Co.*, 748 F. Supp. 2d 211, 218 (S.D.N.Y. 2010); *Hunt v. Ciminelli-Cowper Co., Inc.*, 93

A.D.3d 1152, 1154 (4th Dep't 2012); *Appleby v. Chicago Title Ins. Co.*, 80 A.D.3d 546, 549 (2d

Dep't 2011); *Tower Ins. Co. of N.Y. v. Diaz*, 58 A.D.3d 495, 496 (1st Dep't 2009).[11]  Similarly,

any ambiguity in the terms of an insurance policy application is also to be construed in favor of

the insured.  *Home Ins. Co. v. Spectrum Info. Techs.*, 930 F. Supp. 825, 837 (E.D.N.Y. 1996)

(citing *Vella v. Equitable Life Assurance Soc'y*, 887 F.2d 388, 392 (2d Cir. 1989)); *see also Sec.*

*Mut. Ins. Co. v Perkins*, 86 A.D.3d 702, 703 (3d Dep't 2011); *Fanger v. Manhattan Life Ins. Co.*,

273 A.D.2d 438, 439 (2d Dep't 2000); *Nadel v. Manhattan Life Ins. Co.*, 211 A.D.2d 900, 901

(3d Dep't 1995).  This principle derives from the common law doctrine of *contra proferentem*,

which holds that, in the case of insurance contracts, "drawn as they ordinarily are by the

insurer," *Miller v. Continental Ins. Co.*, 40 N.Y.2d 675, 678 (1976), "it is the insurance company

which has the responsibility of making its intention clearly known."  *Stainless, Inc. v. Emp'rs*

*Fire Ins. Co.*, 69 A.D.2d 27, 33 (1st Dep't 1979).

      Where, as here, an insurer "claims that an exclusion in the policy applies to an otherwise

covered loss," the "insurer bears the burden of proof" to demonstrate that the exclusion applies.

*Morgan Stanley Group, Inc. v. New Eng. Ins. Co.*, 225 F.3d 270, 276 n.1 (2d Cir. 2000); *see also*

*MBIA Inc. v. Fed. Ins. Co.*, 652 F.3d 152, 158 (2d Cir. 2011) ("[T]he insured bears the burden of

showing that an insurance coverage covers the loss, but the insurer bears the burden of showing

that an exclusion applies to exempt it from covering a claim."); *Bianchi v. Lorists' Mut. Ins. Co.*,

---

[11]  As XL correctly observed at the hearing, *see* Hg. Tr. 47, "if the language of [an] insurance
contract is ambiguous . . . the parties may submit extrinsic evidence as an aid in construction,
and the resolution of the ambiguity is for the trier of fact."  *State v. Home Indem. Co.*, 66 N.Y.2d
669, 671 (1985); *see also Green Harbour Homeowners' Assn., Inc. v. Chicago Title Ins. Co.*, 74
A.D.3d 1655, 1658 (3d Dep't 2010).  Only if the extrinsic evidence fails to cure the ambiguity,
must "the ambiguity . . . be resolved against the insurer which drafted the contract."  *State*, 66
N.Y.2d at 671; *see also Green Harbour Homeowners' Assn.*, 74 A.D.3d at 1658.  At this
preliminary stage, however, XL has not identified the extrinsic evidence that it proposes to bring
to bear.  Accordingly, for purposes of this motion, the Court must construe any ambiguity in the
Policy in favor of the Insureds, without prejudice to XL's right to adduce extrinsic evidence as
the case progresses.

422 F. App'x 56, 58 (2d Cir. 2011) (summ. order) (citing *Critchlow v. First UNUM Life Ins. Co.
of Am.*, 378 F.3d 246, 256–57 (2d Cir. 2004)); *Town of Massena v. Healthcare Underwriters
Mut. Ins. Co.*, 98 N.Y.2d 435, 444 (2002) (in context of insurer's duty to defend, "[w]hen an
exclusion clause is relied upon to deny coverage, the burden rests upon the insurance company to
demonstrate that the allegations of the complaint can be interpreted only to exclude coverage");
*Consol. Edison Co. of N.Y. v. Allstate Ins. Co.*, 98 N.Y.2d 208, 220 (2002) ("Once coverage is
established, the insurer bears the burden of proving that an exclusion applies"). "[T]o 'negate
coverage by virtue of an exclusion, an insurer must establish that the exclusion is stated in clear
and unmistakable language, is subject to no other reasonable interpretation, and applies in the
particular case.'" *Inc. Vill. of Cedarhurst v. Hanover Ins. Co.*, 89 N.Y.2d 293, 298 (1996)
(quoting *Cont'l Cas. Co. v. Rapid-American Corp.*, 80 N.Y.2d 640, 652 (1993)). "Policy
exclusions 'are not to be extended by interpretation or implication, but are to be accorded a strict
and narrow construction.'" *Inc. Vill. of Cedarhurst*, 89 N.Y.2d at 298 (quoting *Seaboard Sur.
Co. v. Gillette Co.*, 64 N.Y.2d 304, 311 (1984)); *see also Fed. Ins. Co. v. Int'l Bus. Machs.
Corp.*, 18 N.Y.3d 642, 649 (2012).

Finally, an insurer's "duty to pay 'arises at the time the insured becomes legally obligated
to pay.'" *Fed. Ins. Co. v. Kozlowski*, 18 A.D.3d 33, 42 (1st Dep't 2005) (quoting *Little v. MGIC
Indem. Corp.*, 836 F.2d 789, 793 (3d Cir. 1987)). Once that duty attaches, "under a directors and
officers liability policy calling for the reimbursement of defense expenses . . . 'insurers are
required to make contemporaneous interim advances of defense expenses,'" while reserving the
right to seek recoupment if the facts ultimately show that no coverage was afforded. *Kozlowski*,
18 A.D.3d at 42 (quoting *Nat'l Union Fire Ins. Co. v. Ambassador Grp., Inc.*, 157 A.D.2d 293,
299 (1st Dep't 1990)); *see also Axis Reinsurance Co. v. Bennett*, No. 07-cv-7924 et al., 2008

U.S. Dist. LEXIS 53921, at *7 (S.D.N.Y. June 26, 2008) (Lynch, J.); *Trs. of Princeton Univ. v. Nat'l Union Fire Ins. Co.*, 839 N.Y.S.2d 437, 2007 N.Y. Misc. LEXIS 2350, at *16 (Sup. Ct. N.Y. Cnty. Apr. 10, 2007), *aff'd*, 52 A.D.3d 247 (1st Dep't 2008).  Thus, an insurer may be obligated to fund the criminal defense of an insured, but in the event of a conviction, may have the right to seek recoupment if the conviction establishes a lack of entitlement to coverage (*e.g.*, under a "prior acts" or "intentional acts" exclusion).

### 3.      Does the Prior Knowledge Exclusion Apply?

As noted, Question 8.b on the Application reads:

Is any person(s) or entity(ies) proposed for this insurance aware of any fact, circumstance or situation which might afford valid grounds for any claim such as would fall within the scope of the proposed insurance?  (If "Yes," please explain by attachment to this Application.)

The Prior Knowledge Exclusion, which immediately follows, provides:

**Without prejudice to any other rights and remedies of the Insurer, any Claim arising from any claims, facts, circumstances or situations required to be disclosed in response to 8.a) or 8.b) above is excluded from the proposed insurance.**

For purposes of this motion, the parties agree that (1) Adondakis was a "person[] . . . proposed for this insurance"; (2) Adondakis, at the time of Level Global's application, was "aware of a[] fact, circumstance, or situation which . . . afford[ed] valid grounds for a[] claim" under the proposed insurance; and (3) the Government Actions arise from the "claims, facts, circumstances, or situations" known to Adondakis.[12]

The dispute between the parties as to whether the Prior Knowledge Exclusion applies here centers on the clause "required to be disclosed."  XL argues that clause is defined solely

---

[12] The parties agree that only *Adondakis*'s knowledge is relevant to this motion.  The Court therefore disregards Adondakis's claim that others at Level Global were complicit.

with reference to the text of Question 8.b, such that, if any prospective insured was aware of a "fact, circumstance or situation" which could give rise to a claim, that claim is excluded.  In the absence of other language in the Policy that arguably modified that clause, XL's argument (like the insurer's in *Gluck*) would be strong.

However, the Insureds argue that there *is* modifying language in the Policy: the Reasonable Inquiry Provision.  It appears just after the Exclusion, and reads:

> **FOR THE PURPOSE OF THIS APPLICATION, THE UNDERSIGNED AUTHORIZED AGENT OF THE PERSON(S) AND ENTITY(IES) PROPOSED FOR THIS INSURANCE DECLARES THAT TO THE BEST OF THEIR KNOWLEDGE AND BELIEF AFTER REASONABLE INQUIRY, THE STATEMENTS HEREIN ARE TRUE AND COMPLETE. THE INSURER IS AUTHORIZED TO MAKE ANY INQUIRY IN CONNECTION WITH THIS APPLICATION.   SIGNING THIS APPLICATION DOES NOT BIND THE INSURER TO COMPLETE THE INSURANCE.**

The Insureds argue that the Provision informs the Exclusion, such that Level Global was "required to . . . disclose" *only* the information responsive to Question 8.b known to its signatory, Bohrer, after his "reasonable inquiry."  Insureds' Br. 17–18.  On this reading, the Exclusion would not apply, because—as the parties agree for purposes of this motion—Adondakis did not reveal his crimes to Bohrer, and a reasonable inquiry would not have revealed them.

The Court has carefully considered the parties' competing constructions of the Policy, and their respective arguments why those constructions accord with the Policy's text and yield rational results.  In so doing, the Court has been mindful that "the cardinal principle for the construction and interpretation of insurance contracts—as with all contracts—is that the intentions of the parties should control.  Unless otherwise indicated, words should be given the meanings ordinarily ascribed to them and absurd results should be avoided."  *World Trade Ctr.*

*Props., L.L.C. v. Hartford Fire Ins. Co.*, 345 F.3d 154, 184 (2d Cir. 2003), *overruled in part on other grounds by Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303 (2006).[13]

In the Court's assessment, both parties have articulated colorable textual arguments as to the interplay (or lack thereof) between the Prior Knowledge Exclusion and the Reasonable Inquiry Provision. Both have cogently explained why their constructions achieve rational ends. The Court is mindful that, at this early stage, it has not yet received in-depth briefing on this point, the parties have not engaged in discovery, and, to the extent extrinsic evidence may prove relevant, as XL suggests it may, *see* note 11, *supra*, the parties have not had the opportunity to bring it to bear. With those qualifications, the Court's determination is that the Insureds have raised a "sufficiently serious claim" on the merits of contractual ambiguity—*i.e.*, whether the Exclusion applies—"to make [the merits] a fair ground for litigation." *Citigroup Global Mkts., Inc.*, 598 F.3d at 35. Thus, although XL has advanced a reasonable argument in favor of its construction of the Policy, at this stage, the Court is not prepared to say that it is the only reasonable one.

In reviewing the parties' textual arguments, the Court examines the Reasonable Inquiry Provision first. XL has argued that that Provision and the signatory's attestation to it are devoid of legal force. Rather, XL argues, the Provision and attestation merely exist to give "comfort" to the insurer "that we are dealing with a serious prospective insured out there." Hg. Tr. 50. The

---

[13] *See also Gorman v. Consol. Edison Corp.*, 488 F.3d 586, 596 n.9 (2d Cir. 2007) ("canons of construction forbid contractual interpretations that lead to absurd results"); *Bank Julius Baer & Co. v. Waxfield Ltd.*, 424 F.3d 278, 283 (2d Cir. 2005); *Vector Capital Corp. v. Ness Techs. Inc.*, No. 11-cv-6259, 2012 U.S. Dist. LEXIS 36847, at *8-9 (S.D.N.Y. Mar. 16, 2012) (under New York law, "a court should not interpret a contract in a manner that would be absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties") (internal quotation marks omitted); *Bank of N.Y. Trust, N.A. v. Franklin Advisers, Inc.*, 674 F. Supp. 2d 458, 463–64 (S.D.N.Y. 2009) ("[A]n interpretation that gives a reasonable and effective meaning to all of a contract is generally preferred to one that leaves a part unreasonable or of no effect.").

[32]

Court disagrees.  There is good reason to view the Provision and attestation as a meaningful part of the Application, not an idle collection of words of mere "comfort" to the insurer.  Hg. Tr. 50. The Provision does not say that it is merely precatory.  And the context suggests otherwise.  The Provision and attestation are part of the insured entity's Application; and, according to XL's General Terms and Conditions, the Application "form[s] part of this Policy."  *See* Naunton Decl. Ex. A, at p. 21 (General Terms and Conditions, at I(A)(1)).  The Provision also occupies a prominent place in the Application:  It follows the final question which the applicant must answer (Question 9); the attestation to it is the first attestation listed; and the Provision is followed by others with obvious legal consequence (*e.g.*, the applicant's acknowledgments as to the calculation of liability limits and the definition of "claims made").  *See id.* Ex. C, at p. 3. Further, the Reasonable Inquiry Provision is presented entirely in boldface and capital letters.[14] Given its placement and presentation, a reader would reasonably regard the Provision and accompanying attestation as consequential.

XL's contrary claim that the Provision is irrelevant is in tension with the principle that, in interpreting a contract, courts seek to give "[e]ffect and meaning . . . to every term of the contract, and reasonable effort must be made to harmonize all of its terms."  *Reda v. Eastman Kodak Co.*, 233 A.D.2d 914, 915 (4th Dep't 1996) (citing *Facet Indus., Inc. v. Wright*, 95 A.D.2d 262, 265 (1st Dep't 1983), *rev'd on other grounds*, 62 N.Y.2d 769 (1984)); *see also India.com, Inc. v. Dalal*, 412 F.3d 315, 323 (2d Cir. 2005).  As the New York Court of Appeals has put the point:  "An insurance contract should not be read so that some provisions are rendered meaningless."  *Cnty. of Columbia v. Cont'l Ins. Co.*, 83 N.Y.2d 618, 628 (1994); *see also Vassar Coll. v Diamond State Ins. Co.*, 84 A.D.3d 942, 945 (2d Dep't 2011); *Simplexdiam, Inc. v.*

---

[14] By contrast, the Prior Knowledge Exclusion is in boldface, but is not capitalized.  Question 8.b is neither.

*Brockbank*, 283 A.D.2d 34, 38 (1st Dep't 2001); *Bank of N.Y.*, 607 F.3d at 914 (court must view particular terms from the perspective of one who "has examined the context of the entire integrated agreement").

The Court turns, then to the issue of whether the Provision informs the meaning of the Prior Knowledge Exclusion.  There is a strong argument that it does.  The Provision requires the signatory, "after reasonable inquiry," to declare, as to the Application, that "the statements herein are true and complete."  The Exclusion, which is part of the Application, contains such a "statement" by the signatory:  In response to Question 8.b, the signatory states, "yes" or "no," whether any person proposed for the insurance was "aware of any fact, circumstance, or situation" that could give rise to a claim.  Textually, it is, therefore, reasonable to regard the answer to Question 8.b not as an omniscient statement that no proposed insured knew of a disqualifying "fact, circumstance, or situation."  Rather, as the Insureds posit, the signatory's answer is, logically, bounded by the signatory's knowledge after conducting a "reasonable inquiry."  That construction jibes with common sense:  After all, to what more can the signatory fairly be expected to attest?

XL counters this reading by arguing that, even if the Reasonable Inquiry Provision informs the Exclusion, a clause in the Provision supports XL's view that the knowledge of all proposed insureds, even if concealed from the corporate signatory, is "required to be disclosed." XL notes that the Provision states that "to the best of their knowledge and belief," the statements in the Application are "true and complete."  XL argues that "their" must refer to *all* of the proposed insureds, and argues that the signatory is thereby attesting, omnisciently, that each proposed insured knows of no fact or  circumstance on which a claim could be made.  The Insureds counter that the clause, in totality, is properly read to reflect the signatory's knowledge

[34]

after his due diligence inquiry.  This is so either because the word "their" refers only to the signatory,[15] or, more persuasively in the Court's view, because, even if "their" refers to the proposed insureds, the immediately ensuing phrase, "after reasonable inquiry," necessarily limits the meaning of the attestation to the awareness of the proposed insureds' "knowledge and belief" which the *signatory* possessed following that inquiry.  In the Court's view, the parties' respective attempts to harmonize (1) a clause ("required to be disclosed") that is not self-defining and (2) the awkwardly-phrased Provision and attestation are each plausible.  Neither party's construction is clearly correct or incorrect.

Turning to the language of the Exclusion, XL is certainly correct that, even if the answer to Question 8.b on the Application reflects only the signatory's subjective awareness, it does not necessarily follow that the Exclusion that immediately follows the answer is similarly bounded. The clause "required to be disclosed," can reasonably be read to mean (as XL urges) "required to be disclosed by the proposed insured to the attesting signatory."  On that reading, the Exclusion would bar coverage here. But that clause can also reasonably be read to mean (as the Insureds urge) "required to be disclosed by the applicant, as personified by the attesting signatory, in

---

[15] In arguing that "their" may refer to the signatory, not the proposed insureds, the Insureds note that, although historically used to refer to plural entities, "their" increasingly has been pressed into use as a gender-neutral singular pronoun.  This is especially so in contexts, like form documents, in which the gender of the future referent is unknowable in advance.  Insureds Reply 4–5; *see also* Oxford English Dictionary, *available at* http://www.oed.com/view/Entry/200 291?redirectedFrom=their#eid (last visited June 12, 2012) (stating, of the pronoun "their": "Often used in relation to a singular n[oun] or pronoun denoting a person . . . Also so used instead of 'his or her', when the gender is inclusive or uncertain."); Free Merriam-Webster Dictionary, *available at* http://www.merriam-webster.com/dictionary/their?show=0&t=1337206 803 (last visited June 12, 2012) (defining "their" as "his or her: his, her, its—used with an indefinite third person singular antecedent.").  *See Barney Greengrass, Inc. v. Lumbermens Mut. Cas. Co.*, 445 F. App'x 411, 414 (2d Cir. 2011) (summ. order) ("Under New York law, insurance policies are read in light of 'common speech' and the reasonable expectations of a businessperson.") (quoting *Belt Painting Corp. v. TIG Ins. Co.*, 100 N.Y.2d 377, 383 (2003)); *see also Ace Wire & Cable Co. v. Aetna Cas. & Sur. Co.*, 60 N.Y.2d 390, 398 (1983).

response to Question 8.b." On that reading, the Exclusion would not be triggered here. The text of the Exclusion simply does not rule out the Insurers' construction, although it would have been easy for XL to draft such an exclusion.[16] And, as noted, under New York law, where more than one plausible construction exists as to an exclusion, that ambiguity must be resolved in favor of the insured and a narrower exclusion. *See, e.g.*, *White*, 9 N.Y.3d at 267; *Woodhams*, 748 F. Supp. 2d at 218.

The Court, finally, examines whether either proposed construction of the Exclusion leads to an "absurd" or irrational outcome, so as to be inconsistent with the parties' presumed intent. *See World Trade Ctr. Props., L.L.C.,* 345 F.3d at 184. Neither construction fails under this standard.

The Insureds are correct that XL's construction would put insureds in jeopardy of losing the insurance protection for which they bargained, because they could, as here, suddenly lose their professional liability coverage deep into a litigation if it later came to light that a renegade employee had once engaged in (but never disclosed) misconduct that gave rise to the litigation. Insureds' Br. 7 ("XL's position is that if anyone insured under a policy like the one at issue here—even a secretary in a corporation with thousands of employees—knows of facts that might give rise to a valid claim, then coverage is barred for all other insureds even though none of them knew, should have known, or even *could* have known such facts.").[17] And, under the Insureds'

---

[16] The key is to delete the confusing clause "required to be disclosed." For example: "Any claim arising from facts or circumstances known to any person proposed to be insured, whether or not that knowledge is shared by any other person proposed to be insured, is excluded from coverage for all insureds." *See* Hg. Tr. 43.

[17] At argument, Level Global's counsel represented that between 60 and 70 individuals at Level Global are covered by the Policy. Hg. Tr. 45.

construction, an insurer could still (on other grounds) exclude a malefactor, such as Adondakis, from coverage. The Insureds' construction thus clearly realizes a rational outcome.

On the other hand, as cases like *Gluck*, *MDL Capital Management*, and *Shapiro* hold, valid purposes can be served by prior knowledge exclusions, and they are not inherently against public policy. These cases explain that such exclusions are simply a "bargained for" method of limiting the insurer's exposure based on pre-Policy events, *Gluck*, 680 F. Supp. 2d at 418, and that, while their operation may seem draconian in certain circumstances, "there is nothing unconscionable or inequitable about [an] exclusionary clause [ . . . ] contained in [a] contract," just as "there is no legal barrier to the making of contracts of insurance that would protect innocent insureds against loss of coverage because of the fraud of another." *Shapiro*, 584 F. Supp. at 1253. Other cases have similarly upheld clearly-worded prior knowledge exclusions. *See, e.g.*, *XL Specialty Ins. Co. v. Agoglia*, Nos. 08-cv-3821 et al., 2009 U.S. Dist. LEXIS 36601 (S.D.N.Y. Mar. 2, 2009), *aff'd sub nom Murphy v. Allied World Assur. Co. (U.S.)*, 370 F. App'x 193 (2d Cir. 2010) (summary order). Thus, XL's construction cannot be condemned, either, as yielding an absurd result or one contrary to public policy.[18]

---

[18] To be sure, XL overstates its case in arguing that the Prior Knowledge Exclusion here was necessary to accomplish its goal of insuring only against "fortuitous losses," as opposed to losses based on circumstances that predate the Policy. *See* Hg. Tr. 48; XL's Br. 9–11. The same goal can be achieved, more cleanly, by a "prior acts" exclusion, on which exclusion is triggered by revelation of pre-Application events or misconduct, rather than revelation of any insureds' knowledge. Such exclusions are clearly permissible. *See Axis Reinsurance Co. v. Bennett*, Nos. 07-cv-7924, 08-cv-3242, 2008 U.S. Dist. LEXIS 47697, at *52–54 (S.D.N.Y. June 18, 2008) (Lynch, J.); *Champlain Enters. v. Chubb Custom Ins. Co.*, 316 F. Supp. 2d 123, 127–29 (N.D.N.Y. 2003); *Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, No. 98-cv-6454, 1999 U.S. Dist. LEXIS 22462, at *2–4 (S.D.N.Y. Nov. 20, 1999). And the Prior Knowledge Exclusion here only partially achieves XL's stated goal of not insuring against claims based on pre-application events. The Exclusion would not apply, for example, if the only persons who knew the "fact" or "circumstance" giving rise to a potential claim were not among those "proposed for insurance." *See, e.g.*, Hg. Tr. 55–56 (conceding that Exclusion would not be triggered if the person who had

For the above reasons, the Court holds that the Insureds have demonstrated that there are sufficiently serious claims going to the merits on the question of whether the Prior Knowledge Exclusion in XL's Policy is ambiguous as applied here.[19]

### E.    Does XL Have A Duty to Advance Defense Costs Prior to a Final Ruling?

In an alternative argument, Level Global asserts that, even if it cannot justify preliminary relief based on its claim of ambiguity as to the Exclusion, an injunction is merited because XL has a duty to advance defense costs until a court has decided with finality that there is no coverage.  Insureds' Br. 20–23; Insureds' Reply 8–9.

The Insureds' broad argument that an insurer has an invariable duty under New York law to advance defense costs pending resolution of a dispute the applicability of an exclusion is unconvincing.  There is indeed a line of cases requiring an insurer, unless the policy language is to the contrary, to advance defense costs until the insurer's attempt to *rescind* a policy has been

_____

previously been aware of the problematic fact or circumstance was deceased at the time the policy was issued).

[19]  The Court is unpersuaded by the Insureds' alternative argument that Condition K renders the Policy ambiguous as applied.  In asserting that the Prior Knowledge Exclusion excludes the Government Actions, XL has not imputed the knowledge of one insured to another, as Condition K prohibits.  Instead, XL is claiming that, under the language of that Exclusion, Adondakis's knowledge alone operates to exclude the Government Actions.  Further, on its face, Condition K is addressed to XL's right to rescind based on falsehoods or inaccuracies in the application, not to Policy exclusions.  Condition K states that the Policy was "issued in reliance of the truth" of Level Global's representation "that the statements and particulars contained in the Application are true, accurate and complete"; it addresses XL's right to "void," *i.e.*, rescind, the Policy based on untruthful statements in the Application.  In that context, Condition K protects against rescission those Insureds who were unaware of untruths or inaccuracies in the Application, by limiting rescission to "Insureds who had actual knowledge of the untruth [or] in any material respect knew of such untruth."  *See Am. Int'l Specialty Life Ins. Co. v. Towers Fin. Corp.,* No. 94-cv-2727. 1997 U.S. Dist. LEXIS 22610, at *33–34 (S.D.N.Y. Sept. 12, 1997); *Wedtech,* 740 F. Supp. at 218; *cf. In re HealthSouth*, 308 F. Supp. 2d at 1284–85; *Agoglia,* 2009 U.S. Dist. LEXIS 36601, at *40–42.  XL has not sought to rescind the Policy here as to the Insureds, and assuming *arguendo* as the parties have that the defendant Insureds were all unaware of Adondakis's crimes at the time of the Application, Condition K would bar XL from doing so.

adjudicated to conclusion.  *See, e.g.*, *Worldcom*, 354 F. Supp. 2d at 463 (collecting cases); *Wedtech*, 740 F. Supp. at 221.  However, the Court has not located comparable authority setting out a background norm of mandatory advancement where the parties dispute not the existence of a binding policy but whether a particular claim is covered, as opposed to excluded, under it.  On the contrary, many cases hold, or state, that advancement is required only when a claim is covered, *see, e.g.*, *Kozlowski*, 18 A.D.3d at 42 (citing *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Ambassador Grp.*, 157 A.D.2d 293 (1st Dep't 1990), *lv. dismissed*, 77 N.Y.2d 873 (1991)), and that is, of course, the subject of the dispute here.

      This distinction is important.  As the *Worldcom* court aptly explained, where an insurer pursues the dramatic remedy of voiding a contract *ab initio*, it is appropriate that advancement continue until a neutral arbiter has resolved this dispute.  *See* 354 F. Supp. 2d at 463.  But the calculus is different when an insurer's basis for non-payment is that a claim is not covered by its policy.  Mandating advancement while even dubious assertions of coverage are resolved would invite abuse.  It would permit an insured to gain advancement, potentially for many months, of his or her costs in an underlying proceeding, until a court resolved claims as to coverage.  This would be so even where the insured's claim to coverage was sketchy or even risible.

      Imagine, for example, that in this case, Adondakis had sought advancement of the legal fees he has incurred following his guilty plea in the criminal case against him.  (He has not.)  Had XL disputed a duty to cover Adondakis based on the Prior Knowledge Exclusion, under the Insureds' argument, Adondakis would have had the right to advancement pending a dispositive court ruling.  The insurer in such circumstances would not have any assurance that it would later be able to claw back the costs it advanced to such an undeserving putative insured.  XL is quite correct that such a rule of law would serve only to drive up the costs of insurance, by forcing

[39]

insurers to internalize the cost to them of a materially increased volume of coverage litigation. Hg. Tr. 58–59.  The contrary rule does not leave an insured at the insurer's mercy.  Instead, it puts the onus on an insured who believes the insurer is disclaiming it in error, to seek relief, based on a credible claim of coverage, as the Insureds have done here.

The two cases on which the Insureds principally rely are not to the contrary.  In *Kozlowski*, the First Department substantially affirmed a judgment compelling the insurer to advance funds to pay for Kozlowski's defense.  As the Insureds note, the court there stated that insurers are "required to make contemporaneous interim advances of defense expenses where coverage is disputed, subject to recoupment in the event it is ultimately determined no coverage was afforded."  18 A.D.3d at 42.  Notwithstanding this broad language, however, *Kozlowski* does not stand for the proposition that there is invariably a duty to advance funds where coverage is disputed.  Rather, as the court emphasized, Kozlowski's conduct spanned "both excluded and covered behavior," and it was not possible to allocate defense costs, during the litigation, as between these "intertwined" categories.  *Id.* at 41.  "Since this allocation cannot be made at this juncture," the court held, the insurer was required to "pay all defense costs as incurred, subject to recoupment when Kozlowski's liabilities, if any, are determined."  *Id.* at 42.

Although *Rigas* presents a closer question, it, too, is not determinative.  First, the issue there was governed by Pennsylvania, not New York, law.[20]  *See* 382 F. Supp. 2d at 692.  Second, the *Rigas* court relied substantially on language in the particular knowledge exclusion at issue, which, the court held, "could reasonably be read" to mean that the exclusion would "not . . .

_____

[20] Although the Policy here does not have an express choice of law provision, it references New York law in various places, *see, e.g.*, Naunton Decl. Ex. A at p. 2 (stating that policy forms "meet the minimum standards of the New York Insurance Law"), and the parties have treated the Policy as governed by New York law.

operate until it is judicially determined" that the exclusion applied. *Id.* at 699.  This ambiguity in the policy language was required to be read in favor of the insureds. *See id.* at 701 ("if an insurer wants the unilateral right to refuse a payment called for in the policy, the policy should clearly state that right").  Third, *Rigas* arose in a quirky procedural posture.  As the court noted several times, the insureds were covered by a potentially-lengthy bankruptcy stay, which was likely to prevent the court, until after the insureds' criminal trial was over, from adjudicating with finality whether the exclusion applied. *See id.* at 700.  The court noted, as a "public policy factor," that the insureds were presumed innocent in that case, *id.*, and this consideration appears to have been relevant to its analysis.

The Court is also unpersuaded by the Insureds' argument that their exclusion in this case is tantamount to rescinding the Policy, because, during the Policy's pendency, Level Global made no other claims on XL.  The happenstance of whether unrelated claims were made on the Policy is irrelevant to the Insureds' rights in this case.  The exclusion vs. rescission calculation turns instead on the insurer's stated basis for denying coverage, and here, XL relies exclusively on the Exclusion in the Policy.

Finally, the Court notes, the Insureds have not pointed to language in the Policy that would support, or at least arguably support, their claim of a duty to advance pending a judicial determination of whether the Exclusion applies. *See Rigas*, 382 F. Supp. 2d at 692; *Axis Reinsurance Co.*, 2008 U.S. Dist. LEXIS 53921, at *5–10.

### F.     Does XL Have A Duty, Based on the Insureds' Reliance, to Reimburse Defense Costs Which the Insureds Incurred Before March 5, 2012?

Notwithstanding its conclusion that there is no broad duty to advance costs while the applicability of an exclusion is litigated, the Insureds may have a separate, much narrower, claim available to them, based on the events in this case.  The outlines of this claim emerged at the

hearing in this case.  If valid, it would entitle the Insureds to advancement of either all or part of the sum remaining to be advanced on the XL Policy.

As it acknowledged at argument, XL learned of Adondakis's guilty plea "within a couple of days" of its being unsealed (January 18, 2012).  It appears, however, that at no point between then and March 5, 2012, more than six weeks later, did XL even notify the Insureds that it was considering invoking the Exclusion, even though, by its own account, XL was, from that point forward, actively doing so.  Hg. Tr. 62–64; *id.* at 80.[21]

During this interim period, the Insureds doubtless incurred substantial defense costs. Importantly, these would have included Anthony Chiasson's defense costs during the possibly-pivotal first six-plus weeks of his defense of the Criminal Action, filed contemporaneously with the unsealing of Adondakis's guilty plea, and his and Level Global's defense costs in the SEC Action, filed the same day.  Although the record does not address this issue, it is reasonable to assume that, during this six-week period, XL well knew or appreciated that the Insureds were incurring significant defense costs on the Government Actions, and that Chiasson in particular was mobilizing his defense at a critical juncture.  The parties agree that the defense expenses which the Insureds had collectively accrued on the Government Actions as of March 5, 2012, but which XL has not advanced, exceed the approximately $2.7 million remaining on XL's Policy. Hg. Tr. 9–11, 64.  The record does not reflect the total amount of unpaid defense expenses accrued as of March 5, 2012, nor the amount of such expenses accrued (1) through January 18,

---

[21]  XL has not explained why it did not notify the Insureds of a possible disclaimer of coverage during this period.  At argument, counsel for XL stated that it experienced difficulty obtaining Adondakis's plea allocution from the Clerk of Court, but that, despite knowing the name of the assigned prosecutor from the outset, it did not call the USAO to obtain the allocution until "early to mid-February."  Hg. Tr. 62–63.

2012, when Adondakis's guilty plea became public; and (2) between January 18, 2012 and March 5, 2012.  *See* Hg. Tr. 80.

Under these circumstances, the Insureds may well have a substantial claim, based on detrimental reliance on XL, for advancement of the Insureds' defense costs incurred either (1) up until March 5, 2012, or, more narrowly, (2) between January 18, 2012, and March 5, 2012.  Such a claim might conceivably be based on, *inter alia*, general principles of promissory estoppel or principles specific to insurance law.[22]  Conceivably, the Insureds may also have a claim to the same end based on the language of the Agreement.[23]

It is premature for the Court to resolve this claim.  The parties did not brief it.  Nor have they presented the Court with agreed-upon potentially relevant facts, or, alternatively, taken relevant discovery.

---

[22] In the context in which an insurer provides a defense to the insured, under New York law, the insurer may be estopped from disclaiming coverage where it has unreasonably delayed in doing so, and where that delay has prejudiced the insured.  "As a general rule, where an insurer defends an action on behalf of its insured with knowledge of a defense to the coverage, it is thereafter estopped from asserting that the policy does not cover the claim."  *Nat'l Indem. Co. v. Ryder Truck Rental*, 230 A.D.2d 720, 721 (2d Dep't 1996) (citation omitted).  "The recognition of such an estoppel has as its basis the detrimental reliance suffered by the insured in the loss of the right to control its own defense."  *Id.*; *see also Yoda, LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 88 A.D.3d 506, 508 (1st Dep't 2011); *Topliffe v. U.S. Art Co., Inc.*, 40 A.D.3d 967, 970 (2d Dep't 2007); *Federated Dep't Stores, Inc. v. Twin City Fire Ins. Co.*, 28 A.D.3d 32, 39 (1st Dep't 2006); *cf. Phila. Indem. Ins. Co. v. City of New York*, No. 09-cv-10432, 2011 U.S. Dist. LEXIS 31318, at *22 (S.D.N.Y. Mar. 24, 2011).  Under this line of cases, the "prejudice" required to estop an insurer from disclaiming may be found where "the insurer's control of the defense [was] such that the character and strategy of the lawsuit can no longer be altered."  *Yoda, LLC*, 88 A.D.3d at 508; *Federated Dep't Stores*, 28 A.D.3d at 39.  The role of XL here is plainly more limited than in these cases (funding of defense costs, not provision of a defense).  So, too, however, is the relief sought by the Insureds (repayment of defense costs incurred in reliance on the expectation of coverage).

[23] *Cf. Axis Reinsurance Co.*, 2008 U.S. Dist. LEXIS 53921, at *15–16 (quoting *Rigas*, 382 F. Supp. 2d at 701) ("if an insurer 'wants the unilateral right to refuse a payment called for in the policy, the policy should clearly state that right'").

In the event that XL elects not to appeal the Court's Order mandating advancement, there will be no occasion to address this claim at this time.  If, however, an appeal of that Order is to be taken, it is proper and efficient that this claim be resolved expeditiously, so that the Court's order with respect to them can be subject to the same appeal.

The Court, accordingly, directs the parties to meet and confer within five days of the date of this Order, to (1) identify agreed-upon assumed facts relevant to this claim, or, failing agreement, identify discovery to be taken forthwith on relevant factual issues that are disputed; and (2) set a schedule for briefing on these discrete issues, under which all briefing is to be completed within 21 days of the date of this Order.  If this issue is to be litigated, the parties are directed to submit to the Court a proposed Order addressing discovery and briefing as soon as possible, and in all events, within 10 days of the date of this Order.

## III.    Security Bond

Federal Rule of Civil Procedure 65(c) provides: "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  This Rule "'thus allows a preliminary injunction to become effective only upon the applicant's posting of an amount that the district court determines adequate.'"  *Worldcom*, 354 F. Supp. 2d at 469 (quoting *Corning Inc. v. PicVue Electronics, Ltd.*, 365 F.3d 156, 158 (2d Cir. 2002)).  However, it is in the discretion of the district court to decide that, under the circumstances, no security is required.  *Worldcom*, 354 F. Supp. 2d at 469; *see also ASA v. Pictometry Int'l Corp.*, 757 F. Supp. 2d 238, 247 (W.D.N.Y. 2010); *Rex Medical L.P. v. Angiotech Pharms. (US), Inc.*, 754 F. Supp. 2d 616, 626 (S.D.N.Y. 2010).

[44]

XL has requested that, if the Insureds are granted advancement of defense costs pending resolution of XL's declaratory judgment action, they be compelled to post a security bond for such costs. The Court denies this request. Advancing defense costs does not place an undue hardship on XL, because its liability is capped under the Policy at the remaining $2.7 million. In addition, the Policy requires defense costs to be repaid if the Insureds are ultimately not entitled to such payments, and XL is at liberty, upon such a determination, to pursue repayment from the individual Insureds as well as Level Global. *See Worldcom*, 354 F. Supp. 2d at 469.[24] Finally, the posting of a security bond, and the attendant dislocations of doing so, would undermine the very protection that XL's professional liability policy offered to the Insureds, particularly the individual Insureds, when they purchased that Policy. *Cf. Worldcom*, 354 F. Supp. 2d at 470 (declining to order insured to post a bond for a preliminary injunction); *Pendergest-Holt v. Certain Underwriters at Lloyd's of London*, 681 F. Supp. 2d 816, 835 (S.D. Tex. 2010) (same).

## CONCLUSION

For the foregoing reasons, the Insureds' motion for a preliminary injunction is granted. XL is ordered to resume the advancement of defense costs. To permit XL the opportunity to consider its appellate options, however, this Order will be stayed for 14 days, after which point, barring further order of this Court, this stay will terminate. The Clerk of Court is directed to terminate the motion at docket number 4.

As noted in § II.F of this Order, the Court has identified a potential alternative ground for relief, based on what may have been the Insureds' detrimental reliance on XL. The Court directs counsel to meet and confer, on the schedule it has set forth herein, with respect to (1) developing

---

[24] Because Level Global is presently in runoff, to the extent XL might seek to recoup the outlays made to XL as opposed to individual Insureds, XL might need to pursue Level Global's partners individually. Hg. Tr. 20.

[45]

the facts needed to resolve the issues relevant to this alternative ground, and (2) setting an expedited briefing schedule, consistent with the dates set forth herein. *See* pp. 42–44, *supra.* However, if XL decides not to appeal, there will be no need for expedited attention to these issues.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: June 13, 2012
       New York, New York

[46]